

Philip R. Forlenza
Erik Haas
Muhammad U. Faridi
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222
pforlenza@pbwt.com
ehaas@pbwt.com

*Attorneys for Assured Guaranty Corp.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ASSURED GUARANTY CORP.,                    :

                                           No. 10 Civ. _____

                    Plaintiff,             :

        - against -                        :

                                                   **COMPLAINT**
EMC MORTGAGE CORPORATION,                   :

                    Defendant.             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


        Plaintiff Assured Guaranty Corp. ("Assured"), by and through its attorneys,

Patterson Belknap Webb & Tyler LLP, for its complaint against defendant EMC Mortgage

Corporation ("EMC") hereby alleges as follows:

## NATURE OF THE ACTION

        1.      Assured, a monoline insurance company, brings this action against

JPMorgan Chase & Co. affiliate EMC, a sponsor of residential mortgage-backed securitization

transactions, to address EMC's material and pervasive breaches of its agreement with Assured

relating to a securitization transaction that Assured insured. Acting at the direction of its parent

The Bear Stearns Companies, Inc. and in concert with its affiliate Bear, Stearns & Co, Inc.
(together, "Bear Stearns"), EMC effectuated the securitization at issue by conveying mortgage
loans to a trust, which in turn issued to investors securities that were to be paid down by the
promised cash flows from the loans.  To induce investors to purchase these securities, and to
induce Assured to guarantee to these investors their receipt of certain specified payments on
some of these securities, EMC made specific representations and warranties about, among other
things, the origination and attributes of the securitized loans.  By this negotiated contractual
arrangement between sophisticated parties, EMC agreed to accept the risk of loss in the event
that its representations and warranties turned out to be untrue, while Assured assumed the risk
that the pool of mortgage loans *conforming to EMC's representations and warranties* would not
perform as expected.  But after securing the benefit of its bargain, EMC now seeks to walk away
from its explicit contractual representations and commitments as its pervasive breaches come to
light.

2.     Specifically, this breach of contract action arises from EMC's material and
pervasive breaches of the unambiguous terms and fundamental premise of its agreement with
Assured governing a residential mortgage-backed securitization transaction known as SACO I
Trust 2005-GP1 (the "Transaction").

3.     EMC made two types of representations and warranties to induce Assured
to issue its financial guaranty insurance policy: (i) representations and warranties regarding the
individual loans securitized in the Transaction ("Loan Level Representations"), and (ii)
representations and warranties regarding the accuracy of information that EMC and its affiliates
had provided to Assured, investors, and rating agencies concerning, among other things, the
origination and underwriting practices of GreenPoint Mortgage Funding, Inc. ("GreenPoint"),

2

the originator of the loans at issue in the Transaction ("Transaction Level Representations"). Both types of representations and warranties were critical to Assured's assessment of the risk of insuring the securities issued in the Transaction, and both were fundamentally false.

4.       In its Loan Level Representations, EMC made numerous express representations and warranties concerning the key attributes of the specific mortgage loans that "backed" the securities issued in the Transaction. EMC represented and warranted, among other things, that (i) the loans were *not* originated through improper means (*e.g.*, fraud, error, omission, misrepresentation, negligence, or similar occurrence on the part of any person, including the borrower), (ii) the loans were originated in accordance with GreenPoint's underwriting guidelines, and (iii) the information that EMC and its affiliates disclosed for each loan was true and correct. These specific Loan Level Representations were designed to allow Assured to assess the economic risk that the loans *bearing the attributes that EMC represented and warranted* would not perform after the closing of the Transaction as Assured had projected. This was the bargained-for risk that Assured insured.

5.       In its Transaction Level Representations, EMC represented and warranted, among other things, that all of the disclosures made in the offering documents used to market the securities – including disclosures about the pool-wide characteristics and attributes of the securitized loan portfolio, as well as GreenPoint's underwriting practices – were not false or misleading. The quality of the securitized loan portfolio, and the likelihood that the securitized loans would perform in a manner consistent with their represented attributes, depended directly on GreenPoint's underwriting practices. These broad representations and warranties therefore were fundamental to the parties' agreement.

3

6.      Reflecting the centrality of the representations and warranties to the

parties' bargain, EMC expressly agreed that Assured is entitled to pursue any remedy at law or in

equity to address a breach by EMC.  In addition, to afford Assured an expedited remedy for

breaches of EMC's Loan Level Representations, EMC expressly agreed to cure or repurchase

each breaching loan identified within 90 days of being presented with notice of, or its discovery

of, the breach.  EMC's commitment to cure or repurchase individual defective loans was

intended to address the aberrant breaching loan, not to be an alternative to EMC's obligation to

make accurate and truthful representations and warranties.  The contemplated and bargained-for

agreement called for EMC to transfer to the trust loans that complied with its representations and

warranties in exchange for Assured's irrevocable insurance policy.  As recent analysis of the

loans has demonstrated, however, EMC gutted this bargain and materially breached the parties'

agreement by transferring to the trust a mortgage loan pool that was replete with loans that did

not bear the attributes that EMC had clearly and unambiguously represented and warranted they

bore.

7.      In early 2009, Assured hired third-party consultants to review the

documentation pertaining to an initial sample of 430 defaulted loans with an aggregate principal

balance of approximately $28.2 million for compliance with EMC's representations and

warranties.  This review uncovered widespread breaches of EMC's representations and

warranties in over 88% of the loans examined, with an aggregate principal balance of

approximately $25.1 million.  As a result, beginning in August 2009 Assured repeatedly asked

4

EMC to comply with its contractual obligation to repurchase or cure the breaching loans identified. EMC refused to do so.[1]

8.      Similarly, in early 2010, Assured's third-party consultants began reviewing the documentation pertaining to a second sample consisting of 476 defaulted loans, with an aggregate principal balance of approximately $29.6 million, for compliance with EMC's representations and warranties. This review uncovered widespread breaches of EMC's representations and warranties in over 92% of the loans examined, with an aggregate principal balance of approximately $27.7 million. As a result, on July 8, 2010 Assured asked EMC to comply with its contractual obligation to repurchase or cure these defective loans.

9.      Loss and delinquency patterns experienced by the Transaction have been consistent with these revelations. The loans that EMC securitized have defaulted at an extraordinary rate, resulting in significant write-offs and thereby requiring Assured to make significant payments under its insurance policy to investors holding the insured securities. As of June 25, 2010, less than five years after closing, the Transaction already has suffered more than $60 million in pool losses, resulting in more than $32 million in insurance claims paid by Assured. The dramatically poor loan performance corroborates Assured's findings that the *entire pool* of loans that EMC securitized in the Transaction is plagued by rampant fraud and an abdication of sound origination and underwriting practices.

10.      But, as noted, to induce Assured to participate in the Transaction, EMC expressly represented and warranted that such fraud and failings did not exist, and EMC assumed all risk of loss in the event that these representations and warranties proved untrue. EMC's

---

[1] With respect to six loans, EMC recently purported to "cure" missing-document breaches by asserting both that the missing documents were not required, and providing the missing documents. Assured is evaluating the adequacy of EMC's position and production as to these six loans.

5

representations and warranties (and its acceptance of the risk of loss if those representations and warranties proved untrue) were essential consideration for, and one of the preconditions to Assured's issuance of its insurance policy. Assured would not have issued its policy had it not received EMC's representations and warranties.

11.     EMC fundamentally frustrated the parties' bargain by its material and pervasive breaches of its representations and warranties, its contractual loan level repurchase obligation, and the parties' contract as a whole. EMC's breaches have inflicted and continue to inflict tremendous harm on Assured, including more than $32 million in claims that Assured has paid as of June 30, 2010 and potentially tens of millions of dollars more in claims that it may be required to pay in the future. Assured brings this action to address this harm and, among other things, to be placed in the position that it would have been in had it never entered into the Transaction.

## THE PARTIES

12.     Assured is a duly organized and validly existing Maryland corporation, which maintains its principal place of business in New York, New York, and is a provider of financial guaranty insurance.

13.     Upon information and belief, EMC is organized under the laws of the State of Delaware and its principal place of business is at 2780 Lake Vista Drive, Lewisville, Texas 75067. Upon information and belief, EMC is, or was at all relevant times herein, a wholly owned subsidiary of The Bear Stearns Companies, Inc. (now known as "The Bear Stearns Companies. LLC"), and an affiliate of Bear, Stearns & Co., Inc. (now known as "J.P. Morgan Securities, Inc.").

6

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of

interests and costs, and is between citizens of different states.

15.     This Court has personal jurisdiction over EMC, and venue in this judicial

district is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or

omissions giving rise to Assured's claims occurred, and EMC is currently subject to personal

jurisdiction, in the Southern District of New York. Specifically, in its agreement with Assured,

EMC irrevocably submitted to the "non-exclusive jurisdiction of the United States District Court

for the Southern District of New York."[2]  EMC also "waive[d] and agree[d] not to assert by way

of motion, as a defense or otherwise in any such suit, action or proceeding, any claim that it is

not personally subject to the jurisdiction of such court[], that the suit, action or proceeding is

brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or

that the related documents or the subject matter thereof may not be litigated in or by such

court[]."[3]

## BACKGROUND

## A.     Pending Proceedings against EMC concerning Transactions
         Effectuated by the "Bear Stearns Securitization Machine"

16.     Currently there are two actions pending before this District Court, and

another in a Texas state court, brought by monoline financial guarantors alleging that EMC –

---

[2] Insurance and Indemnity Agreement dated as of September 9, 2005 ("I&I Agreement") § 6.05(a). The parties to the I&I Agreement are Assured, as Insurer; EMC, as the Seller; Bear Stearns Asset Backed Securities I LLC, as the Depositor; SACO I Trust 2005-GP1, as Issuer; LaSalle Bank National Association, as the Master Servicer and Securities Administrator; and Citibank, N.A., as Indenture Trustee.

[3] *Id.*

acting at the direction of and in concert with its affiliates – committed material and pervasive breaches of its representations and warranties in connection with the securitization of residential mortgage loans.[4] *See Ambac Assurance Corp. v. EMC Mortg. Corp.*, No. 08-CV- 9464 (RMB) (S.D.N.Y.); *Syncora Guarantee, Inc. v. EMC Mortg. Corp.*, No. 09-CV-3106 (PAC) (S.D.N.Y.); *CIFG Assurance North America, Inc. v. EMC Mortg. Corp.*, No. 2009-30395-211 (Tex. Dist. Denton County). The *Syncora* action also involves mortgage loans purchased and securitized by EMC from the same originator, *i.e.*, GreenPoint, that originated the loans securitized by EMC in the Transaction.[5]

17. In addition to these recent monoline financial guarantor proceedings, the Federal Home Loan Bank of Seattle and the Federal Home Loan Bank of San Francisco recently brought actions against EMC affiliate Bear, Stearns & Co., Inc., among others, alleging that it made numerous untrue statements or omissions of material facts in relation to securitization of loans originated by GreenPoint, among other originators. *See Federal Home Loan Bank of Seattle v. Bear, Stearns & Co., Inc.*, No. 10-CV-151 (RSM) (W.D. Wa. June 10, 2010); *Federal Home Loan Bank of San Francisco v. Credit Suisse Securities (USA) LLC, et. al.*, No. CGC 10-

---

[4] EMC also recently was named as a defendant in another suit brought by a monoline financial guarantor for EMC's refusal, in contravention of the parties' Insurance and Indemnity Agreement, to provide the insurer with access to certain mortgage loan and financial information. *See Syncora Guarantee, Inc. v. EMC Mortg. Corp.*, No. 10-CV-749 (WHP) (S.D.N.Y. Feb. 1, 2010). Within just three months after the suit was brought, the Court ordered EMC to produce the requested documents. *See Order, Syncora*, No. 10-CV-749 (S.D.N.Y. Apr. 26, 2010).

[5] Like EMC, GreenPoint has been faced with a wave of litigation arising from its origination of defective mortgage loans. *See Steinmetz v. GreenPoint Mortgage Funding, Inc.*, No. 08-CV-5367 (S.D.N.Y. June 11, 2008); *Ferguson v. GreenPoint Mortg. Funding, Inc.*, No. 08-CV-60854 (S.D. Fla. June 5, 2008); *Lewis v. GreenPoint Mortg. Funding, Inc.*, No. 1:08-CV-567 (E.D. Va. June 3, 2008); *Ouziz v. GreenPoint Mortg. Funding, Inc..*, No. 3:08-CV-2201 (N.D. Cal. Apr. 29, 2008); *Perez v. GreenPoint Mortg. Funding, Inc..*, No. 5:08-CV-1972 (N.D. Cal. Apr. 15, 2008); *Ramirez v. GreenPoint Mortg. Funding, Inc.*, No. 3:08-CV-369 (N.D. Cal. Jan. 18, 2008); *Knapp v. GreenPoint Mortgage Funding, Inc.*, No. CIV 466080 (Cal. Super. Ct. Sept. 14, 2007); *Feinstein v. GreenPoint Mortg. Funding, Inc.*, No. 07-CV-1851 (E.D. Pa. May 7, 2007); *Bank of America, N.A. v. GreenPoint Mortg. Funding, Inc.*, No. 09-CV-71 (W.D.N.C. Feb. 26, 2009).

497840 (Cal. Super. Ct. June 10, 2010). In a similar action brought against EMC and its affiliates by investors who purchased securities from EMC-sponsored transactions, the plaintiffs allege that EMC and other originators, including GreenPoint, systematically disregarded underwriting and appraisal standards when issuing loans to borrowers. *See In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, No. 08-CV-8093 (LTS) (KNF) (S.D.N.Y. Feb. 19, 2010).

18.    The pleadings in these matters, which are incorporated by reference herein, allege that, from 2003 through 2007, Bear Stearns leveraged its reputation and network of affiliates to build a "securitization machine" that controlled every step in the mortgage-loan-securitization chain, including (i) originating loans and providing the financing for the origination of loans by other lenders, (ii) purchasing and servicing those loans, which provided the cash flow for the mortgage backed securities, (iii) underwriting the sale to investors of the mortgage-backed securities issued from the transactions, and (iv) management of hedge funds that Bear Stearns caused to buy the mortgage backed securities, which also repackaged these securities into other investment vehicles such as collateralized debt obligations and engaged in various hedging agreements in relation to these securities.

19.    The financial guarantors allege in the pending matters that EMC and its affiliates induced rating agencies to rate, monoline financial guarantors to insure, and investors to purchase the mortgaged backed securities issued through its securitization machine by making false representations and warranties pertaining, among other things, to its operations and the mortgage loans it securitized. By doing so, executives of EMC and its affiliates earned lucrative bonuses, while putting at risk the capital of its shareholders, the investors in its mortgaged backed securities, and the financial guarantors that insured those securities.

9

20.     EMC and its affiliates engaged in the same misconduct with respect to the Transaction at issue in this matter, which was executed in September 2005, at the height of EMC's and its affiliates' securitization operations.

**B.     The Transaction**

21.     The Transaction at issue is a securitization of home equity lines of credit ("HELOCs") that closed on September 9, 2005. As the Sponsor and Seller[6] of the Transaction, EMC pooled and securitized approximately 6,028 HELOCs, with an aggregate principal balance of approximately $346 million, that EMC had previously purchased from GreenPoint. These HELOCs in turn served as collateral for the public issuance of approximately $337 million in securities that were guaranteed by Assured.

22.     The Transaction was effectuated through the following series of agreements (the "Transaction Documents") executed by EMC and its affiliates. The Transaction Documents governed, among other things, the rights and obligations of the various parties with respect to the HELOCs and the securities that resulted from their securitization.

23.     EMC, acting as HELOC Seller, sold and assigned its entire interest in the HELOCs to its affiliate Bear Stearns Asset Backed Securities I LLC ("BSABS") pursuant to a Mortgage Loan Purchase Agreement dated as of September 9, 2005 ("MLPA"). Under the MLPA, EMC made numerous detailed representations and warranties concerning the HELOCs, the related mortgagors and the related mortgaged properties, and committed to specified remedies if those representations and warranties proved to be untrue.

---

[6] Capitalized terms used but not defined in this sentence and elsewhere in this Complaint shall have the meanings assigned to such terms in Section 1.01 of the I&I Agreement, and Appendix A to the Indenture dated as of September 9, 2005 among SACO I Trust 2005-GP1, as Issuer, Citibank, N.A., as Indenture Trustee, and LaSalle Bank National Association, as Securities Administrator (the "Indenture").

10

24.     BSABS, in turn, sold and assigned all its rights, title and interest in the

HELOCs to the SACO 1 Trust 2005-GP1 (the "Trust") pursuant to a Sale and Servicing

Agreement dated as of September 9, 2005 ("SSA"), including its sale and assignment to the

Trust of the remedies available to BSABS against EMC under the MLPA in the event that

EMC's representations and warranties in the MLPA proved untrue.[7]  Pursuant to the Indenture

and the SSA, the Trust simultaneously granted to the Indenture Trustee (*i.e.*, Citibank, N.A.) all

its rights, title and interest in and related to the HELOCs, and all its interest under the SSA, for

the benefit of the Noteholders and the Note Insurer (*i.e.*, Assured).[8]

25.     Under the Indenture, the Trust then issued five classes of Notes, including

the Class A-1 Notes and the Class M-1 Notes insured by Assured  (collectively, the "Insured

Notes"), which were registered with the U.S. Securities and Exchange Commission ("SEC").

These securities were underwritten and marketed to investors by Bear, Stearns & Co., Inc. by

means of the related Prospectus dated as of June 24, 2005 and Prospectus Supplement dated as of

August 31, 2005 (collectively, "ProSupp").  In order to enhance the credit rating and

marketability of the Insured Notes and its return on the Transaction, EMC and its affiliates

sought and obtained a financial guaranty insurance policy from Assured, which guaranteed to the

---

[7] Pursuant to a Servicing Agreement dated as of August 1, 2005, EMC and GMAC Mortgage Corporation ("GMAC") agreed that GMAC would service the HELOCs.  The Servicing Agreement was then assigned by EMC to the Trust pursuant to the Assignment, Assumption and Recognition Agreement dated as of September 9, 2005 ("AAR").  More specifically, pursuant to Section 1 of the AAR, EMC granted, transferred and assigned to the Trust all its rights, title and interest in and relating to the HELOCs, including those under the Servicing Agreement.  In Section 2 of the AAR, EMC made additional representations and warranties to the Trust, GMAC and Assured.  And in Section 5, EMC agreed to indemnify the Trust and Assured for any harm relating to the breaches of EMC's representations and warranties or covenants.  Finally, Section 14 provides that Assured "shall be considered a third party beneficiary to this AAR . . . entitled to all the related rights and benefits accruing to [Assured] as if it were a direct party to this AAR . . . ."

[8] *See* SSA §§ 2.01(a), 2.08.

11

holders of the Insured Notes their receipt of certain payments relating to the Insured Notes (the "Policy").

      26.    As a condition precedent to the Policy's issuance and as an inducement to Assured, EMC entered into the I&I Agreement with Assured, whereby, among other things, EMC and its affiliates made numerous representations and warranties to and for the benefit of Assured with respect to the Transaction, including that the representations and warranties made by EMC and its affiliates in the Operative Documents[9] were true and correct as of the closing date, and that each such representation and warranty was made "for the benefit of, [Assured] as if the same were set forth in full" therein, without limitation or restriction as to any recourse or remedy for breach thereof.[10] Under the I&I Agreement, EMC agreed to afford Assured any relief "existing at law or in equity" and to reimburse and indemnify Assured in full in the event that, among other things, EMC's representations and warranties proved to be untrue.[11] EMC, the Trust, and BSABS also agreed that they "shall be jointly and severally liable for all amounts due and payable to [Assured] hereunder by any such parties."[12]

      27.    Relying on EMC's and its affiliates' representations, warranties, disclosures, statements, covenants, and remedies contained in and encompassed by the I&I Agreement, the Indenture, the Underwriting Agreement dated as of August 31, 2005, the ProSupp, the MLPA, the AAR, and the SSA, Assured issued the Policy (Policy Number D-2005-69). Under the Policy, Assured agreed to insure that holders of the Insured Notes will receive,

---

[9] The I&I Agreement defines "Operative Documents" to include, among other documents, the I&I Agreement, the MLPA, and the SSA.

[10] See I&I Agreement § 2.01(m).

[11] See I&I Agreement §§ 3.03, 3.04 and 5.02(a)(iii).

[12] See I&I Agreement § 3.06.

amongst other things, certain payments of interest and principal with respect to the Insured Notes.

## C.    EMC's Representations and Warranties Reflect the Bargained-For Risk Allocation

28.    Each party assumed the risk and the burden consistent with its respective role in the Transaction. EMC, as the Sponsor and the Seller, assumed the risk and the burden of assessing the validity and accuracy of the characteristics and attributes which it represented and warranted the HELOCs conveyed to the Trust possessed (including that the loans were originated pursuant to the appropriate underwriting guidelines and were not fraudulently procured). Assured, as the Note Insurer, did not bear those burdens or risks. Instead, it bore the burden of evaluating whether a pool of loans composed of HELOCs *bearing the characteristics and attributes represented and warranted* by EMC would perform after the closing of the Transaction despite economic variables that might change after the closing.

29.    That was a reasoned risk allocation. Before and through the closing of the Transaction, EMC was in privity with GreenPoint with respect to the HELOCs "backing" the Notes. EMC purchased the HELOCs that it conveyed to the Trust from GreenPoint pursuant to a contract in which GreenPoint granted EMC representations and warranties concerning the HELOCs and agreed to repurchase HELOCs that did not conform with those representations and warranties. Pursuant to EMC's sales contract with GreenPoint, before and through the closing of the Transaction, EMC owned the HELOCs and possessed the related loan origination, credit and servicing files, which afforded it access to and control over information that is required to effectively evaluate the characteristics and attributes of these loans. To the extent that EMC identified defects in the HELOCs, it had the right before and through the closing of the Transaction to demand that GreenPoint repurchase the defective HELOCs. EMC thus had the

13

means before the closing of the Transaction to assess the quality of the HELOCs and had recourse back to GreenPoint in the event a defect was discovered.

30.     In contrast, as EMC and its affiliates knew, Assured (i) was not in privity with GreenPoint with respect to the HELOCs securitized in the Transaction, (ii) had not ever owned the HELOCs, (iii) did not and would not have access to the loan origination, credit and servicing files before the closing of the Transaction, and (iv) lacked direct recourse against GreenPoint with respect to the HELOCs.

31.     It therefore made sense for the sophisticated parties to agree, and they did agree, that: (i) EMC would bear the risk and the burden of assessing the validity and accuracy of the characteristics and attributes of the HELOCs conveyed to the Trust, and (ii) Assured would bear the burden of evaluating whether HELOCs *bearing these characteristics and attributes* would perform after the closing of the Transaction as it had projected.

32.     The representations, warranties, covenants, and remedies that EMC provided, and on which Assured relied, were the means by which the parties effectuated their reasoned and bargained-for risk allocation, and therefore, were one of the essential inducements for Assured to participate in the Transaction.

**D.     EMC's Loan Level Representations and Warranties in the MLPA**

33.     EMC made myriad representations and warranties in the MLPA regarding, among other things, the attributes of the HELOCs and the practices used to originate, underwrite, and service the HELOCs. As demonstrated by their number, scope, and particularity, these Loan Level Representations were designed to convey absolute confidence that EMC was standing behind the quality of the HELOCs and, specifically, accepting the risk of loss should any of the HELOCs be found to have been included in the Transaction in violation of any representation or

14

warranty. Among them, EMC represented and warranted as to each of the HELOCs in the pool

that:

- MLPA § 7(a): "[T]he information set forth in the Mortgage Loan Schedule on the Closing Date is complete, true and correct."

- MLPA § 7(j): "[N]o fraud, error, omission, misrepresentation, gross negligence or similar occurrence with respect to a Mortgage Loan has taken place on the part of any Person, including without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination or servicing of the Mortgage Loan."

- MLPA § 7(n): "Each loan at the time it was made complied in all material respects with applicable local, state, and federal laws, including, but not limited to, all applicable anti-predatory lending laws."

- MLPA § 7(w): "[T]here was no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and there was no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and the related Mortgage Loan Seller has not waived any default, breach, violation or event of acceleration."

- MLPA § 7(z): "The origination, servicing and collection practices with respect to each Mortgage Note and Mortgage including, the establishment, maintenance and servicing of the escrow accounts and escrow payments, if any, since origination, have been conducted in all respects in accordance with the terms of Mortgage note and in compliance with all applicable laws and regulations and, unless otherwise required by law or Fannie Mae/Freddie Mac standards, in accordance with the property, prudent, and customary practices in the mortgage origination and servicing business. . . ."

- MLPA § 7(ee): "The Mortgagor has received all disclosure materials required by applicable law with respect to making of the Mortgage Loan."

- MLPA § 7(jj): "Each Mortgage Loan at the time of origination was underwritten in general in accordance with guidelines not inconsistent with the guidelines set forth in the Prospectus

> Supplement and generally accepted credit underwriting guidelines."

- MLPA § (kk): "No error, omission, misrepresentation, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of either Mortgage Loan Seller or the related Originator."

34. To further assure the deal participants that the loans that EMC conveyed to

the Trust complied with these and other representations and warranties, EMC also committed in

the MLPA and the SSA that, should any of its Loan Level Representations prove untrue, EMC

would cure the breach(es) or repurchase the breaching loan(s).[13] To this end, Section 7 of the

MLPA provides, in pertinent part, as follows:

> Upon discovery or receipt of notice . . . of a breach of any representation or warranty of [EMC] set forth in this Section 7 which materially and adversely affects the value of the interests of [the parties] in any of the Mortgage Loans . . . , the party discovering or receiving notice of such breach shall give prompt written notice to the others. In the case of any such breach of a representation or warranty set forth in Section 7, within 90 days . . . [EMC] will (i) cure such breach in all material respects, [or] (ii) purchase the affected Mortgage Loan at the applicable Purchase Price . . .[14]

Section 2.03(b) of the SSA contains similar, but slightly broader, language:

> If [BSABS], the Securities Administrator, the Master Servicer, the Custodian, the [Trust], [Assured] or the Indenture Trustee discovers a breach of any of the representations and warranties set

---

[13] EMC committed to repurchase *or* substitute incurable breaching loans, but the substitution remedy only was available for two years after the September 9, 2005 closing date, and therefore, was no longer available to EMC as of August 17, 2009 (the date that Assured first gave notice to EMC of breaches of its representations and warranties) or thereafter. Assured therefore omits reference to the substitution remedy in this Complaint.

[14] The MLPA defines "Purchase Price" as "an amount equal to the sum of (i) 100% of the principal remaining unpaid on such Mortgage Loan as of the date of purchase (including if a foreclosure has already occurred, the principal balance of the related Mortgage Loan at the time the Mortgaged Property was acquired), (ii) accrued and unpaid interest thereon at the Mortgage Interest Rate through and including the last day of the month of purchase and (iii) any costs and damages (if any) incurred by the Trust in connection with any violation of the terms of such Mortgage Loan of any anti-predatory lending laws."

16

> forth in the [MLPA], which breach materially and adversely affects the value of the interests of the [Trust], the Noteholders, the Certificateholders, [Assured] or the Indenture Trustee in the related HELOC, the party discovering the breach shall give prompt written notice of the breach to the other parties. [EMC], within 90 days of its discovery or receipt of notice that such breach has occurred (whichever occurs earlier), shall cure the breach in all material respects or, subject to the [MLPA], shall purchase the HELOC or any property acquired with respect thereto from the [Trust]; provided, however, that if there is a breach of any representation set forth in the [MLPA], and the HELOC or the related property acquired with respect thereto has been sold, then [EMC] shall pay, in lieu of the Repurchase Price, any excess of the Repurchase Price over the Net Liquidation Proceeds received upon such sale. . . .[15]

35.   Section 23 of the MLPA makes Assured an express third-party beneficiary

of the MLPA. *See also* SSA § 7.16 (making Assured an express third-party beneficiary of the

SSA with the authority to enforce any "right, remedy or claim conferred" therein). Further,

under Section 2.08 of the SSA, the Trust assigned "all of its right, title and interest in and to the

HELOCs and its right to exercise the remedies . . . for breaches of the representations,

warranties, agreements and covenants of [EMC] contained in the [MLPA], to the Indenture

Trustee, for the benefit of the Noteholders and [Assured]." EMC also agreed that "such

representations, warranties, agreements and covenants will run to and be for the benefit of the

Indenture Trustee and [Assured], and the Indenture Trustee may enforce, without joinder of

[BSABS] or the [Trust], the repurchase obligations of [EMC] set forth herein and the [MLPA] . .

. ." *See* SSA § 2.08.

---

[15] The definition of "Repurchase Price" in the SSA provides that "[w]ith respect to any HELOC . . . required to be repurchased by [EMC] pursuant to the [MLPA] or Article II of the [SSA], an amount equal to the sum of (i)(a) 100% of the Outstanding Principal Balance of such HELOC as of the date of repurchase . . . , plus (b) accrued but unpaid interest on the Outstanding Principal Balance at the related Net Mortgage Rate, through and including the last day of the month of repurchase, plus (c) any unreimbursed Monthly Advances and servicing advances payable to the Servicer or to the Master Servicer and (ii) any costs and damages . . . incurred by the Trust in connection with any violation of such HELOC of any predatory lending laws."

17

36.     The parties intended the contractual cure or repurchase remedy to address EMC's inadvertent inclusion in the Transaction of an aberrant breaching loan. The remedy was not designed, and is not adequate, to address a large volume of breaching loans, and certainly is inadequate to handle EMC's wholesale failure to comply with its express representations and warranties. Rather, it was the parties' intent that EMC would comply with its representations and warranties, convey to the Trust only those HELOCs that bore the represented attributes, and cure or repurchase the rare HELOC that circumvented EMC's purported controls. EMC thwarted the parties' contractual intent by conveying to the Trust a large volume of breaching loans and, thereafter, by refusing to comply with its contractual commitment to cure or repurchase the breaching loans. The appropriate remedy for such wholesale breach of the parties' agreement and bargain is damages sufficient to place Assured in the position it would have been in had it not entered into the I&I Agreement and issued the Policy.

**E.     EMC's Transaction Level Representations in the I&I Agreement**

37.     In the I&I Agreement, EMC not only extended to Assured the Loan Level Representations that EMC had made in the MLPA, but made directly to Assured additional and much broader representations, warranties, covenants, and remedies to reinforce the parties' negotiated risk allocation arrangement. Thus, for example, EMC expressly agreed that Assured was entitled to both (i) enforce EMC's obligation to cure or repurchase HELOCs that did not comply with the Loan Level Representations in the MLPA, *and in addition*, (ii) seek any remedy, without exclusion, at law or in equity in the event that EMC breached any of its representations, warranties, and covenants. By extending and expanding Assured's rights and remedies beyond those afforded to the parties to the MLPA and the SSA, EMC reinforced the purported veracity of its disclosures, representations and warranties, and its commitment to bear

18

the risk of loss in the event any disclosures, representations and warranties are found to be false

or misleading.

38.     EMC's broad representations and warranties, and its commitment to bear

the risk of their inaccuracy, are clearly and unambiguously stated in the I&I Agreement.  First,

the I&I Agreement explicitly extends to Assured the numerous Loan Level Representations that

EMC and its affiliates made in the Operative Documents:

> I&I Agreement § 2.01(m):  "*Operative Documents.*  Each of the
> representations and warranties of the Seller, the Issuer and the
> Depositor contained in the applicable Operative Documents to
> which it is a party is true and correct as of the date reflected therein
> and each of the Seller, the Issuer and the Depositor hereby makes
> each such representation and warranty to, and for the benefit of,
> the Insurer as if the same were set forth in full herein."

39.     Second, the I&I Agreement provides that Assured is a third-party

beneficiary of the underlying Operative Documents, with all rights afforded thereunder, and

incorporated and restated for the benefit of Assured all of the representations, warranties, and

covenants that EMC made in the Operative Documents:

> I&I Agreement § 2.02(k):  "*Third-Party Beneficiary.*  Each of
> [EMC], the Issuer and the Depositor agrees that the Insurer shall
> have all rights provided to the Insurer in the Operative Documents
> and that the Insurer shall constitute a third-party beneficiary with
> respect to such rights in respect of the Operative Documents and
> hereby incorporates and restates its representations, warranties and
> covenants as set forth therein for the benefit of the Insurer . . . ."

*See also* MLPA § 27; SSA § 7.16; Indenture § 11.17.

40.     Third, the I&I Agreement adds for Assured's benefit additional and

broader Transaction Level Representations not found in the MLPA, SSA, or AAR, including

EMC's promise as to the truthfulness of the information that it and its affiliates provided to

Assured and investors about itself, the Transaction, and GreenPoint's origination and

19

underwriting practices, as well as the truthfulness of the information that EMC provided to the

rating agencies:[16]

> I&I Agreement § 2.01(j): "*Accuracy of Information.* Neither the
> Operative Documents to which it is a party nor other information
> relating to the HELOCs, the operations of the Seller, the Issuer or
> the Depositor or the financial condition of the Seller, the Issuer or
> the Depositor (collectively, the "Documents"), as amended,
> supplemented or superseded, furnished to the Insurer in writing or
> in electronic form by the Seller, the Issuer or the Depositor
> contains any statement of a material fact which was untrue or
> misleading in any material respect when made or fails to state any
> material fact necessary to make the statements therein, in light of
> the circumstances under which they were made, not misleading.
> Since the furnishing of the Documents, there has been no change
> nor any development or event involving a prospective change
> known to the Seller, the Issuer or the Depositor that would render
> any of the Documents untrue or misleading in any material
> respect."

> I&I Agreement § 2.01(l): *Compliance With Securities Laws;*
> *Accuracy of Information.* The offer of the Securities complies or
> shall comply in all material respects with all requirements of law,
> including all registration requirements of applicable securities
> laws. Without limiting the foregoing, the Offering Document[17] . . .
> does not contain any untrue statement of a material fact and does
> not omit to state a material fact necessary to make the statements

---

[16] Under Section 3.01(k) of the I&I Agreement, the issuance of the Policy was conditioned upon the Class A-1 Notes and the Class M-1 Notes (to be insured by the Policy) being rated at least "AAA" and "BBB" by Standard and Poor's ("S&P"), respectively, and at least "Aaa" and "Baa2" by Moody's Investors Service, Inc. ("Moody's"), respectively, in each case without regard to the benefit of the Policy. The Section further conditions the issuance of the Policy on both classes of the Notes being rated as "AAA" by S&P, "Aaa" by Moody's, and "AAA" by Fitch, Inc., taking into consideration the Policy. Likewise, by letter dated August 29, 2005, Assured informed Bear, Stearns & Co., Inc. that the issuance of the Policy was subject to, among other things, confirmation acceptable to Assured that the Class A-1 Notes will be rated as "AAA" and "Aaa" by S&P and Moody's, respectively, and that the Class M-1 Notes will be rated as "BBB" and "Baa2" by S&P and Moody's respectively, each before giving effect to the Policy. (On that same date, Bear Stearns ("acting on behalf of itself and its affiliates," including EMC) executed its agreement and acceptance of this letter.) As noted, to secure these ratings, EMC and its affiliates disseminated the same type of false and misleading data to the rating agencies that they provided to Assured.

[17] The I&I Agreement defines the "Offering Document" to include "the Prospectus, dated June 24, 2005, as supplemented by the Prospectus Supplement, dated August 31, 2005, in respect of the Insured Notes and any amendment or supplement thereto, and any other offering document in respect of the Securities prepared by or on behalf of the Depositor that makes reference to the Policy."

> made therein, in light of the circumstances under which they were made, not misleading as of the date of the Offering Document, as of the Closing Date and as of any amendment or supplement to the Offering Document . . . . The offer of the Insured Notes has not been and will not be in violation of the Securities Act or any other federal or state securities laws. . . .[18]

41. As demonstrated by its plain language, the Accuracy of Information representation and warranty in Section 2.01(j) of the I&I Agreement gave Assured a strong guaranty as to the veracity of information conveyed to Assured before the close of the Transaction. This information included, among other things, mortgage loan "tapes" sent to Assured on July 15, 2005, July 27, 2005, and August 30, 2005. The mortgage loan tapes were large spreadsheets that, as represented and warranted by EMC, purported to contain true, accurate and complete data concerning the proposed loan pool, including key metrics for assessing the borrowers' ability to repay their loans and the sufficiency of the mortgaged properties as collateral. These metrics included (i) the combined loan-to-value ratio ("CLTV") for each loan, which compared the aggregate amount of the loans encumbering the borrower's property to the value of the property, (ii) the FICO (or credit) score of each borrower, (iii) the debt-to-income ratio ("DTI") for each borrower, which compared payments due on a borrower's monthly debts to a borrower's income, and (iv) the occupancy status of the property, which listed whether the property was the borrower's primary or secondary residence, or an investment property. As demonstrated by the subsequent review by third-party consultants retained by Assured, discussed below, the data disclosed on these tapes were false and misleading.

---

[18] The significance of this representation and warranty is further bolstered by Section 3.01(j) of the I&I Agreement which provides that Assured "shall be entitled to rely on each of the documents[] required to be delivered to the Underwriters pursuant to the Underwriting Agreement[,]" (*i.e.*, the Offering Documents).

42.     The Compliance with Securities Laws representation and warranty in

Section 2.01(l) of the I&I Agreement afforded Assured an equally strong guaranty concerning

the veracity of the statements made in the Offering Documents, which included the ProSupp

prepared to market the securities (including the Insured Notes) to investors. The ProSupp

contains material statements pertaining to the loan attributes, the underwriting performed during

the origination of the HELOCs, and the risks associated with the Transaction. The ProSupp

states, for example, that the "[u]nderwriting standards are applied by or on behalf of a lender to

evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the

mortgaged property as collateral." The ProSupp also contains a detailed appendix purporting to

represent critical statistical data for stratified segments of the loan pool, including CLTV and

DTI ratios, FICO scores, and the occupancy and documentation types of the HELOCs. These

disclosures were false and misleading. The Offering Documents failed to disclose that

underwriting standards had been abandoned and that GreenPoint disregarded whether borrowers

ever would be able to repay their loans. And, like the data on the mortgage loan tapes, the

attributes of the HELOCs described in the ProSupp were false.

43.     Lastly, the I&I Agreement affords Assured broad remedies to address

breaches by EMC of its representations and warranties and other contractual commitments:

> ***All remedies available at law and equity:*** Section 5.02 of the I&I
> Agreement, in recognition of the broad scope and significance of
> EMC's representations and warranties, provides that any and all
> remedies "at law or in equity" -- including those available in the
> Operative Documents – are available to Assured on a non-
> exclusive and cumulative basis.
>
> ***Loan level cure or repurchase:*** In Section 5.02 of the I&I
> Agreement, EMC agreed that Assured may enforce the cure or
> repurchase provisions of the MLPA (§ 7) and SSA (§§ 2.02-2.04).
>
> ***Reimbursement:*** EMC separately agreed to reimburse Assured for
> any payments resulting from, among other things, EMC's failure to

comply with the remedial provisions of the SSA and the MLPA. Specifically, in Section 3.03(b) of the I&I Agreement, "EMC agree[d] to pay [Assured], and [Assured] shall be entitled to reimbursement from [EMC] and shall have full recourse against [EMC] for, (i) any payment made under the Policy arising as a result of [EMC's] failure to . . . deposit an amount in respect of any defective Mortgage Loan as required pursuant to Section [7] of the Mortgage Loan Purchase Agreement, together with interest on any and all such amounts remaining unreimbursed . . . ."

*Payment and indemnification:* Pursuant to Section 3.04(a) of the I&I Agreement, EMC also agreed to pay and indemnify Assured for any claims, losses, or demands arising out of or relating to, among other things, any breach of a representation, warranty, or covenant made by EMC. In particular, Section 3.04(a) states that EMC agrees "to pay, and to protect, indemnify and save harmless, [Assured] . . . from and against any and all claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs or expenses (including reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) of any nature arising out of or relating to the breach by [EMC] . . . of any of the representations or warranties contained in Section 2.01 or Section 2.05 or arising out of or relating to the transactions contemplated by the Operative Documents by reason of: . . . (iv) the breach by [EMC] . . . of any representation, warranty or covenant under any of the Operative Documents to which it is a party or the occurrence, in respect of [EMC] . . . , under any of the Operative Documents of any 'event of default' or any event which, with the giving of notice or the lapse of time or both, would constitute any 'event of default'. . . ."

*Recovery of fees, costs, expenses, and interest:* EMC agreed that it would pay Assured any expenses incurred in enforcing EMC's obligations under the Operative Documents. To that end, Section 3.03(c) of the I&I Agreement states that "[EMC] agrees to pay [Assured] any and all charges, fees, costs and expenses that [Assured] may reasonably pay or incur, including reasonable attorneys' and accountants' fees and expenses, in connection with (i) the enforcement, defense or preservation of any rights in respect of any of the Operative Documents." Moreover, Section 3.03(d) of the I&I Agreement entitles Assured to collect interest on any and all amounts recovered as reimbursement or any and all amounts expended in enforcing or preserving its rights under the I&I Agreement.

44. To underscore the breadth and unqualified nature of these representations,

warranties, covenants, and remedies, EMC and its affiliates agreed that their obligations were

irrespective of any defenses:

> The obligations of . . . [EMC], [the Trust] and [BSABS] hereunder
> shall be absolute and unconditional and shall be paid or performed
> strictly in accordance with [the I&I] Agreement or the relevant
> Operative Document, as applicable, under all circumstances
> irrespective of: . . . (iii) the existence of any claim, setoff, defense,
> reduction, abatement or other right that . . . [EMC] . . . may have at
> any time against [Assured] or any other Person; . . . or (viii) any ˙
> other circumstances, other than payment in full, that might
> otherwise constitute a defense available to, or discharge of, . . .
> [EMC], [the Trust] or [BSABS] in respect of any Operative
> Document.[19]

45. The representations, warranties, covenants, and remedies that EMC and its

affiliates provided to Assured in the I&I Agreement were fundamental consideration for

Assured's agreement to issue its Policy. Assured required these provisions because its decision

of whether to provide insurance depended on the accuracy of the information and representations

and warranties that EMC had provided, as well as EMC's covenants and Assured's remedies in

the event that this information and these representation and warranties were false or misleading.

The stated agreement was that Assured was to assume the risk that the loans in the securitized

pool would default, provided – *and only to the extent* – that the characteristics and attributes that

EMC had represented and warranted were possessed by those loans and were in fact true,

accurate and complete. EMC assumed the risk that its representations and warranties as to these

characteristics and attributes were false or misleading, and gave Assured the right to take

whatever action at law or in equity as may appear necessary or desirable in its judgment to

address such breaches, including without limitation requiring EMC to repurchase or cure the

---

[19] *See* I&I Agreement § 4.03(a).

breaching loans. This risk allocation was the bargain that the parties struck, and the bargain that
EMC has gutted.

**F.    EMC's Material Breach**

46.    The loans that EMC sold to the Trust in connection with the Transaction
have failed miserably. As of June 25, 2010, the Transaction had experienced cumulative losses
of more than $60 million and Assured's resulting claim payments to the insured Noteholders
have exceeded $32 million.

47.    In early 2009 (several months after the Transaction first began showing
signs of significant performance deterioration), Assured hired third-party consultants to review
the files created during the origination of 430 of the securitized HELOCs that had defaulted. The
consultants found breaches of EMC's representations and warranties in a remarkable 379, or
over 88%, of the loans with an aggregate principal balance of approximately $25.1 million.

48.    These loans contained one or, in most cases, more than one defect that
constituted a breach of one or more of the numerous representations and warranties made by
EMC in the MLPA and that materially altered the loans' risk profile. These defects include:

- rampant fraud, primarily involving misrepresentation of the
  borrower's income, assets, employment, or intent to occupy the
  property as the borrower's residence (rather than as an
  investment), and subsequent failure to so occupy the property;

- failure by the borrower to accurately disclose his or her
  liabilities, including multiple other mortgage loans taken out to
  purchase additional investment property;

- inflated and fraudulent appraisals; and

- pervasive violations of GreenPoint's own underwriting
  guidelines and prudent mortgage lending practices, including
  loans made to borrowers (i) who made unreasonable claims as
  to their income, (ii) with multiple, unverified social security
  numbers, (iii) with credit scores below the required minimum,
  (iv) with DTI and/or CLTV ratios above the allowed

25

maximum, or (v) with relationships to GreenPoint or other non-arm's-length relationships.

49.     Each of these breaches materially and adversely affected the value of Assured's interests (as well as the interests of each of the Certificateholders, the Noteholders, the Trust, and the Indenture Trustee) in the identified HELOCs. Loans subject to fraud, loans that were not originated and underwritten pursuant to prudent and proper practices, or loans whose key attributes are otherwise false or misleading, are markedly more risky and therefore have far less value than loans not suffering from such shortcomings.

50.     Assured has gone to great lengths to persuade EMC to comply with its contractual obligations to address these breaches, all to no avail. By e-mail dated August 17, 2009, Assured provided EMC with notice that 44 loans in the Transaction breached EMC's representations and warranties. The e-mail attached a detailed list identifying the loans and the corresponding breaches. EMC responded on November 12, 2009, refusing to repurchase a single loan or cure any of the multiple documented breaches. By letter dated December 3, 2009, Assured advised EMC that its November 12 response was deficient, having failed to address the substance of Assured's August 17 breach notice, and again demanded that EMC comply with its contractual repurchase-or-cure obligations. More than seven months have passed since that date, and EMC still has not done so.

51.     Accordingly, by letter dated April 8, 2010, Assured gave EMC additional formal notice of its breaches pertaining to 379 loans with an aggregate outstanding principal balance of approximately $25.2 million (including those loans for which notice was already sent on August 17, 2009 and for which a deficiency notice was sent on December 3, 2009). Assured demanded that EMC comply with Section 7 of the MLPA and Section 2.03 of the SSA by curing or repurchasing the affected HELOCs. Assured also demanded that EMC pay Assured its fees

and expenses incurred in connection with identifying these breaches and enforcing its rights, pursuant to Sections 3.03 and 3.04 of the I&I Agreement. The letter further reserved any and all of Assured's rights to assert additional claims or demands with respect to indemnification, reimbursements, breaches, and other claims. By letter dated July 7, 2010, EMC refused to comply with its contractual obligations.

52.    Finally, on July 8, 2010 Assured gave notice to EMC that an additional 441 loans with an aggregate principal balance of approximately $27.7 million breached its representations and warranties. Assured again particularized the breaches, which were substantially identical to those previously identified by Assured to EMC with respect to the earlier batch of 379 loans that Assured had reviewed. And, Assured again demanded that EMC cure or repurchase the affected HELOCs, again demanded payments for its costs incurred in identifying these breaches, and again reserved all of its rights.

53.    Despite all of Assured's good faith efforts, and its detailed particularization of EMC's breaches of its representations and warranties with respect to 820 HELOCs with an aggregate principal balance of approximately $52.9 million, as of the filing of this complaint EMC has not repurchased or cured a single breaching loan.

54.    The pervasive breaches of EMC's representations and warranties pierce the very heart of the bargain struck by the parties. As has become increasingly more evident, EMC did not sell to the Trust the contemplated portfolio of loans with the represented attributes. Rather, EMC transferred a pool in which a staggering percentage of loans bore little resemblance at all to the loans that EMC had expressly represented and warranted would comprise the pool.

55.    EMC's conduct has greatly harmed Assured by, among other things, requiring Assured to pay out more than $32 million in claim payments as of June 30, 2010, and

27

to potentially pay out tens of millions of dollars in claim payments in the future, to cover the defaults of these defective loans. Further compounding the harm to Assured is EMC's deliberate frustration of the contractual repurchase-or-cure remedy, which was in any case designed to address only the inadvertent breach (and is not adequate to address a large volume of breaching loans, and certainly is inadequate to handle EMC's wholesale failure to comply with its express representations and warranties).

## FIRST CAUSE OF ACTION

### (Breach of Representations and Warranties)

56.     Assured re-alleges and incorporates by reference paragraphs 1 through 55 of this Complaint.

57.     The I&I Agreement is a valid and binding agreement between Assured and EMC.

58.     Assured has performed all of its obligations under the I&I Agreement.

59.     EMC has materially breached its representations and warranties under Section 7 of the MLPA and Section 2.01 of the I&I Agreement.

60.     Assured has been damaged and will continue to be damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### (Breach of Cure-or-Repurchase Obligation)

61.     Assured re-alleges and incorporates by reference paragraphs 1 through 60 of this Complaint.

62.     EMC has materially breached its obligations under Section 7 of the MLPA, Section 2.03 of the SSA, and Section 2.02 of the I&I Agreement by refusing to cure or

repurchase the HELOCs that breached EMC's representations and warranties and with respect to which notice of breach has been provided by Assured to EMC by e-mail dated August 17, 2009, and letters dated December 3, 2009, and April 8, 2010.

63.     Assured has been damaged and will continue to be damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### (Material Breach of the I&I Agreement)

64.     Assured re-alleges and incorporates by reference paragraphs 1 through 63 of the Complaint.

65.     EMC induced Assured to enter into the I&I Agreement and to issue its Policy by making extensive representations and warranties concerning the HELOCs that EMC caused to be sold to the Trust, by agreeing to broad remedies for breaches of those representations and warranties, and by procuring favorable shadow ratings and securities ratings from S&P and Moody's.

66.     EMC's representations and warranties and related remedial commitments were material to Assured's decision to insure the Insured Notes, and Assured was induced thereby to enter into the I&I Agreement and perform its obligations thereunder.

67.     EMC has materially breached the I&I Agreement, and the loan-by-loan cure-or-repurchase remedy not only is inadequate to address the magnitude and pervasiveness of the breaches identified, but is being frustrated by EMC's wholesale failure to comply with it.

68.     Assured has been damaged and will continue to be damaged in an amount to be determined at trial.

29

## FOURTH CAUSE OF ACTION

### (Indemnification)

69.     Assured re-alleges and incorporates by reference paragraphs 1 through 68 of this Complaint.

70.     Pursuant to Section 3.04(a) of the I&I Agreement, Assured is entitled to be indemnified by EMC, the Trust, and BSABS, jointly and severally, for all claims, losses, liabilities, demands, damages, costs, or expenses of any nature arising out of or relating to the breach by EMC of any of the representations or warranties contained in Section 2.01 of the I&I Agreement or arising out of or relating to the transactions contemplated by the Operative Documents by reason of, among other things, a breach by EMC, the Trust, or BSABS of any representation, warranty, or covenant contained in the Operative Documents or the occurrence, in respect of EMC, the Trust, or BSABS, under any of the Operative Documents of any "event of default."

71.     EMC has breached numerous representations, warranties, and covenants set forth in the Operative Documents and those breaches have caused Assured to pay claims and incur losses, costs, and expenses, and will continue to cause Assured to pay claims and incur losses, costs, and expenses in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (Reimbursement of Claim Payments, Costs, and Fees)

72.     Assured re-alleges and incorporates by reference paragraphs 1 through 71 of this Complaint.

73.     Section 3.03(c) of the I&I Agreement requires EMC "to pay to [Assured] any and all charges, fees, costs and expenses that [Assured] may reasonably pay or incur,

30

including reasonable attorneys' and accountants' fees and expenses, in connection with . . . the enforcement, defense or preservation of any rights in respect of any of the Operative Documents, including . . . participating in any litigation . . . relating to any of the Operative Documents . . . ."

74. Section 3.03(b) of the I&I Agreement provides that EMC "agrees to pay [Assured], and [Assured] shall be entitled to reimbursement from [EMC] and shall have full recourse against [EMC] for, (i) any payment made under the Policy arising as a result of [EMC's] failure to . . . deposit an amount in respect of any defective Mortgage Loan as required pursuant to Section [7] of the Mortgage Loan Purchase Agreement . . . ."

75. In addition, Sections 3.03(b) and (d) of the I&I Agreement requires EMC to pay Assured interest on any and all amounts recovered as reimbursement under either Sections 3.03(b) and 3.03(c) of the I&I Agreement.

76. Assured has incurred numerous expenses, including attorneys' fees and expert fees, in order to enforce, defend, and preserve its rights under the Operative Documents.

## PRAYER FOR RELIEF

**WHEREFORE**, Assured respectfully prays for the following relief:

A. For an award of compensatory, consequential, and/or equitable damages, including all of Assured's claim payments made and to be made in the future, and any other present and future damages to be proven at trial, for EMC's pervasive and material breaches of its representations and warranties and its related contractual remedial obligations, constituting a material breach of the I&I Agreement and other Operative Documents, and frustration of the parties' bargain;

B. For an order compelling EMC to comply with its obligations under MLPA § 7 and SSA § 2.03 to cure or repurchase the HELOCs that breach its representations and warranties;

C. For an order of indemnification for the claim payments and other losses and expenses that Assured has paid or will pay in the future that were caused by EMC's breaches of its representations, warranties, or covenants, EMC's negligence, misfeasance, or

31

malfeasance, and untrue statements and material omissions in the Offering Documents, pursuant to I&I Agreement § 3.04(a);

**D.**    For an order awarding reimbursement of the claim payments and other amounts, including interest, that Assured has paid or will pay in the future under the Policy that arise from EMC's breaches of its representation, warranties, or covenants under the Operative Documents and from EMC's negligence, willful misconduct, bad faith, or reckless disregard in the performance of its duties and obligations under the Operative Documents, and of Assured's attorney's fees and other costs and expenses, including interest, paid and incurred in enforcing, defending, and preserving its rights and enforcing EMC's obligations under the Operative Documents, pursuant to I&I Agreement §§ 3.03(b), (c), and (d);

**E.**    For an order of prejudgment interest; and

**F.**    For an order awarding Assured such other and further relief as the Court deems just and proper.

Dated:       New York, New York
              July 14, 2010

                              Respectfully submitted,

                              PATTERSON BELKNAP WEBB & TYLER LLP

                              Philip R. Forlenza
                              Erik Haas
                              Muhammad U. Faridi
                              1133 Avenue of the Americas
                              New York, NY  10036-6710
                              Telephone:  (212) 336-2000
                              Fax:  (212) 336-2222
                              pforlenza@pbwt.com
                              ehaas@pbwt.com

                              *Attorneys for Assured Guaranty Corp.*