PATTERSON BELKNAP WEBB & TYLER LLP
Erik Haas (*ehaas@pbwt.com*)
Robert W. Lehrburger (*rwlehrburger@pbwt.com*)
Benjamin S. Litman (*blitman@pbwt.com*)
Muhammad U. Faridi (*mfaridi@pbwt.com*)
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222

*Attorneys for Plaintiff Assured Guaranty Corp.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| ASSURED GUARANTY CORP., | : | No. 10 Civ. 5367 (NRB) |
| Plaintiff, | : | |
| - against - | : | **AMENDED COMPLAINT** |
| EMC MORTGAGE LLC (formerly known as EMC MORTGAGE CORPORATION), J.P. MORGAN SECURITIES LLC (formerly known as BEAR, STEARNS & CO. INC.), and JPMORGAN CHASE BANK, N.A., | : | **(REDACTED)** |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ......................................................................1

I.    THE PARTIES ...........................................................................13

    A.    PLAINTIFF .........................................................................13

    B.    THE "BEAR STEARNS" DEFENDANTS ......................................13

II.    JURISDICTION AND VENUE ......................................................15

III.    THE BEAR STEARNS MORTGAGE LOAN SECURITIZATION "MACHINE" ........................................................................17

    A.    BEAR STEARNS CONTROLLED EVERY ASPECT OF THE SECURITIZATION PROCESS ...................................................18

    B.    BEAR STEARNS EXTRACTED REVENUE AND PROCEEDS AT EVERY STEP IN THE MORTGAGE LOAN SECURITIZATION PROCESS .......................................................................24

    C.    BEAR STEARNS INCREASED LOAN VOLUME TO SUPPORT ITS SECURITIZATIONS BY SACRIFICING LOAN QUALITY ................25

    D.    BEAR STEARNS EXECUTIVES DROVE BEAR STEARNS' SECURITIZATION MACHINE TO ASSUME INORDINATE RISK FOR PERSONAL GAIN .........................................................39

IV.    GREENPOINT FUELED THE BEAR STEARNS SECURITIZATION MACHINE ...........................................................................46

    A.    GREENPOINT WAS AMONG THE MORTGAGE INDUSTRY'S WORST ORIGINATORS ...........................................................46

    B.    BEAR STEARNS RELIED ON THE LARGE SUPPLY OF DEFECTIVE GREENPOINT LOANS TO FUEL ITS SECURITIZATION MACHINE ...........................................................53

    C.    BEAR STEARNS MADE CONCESSIONS TO GREENPOINT TO ENSURE ITS CONTINUED SUPPLY OF LOANS FOR SECURITIZATIONS .....................................................54

    D.    BEAR STEARNS MADE INCREMENTAL AND UNDISCLOSED PROFITS FROM ITS PURCHASE OF DEFECTIVE LOANS FROM GREENPOINT ...........................................................60

V.    THE TRANSACTION ...................................................................64

**TABLE OF CONTENTS**
(continued)

Page

VI.   BEAR STEARNS' FRAUDULENT INDUCEMENT BASED ON
      FALSE AND MISLEADING PRE-CONTRACTUAL
      REPRESENTATIONS TO ASSURED ..................................................................69

      A.   BEAR STEARNS SOLICITED ASSURED TO PARTICIPATE IN THE
           TRANSACTION ..........................................................................................70

           1.   Bear Stearns' Marketing Presentations, Deal
                Correspondence, and Oral Communications .............................70

           2.   Bear Stearns' Distribution of Mortgage Loan Tapes
                and Other Collateral Data ........................................................74

           3.   Bear Stearns' Affirmative Representations to
                Secure Rating Agency Ratings .................................................76

           4.   Bear Stearns' Representations and Disclosures in
                the Offering Documents to Market and Sell the
                Notes .......................................................................................79

      B.   BEAR STEARNS' REPRESENTATIONS CONCERNING ITS DUE
           DILIGENCE WERE FALSE AND MISLEADING ...........................................81

           1.   Bear Stearns' Representations to Assured
                Regarding Due Diligence ..........................................................82

           2.   Bear Stearns Knowingly Misrepresented the
                Purpose and Scope of Due Diligence and Provided
                False Due Diligence Results to Assured ....................................85

           3.   Bear Stearns Knowingly Conducted and Concealed
                Its "Bad Due Diligence" ..........................................................93

      C.   BEAR STEARNS' REPRESENTATIONS CONCERNING ITS
           QUALITY CONTROL PRACTICES WERE FALSE AND
           MISLEADING ...........................................................................................101

           1.   Bear Stearns Knowingly Concealed Its De Minimis
                Quality Control Operations As Well As Pervasive
                Defects Found in GreenPoint Loans .........................................105

           2.   Bear Stearns Performed Virtually No Quality
                Control on the HELOCs and Intentionally
                Disregarded Red Flags of Borrowers' Inability to
                Pay..........................................................................................107

**TABLE OF CONTENTS**
**(continued)**

Page

        3.     Bear Stearns Concealed that Its Quality Control Process Was Designed to Line Its Pockets at the Expense of Transaction Participants ........................................................ 110

    D.    BEAR STEARNS MADE MATERIAL MISREPRESENTATIONS AND OMITTED MATERIAL FACTS CONCERNING THE QUALITY AND ATTRIBUTES OF THE LOANS ............................................................ 113

    E.    TO CONCEAL ITS FRAUD, BEAR STEARNS THREATENED THE RATING AGENCIES ................................................................ 115

    F.    BEAR STEARNS' INDIVIDUAL AND CORPORATE HEDGING STRATEGY DEMONSTRATES ITS KNOWLEDGE OF THE DEFICIENCIES IN THE COLLATERAL BACKING ITS SECURITIZATIONS ................................................................ 116

VII.    ASSURED'S RELIANCE ON BEAR STEARNS' REPRESENTATIONS WAS JUSTIFIABLE AND ITS DUE DILIGENCE WAS REASONABLE AND CONSISTENT WITH THE RISK ALLOCATION IN THE TRANSACTION ................................................................ 118

VIII.    EMC'S EXPRESS REPRESENTATIONS, WARRANTIES, AND CONTRACTUAL COVENANTS IN THE TRANSACTION DOCUMENTS ................................................................ 121

    A.    EMC'S EXPRESS REPRESENTATIONS AND WARRANTIES REFLECT THE BARGAINED-FOR RISK ALLOCATION ................................................................ 121

        1.     Loan-Level Representations and Warranties ........................................... 123

        2.     Transaction-Level Representations and Warranties ................................ 125

    B.    EMC'S CONTRACTUAL COVENANTS REINFORCING THE PARTIES' BARGAINED-FOR RISK ALLOCATION ................................................................ 128

        1.     EMC's Promise to Give "Prompt" Notice of Breaches ................................................................ 128

        2.     EMC's Promise to Repurchase or Cure Breaching HELOCs Within 90 Days ................................................................ 129

    C.    THE BROAD LEGAL AND EQUITABLE REMEDIES RESERVED AND AFFORDED TO ASSURED UNDER THE TRANSACTION DOCUMENTS ................................................................ 131

## TABLE OF CONTENTS
### (continued)

**Page**

    1.    Assured's Express Right to Pursue Any and All
Remedies "at Law or in Equity" .............................................................131

    2.    Assured's Express Contractual Rights to
Indemnification, Payments, and Reimbursement ...................................132

IX.    EMC'S PERVASIVE BREACHES OF ITS
REPRESENTATIONS AND WARRANTIES.................................................134

    A.    ASSURED'S LOAN-LEVEL REVIEW UNCOVERED PERVASIVE
BREACHES .........................................................................................134

    B.    EMC REFUSED TO REPURCHASE ALL OF THE BREACHING
HELOCS IDENTIFIED BY ASSURED .....................................................135

X.    JP MORGAN TORTIOUSLY INTERFERED WITH EMC'S
CONTRACTUAL OBLIGATION TO ASSURED.........................................136

    A.    JPMORGAN CHASE & CO. ACQUIRED BEAR STEARNS'
SECURITIZATION MACHINE AT A FIRE SALE .......................................136

    B.    AFTER THE MERGER, JP MORGAN IMPLEMENTED POLICIES
TO REJECT WHOLESALE CLAIMS FOR BREACHING LOANS TO
MANIPULATE ITS ACCOUNTING RESERVES ..........................................137

        1.    JP Morgan Ordered EMC, "Do Not Repurchase
Any Loans" ..................................................................................137

        2.    JP Morgan Directed EMC to Deny Financial
Guarantors' Repurchase Demands While
Simultaneously Asserting the Same Breach Claims
Against Originators..................................................................138

        3.    JP Morgan Ignored EMC's Prior Breach Positions
and Adopted Conflicting Positions to Reject
Assured's Breach Claims in Bad Faith ....................................142

    C.    JP MORGAN INTERFERED WITH EMC'S CONTRACTS TO
MANIPULATE AND UNDERSTATE ACCOUNTING RESERVES ...................146

XI.    EMC WAS A MERE ALTER EGO AND INSTRUMENTALITY
OF BEAR, STEARNS & CO. .................................................................148

XII.    HARM SUFFERED BY ASSURED.............................................................149

**TABLE OF CONTENTS**
(continued)

Page

XIII.  JPMORGAN CHASE & CO. HAS STRIPPED EMC OF ITS
       ASSETS, SEEKING TO RENDER EMC A JUDGMENT-PROOF
       SHELL, AND SUBJECTING JPMC BANK TO SUCCESSOR
       LIABILITY ..................................................................................................151

       A.    EMC BREACHED ITS COVENANTS NOT TO TRANSFER ITS
             ASSETS OR ITS SERVICING RIGHTS WITHOUT ASSURED'S
             CONSENT ...........................................................................................152

       B.    ASSURED'S CONTRACTUAL RIGHTS TO SUE ANY SUCCESSOR
             OF EMC ..............................................................................................153

       C.    JPMORGAN CHASE & CO. EFFECTUATED A *DE FACTO*
             MERGER OF EMC AND JPMC BANK ...............................................154

FIRST CAUSE OF ACTION ..........................................................................155

SECOND CAUSE OF ACTION ......................................................................156

THIRD CAUSE OF ACTION ..........................................................................157

FOURTH CAUSE OF ACTION ......................................................................157

FIFTH CAUSE OF ACTION ............................................................................158

SIXTH CAUSE OF ACTION ...........................................................................159

SEVENTH CAUSE OF ACTION .....................................................................160

EIGHTH CAUSE OF ACTION ........................................................................161

NINTH CAUSE OF ACTION ...........................................................................162

PRAYER FOR RELIEF ....................................................................................164

Plaintiff Assured Guaranty Corp. ("Assured"), by and through its attorneys, Patterson Belknap Webb & Tyler LLP, for its Amended Complaint against defendants EMC Mortgage LLC, formerly known as EMC Mortgage Corporation ("EMC"), J.P. Morgan Securities LLC ("JP Morgan"), formerly known as Bear, Stearns & Co. Inc. ("Bear, Stearns & Co.," together with EMC, "Bear Stearns"), and JPMorgan Chase Bank, N.A. ("JPMC Bank"), hereby alleges upon personal knowledge as to itself and to its own conduct and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     "Bear don't care."  That phrase – used by underwriters Bear Stearns retained to review mortgage loans for its mortgage-backed securitizations, including the transaction at issue in this matter – succinctly captures the callous disregard that led to the current dispute, Bear Stearns' ultimate demise, and, in good part, the financial crisis that still plagues the world's economies.

2.     This is the third action brought in this Court by a financial guarantor against Bear Stearns after inquiry and investigation revealed its remarkable misconduct – and that of its affiliate EMC and successor JP Morgan – pertaining to its mortgage-backed securitization transactions.  The first two actions detail egregious and widespread fraud perpetrated by Bear Stearns in connection with its mortgage securitization business and the catastrophic consequences for the participants in the securitizations.  This Complaint adds to that overwhelming proof particular facts and testimony from insiders and confidential witnesses who affirm Bear Stearns' malfeasance relating to a mortgage-backed securities transaction known as SACO I Trust 2005-GP1 (the "Transaction"), executed on September 9, 2005.  Assured brings this action to seek redress for the substantial harm it has incurred as the insurer of the securities Bear Stearns issued in the Transaction.

3.     The Transaction is one of the hundreds of mortgage-backed securitizations Bear

Stearns effectuated from 2004 through early 2007, before it collapsed from the exposure its

executives imposed on the corporation to secure extraordinary compensation directly correlated

with the volume of deals done.  In the securitization process, EMC, as the mortgage-loan

"Seller" and transaction "Sponsor," sold thousands of loans to a trust, which in turn issued to

investors securities that were to be paid down by the promised cash flows from the loans.  Bear

Stearns & Co., as the "Deal Manager" and "Underwriter" for the transactions, solicited and

induced (i) financial guarantors (in this case Assured) to insure payments due on certain

securities issued in the transactions, (ii) rating agencies such as Standard & Poor's, Moody's, and

Fitch to rate the mortgage-backed securities, and (iii) investors to purchase the securities issued.

At every point in the securitization process, and specifically with respect to the Transaction,

Bear, Stearns & Co. exercised exclusive and complete domination and control of EMC – under

the common control of their parent The Bear Stearns Companies, Inc.  (Thus, Bear, Stearns &

Co. and EMC are referred together herein as "Bear Stearns" unless clarification is required.)

4.     With Bear Stearns and JP Morgan being brought to task by the prior filed actions,

the truth is now being told by former employees of (i) Bear Stearns, (ii) GreenPoint Mortgage

Funding, Inc. ("GreenPoint"), the mortgage-loan originator from which Bear Stearns acquired

the loans in the Transaction, and (iii) Watterson Prime, LLC ("Watterson Prime"), the vendor

Bear Stearns hired to perform re-underwriting "due diligence" on the loans – all who are braving

potential retaliation to come forward to confirm the fallacy of Bear Stearns' representations

regarding its mortgage securitization operations and the loans that it acquired and sold into these

transactions.  These whistleblowers' testimonials affirm that Bear Stearns disregarded and

abandoned its purported controls to convert what it knew were defective loans (made to

2

borrowers without regard to their ability to repay) into short-term profits and lucrative compensation for its executives.

5.      Simply put, Bear Stearns acquired loans it knew were defective and sold them at a profit into securitizations before they could default.  Bear Stearns represented that it conducted re-underwriting "due diligence" before securitizing the loans to ensure defective loans were not securitized.  That was a lie.  Bear Stearns represented that it had in place, and adhered to, "quality control" and "repurchase" protocols to identify and remove defective loans from the securitizations.  That was a lie.  In fact, Bear Stearns knew its purported re-underwriting due diligence was deficient, it did not engage in material quality control of its favored loan providers, and it did not have protocols to identify and repurchase breaching loans from the trusts.  In the words of those with first-hand knowledge, when it came to the quality of loans for its securitizations, "Bear don't care."

6.      The truth is now coming directly from Bear Stearns' own former employees.  As recited below, seven (7) confidential witnesses who were responsible for underwriting at EMC each have affirmed that they faced intense pressure to approve the purchase of high volumes of loans for Bear Stearns' securitizations without adequate review and at the expense of loan quality.  For example, Bear Stearns imposed strict requirements on EMC's underwriters to review a minimum volume of loan files each day that far exceeded what was reasonable in order to adequately underwrite a loan file.  The pressure to maintain loan volume resulted in the increasing approval and purchase (and ultimately securitization by Bear Stearns) of defective loans without regard to quality or compliance with underwriting guidelines.  Despite repeated complaints to senior managers and executives, the EMC underwriters were consistently told to "keep it moving" and that it was a "waste of time" to undertake proper and prudent underwriting

because Bear Stearns intended to pass the loans to other investors.  Those underwriters that did not succumb to these directives were given adverse reviews or summarily terminated.

7.       The truth is also being revealed by former employees of GreenPoint, the originator of the loans in the Transaction, affirming allegations made in several previously filed lawsuits against GreenPoint.  These confidential witnesses confirm that GreenPoint's management pressured its underwriters to approve loans regardless of quality, and to assume that income listed by the borrower on the loan application was reasonable.  The witnesses also confirm that GreenPoint consistently funded and closed loans in violation of its own underwriting guidelines to maintain its relationships with favored brokers in its network. Statements by these witnesses are also corroborated by internal GreenPoint documents.  For instance, ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████  The confidential witnesses and █████████████████████ also confirm that GreenPoint consistently funded and closed loans in violation of its own underwriting guidelines to maintain its relationships with favored brokers in its network.

8.       The truth also is being told by employees of the third-party firms hired to perform the re-underwriting "due diligence" that Bear Stearns represented was designed to prevent defective loans from being securitized.  This includes statements made by over twenty-nine (29)

4

confidential witnesses from Watterson Prime, the due diligence firm hired by Bear Stearns to review loans in the Transaction – who consistently affirm that Bear Stearns disregarded loan quality for loan quantity. The mantra among the reviewers was "Bear did not care." As the "client," Bear Stearns routinely instructed the Watterson Prime underwriters "not to focus on finding certain defects," and directed Watterson Prime's project leads and management to override loans initially deemed to be defective by changing the loan grade and then to delete any evidence of the audit trail.

9.      The statements recently obtained from these confidential witnesses corroborate the admissions obtained from the internal and contemporaneous files of Bear Stearns and testimony of its executives and employees obtained through discovery in this matter. These admissions establish that Bear Stearns disregarded its represented due diligence, quality control and repurchase processes to maintain an uninterrupted flow of loans from GreenPoint, one of Bear Stearns' largest suppliers of loans and the sole supplier of the loans for the Transaction. To the detriment of insurers like Assured, Bear Stearns never disclosed and deliberately concealed that its longstanding relationship with GreenPoint was based not on a commitment to quality, but rather on the unabashed pursuit of greater loan volume to fuel Bear Stearns' securitizations.

10.     The internal documents and testimony show that Bear Stearns *knew* its representations concerning the re-underwriting due diligence it commissioned were false and misleading. While touting to Assured the high quality of its due diligence, Bear Stearns withheld that it had decided *not* to implement policies that the head of its due diligence department – Vice President John Mongelluzzo – advised its senior executives were required to screen out bad loans. For example, as early as April 2005, well before the close of the Transaction, Mongelluzzo advised Bear Stearns directors in internal correspondence that its due diligence

5

protocols were deficient and should be revised to apply incremental resources to the review of

riskier loans.  Baron Silverstein, one of the two directors responsible for the daily securitization

operations, testified that this "significant" requirement was not implemented.  Indeed, both

Mongelluzzo and Silverstein admitted that, almost exactly two years later in March 2007,

Mongelluzzo renewed the same proposal to apply greater scrutiny to riskier loans, stating "we

need to completely revamp how we do due diligence."  The documents show that Bear ***never***

"revamped" its protocols to implement that significant requirement.

      11.    As Mongelluzzo's internal correspondence reveals, Bear Stearns did not begin to

adopt any of what it recognized as requisite enhancements to its due diligence process until well

into 2007, after it realized its scheme was unraveling and as part of its attempt to create a cover

story.  This duplicity is evident from the blatantly misleading testimony Mongelluzzo gave to the

congressionally established Financial Crisis Inquiry Commission ("FCIC") on September 29,

2010.  In his interview, Mongelluzzo touted Bear Stearns' due diligence, pointing as hallmarks

of its purportedly premier protocols that it (i) "test[ed] all of the diligence firms and their

contract underwriters" to ensure they were qualified to underwrite the loans, (ii) "audited the

individual diligence firms to see what their processes were and what they were doing internally,"

and (iii) "spearheaded . . . a due diligence committee" where "all of the Wall Street firms could

get together and talk about standards."  What Mongelluzzo withheld from the FCIC, but that

documents now show, is that ***none*** of these hallmarks of a quality due diligence protocol was in

place when Bear Stearns conducted due diligence on the vast majority of its securitizations,

including the Transaction.  That is, Bear Stearns (i) did not start its purported testing until

February 2007, (ii) did not conduct its first audit of the due diligence firms until mid-2007, and

(iii) never adopted the standards it purportedly spearheaded.

12.     Thus, Bear Stearns' internal documents and testimony reveal that its executives knew full well that the re-underwriting due diligence it touted to induce participation in its securitizations was grossly deficient.  As stated in no uncertain terms by Bear Stearns Senior Managing Director Jeffrey Verschleiser in his internal email to his fellow director in March 2006, during the height of its securitizations, Bear Stearns knew it commissioned "Bad Due Diligence."

13.     Bear Stearns likewise *knew* that its representations regarding the "quality control" and "repurchase" processes that it purportedly implemented for the benefit of the securitizations were false and misleading.  Bear Stearns represented that it conducted a thorough review of loans it securitized to ensure compliance with EMC's contractual representations and warranties, that it repurchased breaching loans from its securitizations, and that it tracked the results over time to "monitor" the quality of the loan sellers.  But, in fact, these quality control processes were virtually non-existent.

14.     As a Bear Stearns quality control manager has testified, even as of late 2007 Bear Stearns had "no protocols in place" for reviewing and repurchasing breaching loans out of securitizations, including the Transaction.  Indeed, leading up to the Transaction, Bear Stearns knew, but did not disclose, that the scope of its quality control review of GreenPoint was far less extensive than represented to Assured – consisting of only *de minimis* quality control audits between August 1, 2004 and July 31, 2005 of *less than one percent* of over 10,000 GreenPoint loans.  Meanwhile, Bear Stearns concealed the incredibly high breach rates uncovered through the sparse quality control it did perform between 2002 and September 2005, which had revealed underwriting defects in *43 percent* of the GreenPoint loans reviewed by Bear Stearns' own third-party quality control vendor before the Transaction closed.

7

15.     After closing, Bear Stearns continued to disregard quality control over GreenPoint.  Bear Stearns performed quality review of a mere 43 loans out of over 6,000 GreenPoint loans securitized in the Transaction, finding breaches of contractual warranties in 37 of the 43 loans reviewed.  That defect rate of *86* percent is remarkably similar to the *88* percent breach rate revealed by Assured's independent forensic review in 2009 (discussed below).  The high percentage of defective GreenPoint loans identified by Bear Stearns' consultant in the regular course of its business dovetails with the testimonial of a former employee of Bear Stearns that GreenPoint was a "really hairy" originator:  "I felt like we were their janitors, picking up pools from them that had horrible data points . . . ."

16.     In sum, the recently obtained statements from confidential witnesses and Bear Stearns' admissions are directly contrary to the representations Bear Stearns made to Assured *in advance of closing* of the Transaction regarding its securitization operations and the quality and attributes of the mortgage loans Bear Stearns securitized in the Transaction.  The disclosures also corroborate Assured's findings that Bear Stearns materially and pervasively breached the warranties it provided to Assured *at closing* to induce Assured to issue its insurance policy.

17.     In the parties' agreements executed in connection with the closing, Bear Stearns (through EMC) made numerous express contractual warranties concerning key attributes of the mortgage loans that backed the securities and the practices of the entities that made those loans, including that the loans were not originated through improper means (*e.g.*, fraud or underwriter negligence).  Bear Stearns (through EMC) also contractually agreed to (a) provide "prompt" notice to Assured and other deal participants of any loan found to breach its warranties, (b) cure, repurchase, or provide adequate substitutes for breaching loans within 90 days thereafter, and (c) indemnify and reimburse Assured for any losses caused by such breaches.

18.     These warranties, covenants, and remedies were fundamental to the parties' agreement. It was essential that Assured, as insurer, have clear delineations before it issued its policy as to the risks it was assuming – and those it was not – and have ***prompt*** and full recourse for breaches of the parties' agreement. In making the warranties, Bear Stearns assumed the risk that the loans it provided as collateral for the securities Assured insured did not conform with the warranties. And by its covenants and remedies, Bear Stearns committed to ***promptly*** advise and fully remedy Assured for any breaches of warranties. Bear Stearns materially breached its warranties by selling into the securitization at issue loans that did not conform with the warranted attributes, completely disregarded its promise to promptly advise Assured of such breaches, and entirely frustrated the contractual remedies by failing to cure, repurchase, or substitute for breaching loans.

19.     Bear Stearns knew full well from the outset of the Transaction that the contractual warranties were false when made, as evidenced by the remarkable percentage of loans in the Transaction that breach the warranties. The pervasiveness of the breaches was confirmed by a forensic review of the loans that Assured commissioned after the Transaction loans began to default at remarkable rates. The breaches identified include rampant borrower misrepresentations and fraud, total disregard by GreenPoint to adhere to underwriting guidelines, and other materially false statements regarding key loan characteristics.

20.     As the number of defaulting loans began to rise in late 2007, Bear Stearns did not advise Assured of the breaches or comply with its promises to cure, repurchase, or substitute for the breaching loans. Bear Stearns instead endeavored to conceal the true extent of the defective loans in its securitizations, while its executives adopted trading strategies for the company, and their personal holdings, that leveraged their inside knowledge of such defective collateral and the

harm it would inflict on the financial guarantors that insured Bear Stearns' securitizations (including Assured). Specifically, starting in October 2007 and continuing through March 2008, Bear Stearns began aggressively shorting both the financial guaranty insurers and the banks with large exposure to the securities they insured. And at around the same time, in November 2007, Thomas Marano, the Bear Stearns Senior Managing Director who was responsible for its mortgage securitization business, liquidated his personal holdings in various financial guaranty insurers.

21.    As he was quietly liquidating his personal holdings in the financial guarantors and directing Bear Stearns' secret shorting strategies, Marano actively attempted to suppress any indication of the true nature of the loans in its securitizations. In late 2007, for example, the rating agencies began to adjust their ratings of Bear Stearns' mortgage-backed securities. Marano responded furiously, attempting to prop up those ratings by – admittedly – directing his executives to withhold "every fee" due to the rating agencies that downgraded the Bear Stearns securities. Marano thereafter warned the Bear Stearns Co-President by email dated February 12, 2008 that any hint as to "how distressed we are as a firm could spil [sic] in to [sic] the market and make our problems turn into a death spiral."

22.    Marano and the Bear Stearns senior management allowed the foregoing misconduct to occur, and failed to implement the controls required to prevent such abuses, to secure extraordinary compensation directly correlated with the volume of securitizations effectuated. Because Bear Stearns was a public company, and they were "playing with other people's money," the Bear Stearns executives disregarded the long-term implications of their conduct to generate the short-term earnings that funded their compensation. As the FCIC

concluded, Bear Stearns' "executive and employee compensation system . . . create[ed] incentives to . . . focus on short-term gains . . . ."

23.     This textbook example of unmitigated and realized "moral hazard" risk has wreaked unprecedented harm on (i) the borrowers that have defaulted in droves and lost their homes because they were put into loans they could not afford, (ii) the investors that purchased the securities issued in the Bear Stearns transactions, (iii) Assured as a financial guarantor of the payments due to the investors, (iv) Bear Stearns' own shareholders, and (v) the national, and indeed global, economy.  In March 2008, The Bear Stearns Companies collapsed due to, as noted by the FCIC, "its exposure to risky mortgage assets," and was acquired by JPMorgan Chase in a taxpayer-financed fire sale, with Bear Stearns thereafter merging into and with JP Morgan.  A former employee of Bear Stearns further elaborated on the reasons behind its collapse:

> A lot of great people at [Bear Stearns] lost their jobs. . . .  They were burned by a few [executives], they ruined it for everybody, [because] what they were doing wasn't ethical. . . .  The fact that a little bit of greed in one area led to even more greed . . . .  it collapsed the whole firm. . . . there weren't checks/balances. . . . [T]here was people in there [who] didn't have incredible character.

24.     Once JP Morgan assumed control over Bear Stearns, it used its domination over EMC to implement an across-the-board strategy to improperly bar EMC from honoring its contractual promises to disclose and repurchase defective loans.  In what amounts to accounting fraud, JP Morgan's bad-faith strategy was designed to avoid and has avoided recognition of the vast off-balance-sheet exposure relating to Bear Stearns' securitizations, including the Transaction – thereby enabling JPMorgan Chase & Co. to manipulate its accounting reserves following the taxpayer-financed acquisition of Bear Stearns.

25.     More specifically, in May 2008, just days after assuming responsibility for the Bear Stearns securitizations, the JP Morgan executive director tasked with addressing insurers'

11

repurchase demands, but with no prior knowledge of the deals, slashed by 56 percent the breach findings already made by EMC, in order to make a corresponding reduction in the accounting reserves attributable to the acquisition of Bear Stearns under the JPMorgan Chase & Co. umbrella.  The same JP Morgan executive director thereafter strictly enforced a strategy to reject all repurchase demands made by insurers unless JP Morgan had recourse against the originator of the loans to offset its obligations.

26.    JP Morgan applied this very strategy in response to Assured's demands that EMC repurchase the breaching loans identified by Assured.  At the direction of JP Morgan executives, EMC refused to repurchase or acknowledge the breaches with respect to *every one of the 820 breaching loans* identified by Assured in correspondence dated April 8 and August 8, 2010.

27.    Making matters even worse, subsequent to the filing of the original complaint in this action detailing EMC's liability for the extensive losses suffered by Assured, JP Morgan Chase & Co. has taken steps to strip EMC of its assets and render it unable to satisfy any judgment against it.  In violation of EMC's numerous contractual obligations to Assured, on or about April 1, 2011, JPMorgan Chase & Co. effectuated an intercompany asset sale whereby EMC transferred to its affiliate, JPMC Bank, all of EMC's servicing-related assets (the "Asset Transfer").  EMC has been shorn of its assets and has become, in essence, a shell.  By taking these improper actions, JPMorgan Chase & Co. has subjected its subsidiary, JPMC Bank, to liability as EMC's successor.

28.    Assured has incurred substantial harm as a result of defendants' misconduct.  The Transaction has failed miserably and the overwhelming percentage of the securitized loans have defaulted or are seriously delinquent, causing massive shortfalls in the cash flows required to pay down the securities and, thereby, requiring Assured to make significant payments with respect to

its insurance policy.  The Transaction has experienced cumulative losses exceeding $75 million, resulting in more than $43 million in unreimbursed claims payments by Assured.

29.      Assured therefore brings this action to redress the pervasive misconduct by Bear Stearns relating to the Transaction.  Among other relief, Assured is entitled to be put in the position it would be in had it not been fraudulently induced to enter into the Transaction and issue its insurance policy, the recovery of claims payments made and to be made thereunder, the recovery of fees and costs expended to uncover and prosecute Bear Stearns' egregious fraud, punitive damages, and others.

## I.      THE PARTIES

### A.      PLAINTIFF

30.      Assured is a duly organized and validly existing Maryland corporation, which maintains its principal place of business in New York City, and is a provider of financial guaranty insurance.

### B.      THE "BEAR STEARNS" DEFENDANTS

31.      EMC is organized under the laws of the State of Delaware and its principal place of business is at 2780 Lake Vista Drive, Lewisville, Texas 75067.  At all relevant times leading up to, and including, the Transaction closing date, EMC was a wholly owned subsidiary of The Bear Stearns Companies Inc. ("The Bear Stearns Companies") and an affiliate of Bear Stearns Asset Backed Securities I LLC ("BSABS," the depositor) and Bear, Stearns & Co. (the underwriter in the Transaction).  Pursuant to a merger agreement effective May 30, 2008, JPMorgan Chase & Co. acquired The Bear Stearns Companies Inc., including Bear, Stearns & Co. and EMC, for nominal consideration in a transaction that was financed in part by a $29 billion non-recourse loan made by taxpayers (the "Merger").  After the Merger, EMC is wholly owned by The Bear Stearns Companies, LLC, which in turn is wholly owned by JPMorgan

13

Chase & Co.[1]  On or about March 31, 2011, EMC underwent a change in form from a corporation to a limited liability company, and it now is registered in Delaware as EMC Mortgage LLC.

32.     Bear, Stearns & Co. was an SEC-registered broker-dealer and a wholly owned subsidiary of The Bear Stearns Companies, principally located at 383 Madison Avenue, New York, New York 10179.  Bear, Stearns & Co. served as the underwriter for the Transaction. Following the Merger, on or about October 1, 2008, Bear, Stearns & Co. merged with an existing subsidiary of JPMorgan Chase & Co. known as J.P. Morgan Securities Inc., and the resulting entity was renamed as J.P. Morgan Securities Inc.  Effective September 1, 2010, J.P. Morgan Securities Inc. converted from a corporation to a limited liability company, and changed its name to J.P. Morgan Securities LLC (defined above as "JP Morgan").  All allegations against Bear Stearns are made against JP Morgan.  JP Morgan is an indirect wholly owned subsidiary of JPMorgan Chase & Co., which is an investment banking holding company incorporated in Delaware and principally located at 270 Park Avenue, New York, New York 10016.

33.     JPMC Bank is a national banking association whose articles of association designate Columbus, Ohio as the location of its main office, and whose principal place of business is in New York City.  JPMC Bank acquired all or substantially all of EMC's assets and succeeded to EMC's business on or about April 1, 2011.  JPMC Bank and EMC are both wholly owned by JPMorgan Chase & Co.  JPMC Bank and EMC are affiliated entities that shared common ownership before JPMC Bank acquired all or substantially all of EMC's assets, and continue to share common ownership after the acquisition.  As explained more fully below, JPMC Bank is a successor to EMC and is therefore liable for the conduct of EMC alleged herein.

---

[1] *See* EMC's 7.1 Rule 7.1 Disclosure Statement, *Assured Guaranty Corp. v. EMC Mortgage Corp.*, No. 10-CV-5367 (NRB) (JCF) (S.D.N.Y. July 28, 2010).

## II.   JURISDICTION AND VENUE

34.   This Court has personal jurisdiction over the defendants, and venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Assured's claims occurred, and the defendants are currently subject to personal jurisdiction, in the Southern District of New York.

35.   Further, in its Insurance and Indemnity Agreement ("I&I Agreement") with Assured for the Transaction, EMC irrevocably submitted to the "non-exclusive jurisdiction of the United States District Court for the Southern District of New York."[2]  Additionally, in the I&I Agreement, EMC "waive[d] and agree[d] not to assert by way of motion, as a defense or otherwise in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such courts, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that the related documents or the subject matter thereof may not be litigated in or by such courts."[3]

36.   Defendant JP Morgan, formerly known as Bear, Stearns & Co., is subject to personal jurisdiction in this Court because it is authorized to do business within New York and regularly transacts business within the State.

37.   Defendant JPMC Bank is subject to personal jurisdiction in this Court because it is authorized to do business within New York, has offices within the State, and regularly transacts business within the State.

---

[2] I&I Agreement § 6.05(a).  The parties to the I&I Agreement are Assured, as Insurer; EMC, as the Seller; BSABS, as the Depositor; SACO I Trust 2005-GP1, as Issuer; LaSalle Bank National Association, as the Master Servicer and Securities Administrator; and Citibank, N.A., as Indenture Trustee.  Capitalized terms used but not defined in this sentence and elsewhere in this Complaint shall have the meanings assigned to such terms in Section 1.01 of the I&I Agreement and Appendix A to the Indenture dated as of Sept. 9, 2005 among SACO I Trust 2005-GP1, as Issuer; Citibank, N.A., as Indenture Trustee; and LaSalle Bank National Association, as Securities Administrator (the "Indenture").

[3] I&I Agreement § 6.05(a).

38.    Defendants EMC and Bear, Stearns & Co. participated in negotiations and other activities within the State that led to the Transaction that gives rise to the claims in this Complaint, and the Transaction occurred within the State.

39.    Assured initially filed a complaint in this action in July 2010.  At the initial scheduling conference, Assured advised the Court that it would amend its complaint to, among other things, assert claims against Bear, Stearns & Co. if discovery and disclosures revealed evidence that EMC and its affiliate Bear, Stearns & Co. fraudulently induced Assured to enter into the Transaction by making false and misleading statements about the home equity lines of credit pooled into the Transaction ("HELOCs") and Bear Stearns' mortgage securitization operations.  The parties also advised the Court that filing an amended complaint adding Bear, Stearns & Co. would destroy diversity and require the case to be dismissed (without prejudice) and refiled in state court.  Based on those disclosures, the Court entered a scheduling order allowing Assured to amend its complaint as a matter of right, and by the parties' so-ordered stipulation, Assured was permitted to file an amended complaint as of right by November 19, 2011.[4]

40.    After bringing suit, Assured uncovered dramatic evidence that Bear, Stearns & Co. and EMC fraudulently induced Assured to enter into the Transaction.  Further, since the commencement of the action, JPMC Bank has acquired all or substantially all of EMC's assets and has succeeded to EMC's business.  Accordingly, Assured filed this amended complaint asserting claims against Bear, Stearns & Co. and JPMC Bank, both non-diverse parties.  The addition of the non-diverse parties destroys subject-matter jurisdiction in federal court.

---

[4] Stipulation and Order Extending Deadline for Amended Pleadings as of Right, *Assured Guaranty Corp. v. EMC Mortgage Corp.*, No. 10-CV-5367 (NRB) (S.D.N.Y. Oct. 20, 2011).

Accordingly, Assured will ask the Court to dismiss this action without prejudice so that it may be refiled in state court.

## III.   THE BEAR STEARNS MORTGAGE
##        LOAN SECURITIZATION "MACHINE"

41.    This action arises from (i) the material misrepresentations and omissions in the disclosures made by Bear Stearns to induce Assured and investors to participate in the Transaction, (ii) the material breaches of the contractual warranties and covenants made by EMC in the agreements effectuating the securitization of HELOCs in the Transaction, and (iii) Bear Stearns' unjustified procurement of EMC's breach of its covenant to repurchase HELOCs that breached EMC's contractual warranties.

42.    By way of background, the securitization process involves the pooling and sale of mortgage loans to a trust, which issues debt securities of varying seniority with payments dependent on, or "backed" by, the cash flow received from the pooled loans.  That is, the cash flow received from the mortgage loans – borrowers' principal and interest payments – is used to pay investors who purchased the securities issued by the trust.  The sponsors of mortgage-backed securitizations often secure an insurance policy issued by a financial guarantor (in this case, Assured) guaranteeing certain payments to investors in specified classes of securities.  Under such policies, the insurer covers shortfalls in cash flow from the principal and interest payments by borrowers for the benefit of certain classes of investors.

43.    The Transaction closed in September 2005.  Bear Stearns pooled and securitized thousands of HELOCs, effectuated the issuance of securities backed by the HELOCs, induced Assured to issue an insurance policy guaranteeing certain payments due on the securities, and sold the securities to investors.  The Transaction was among hundreds of transactions that the Bear Stearns securitization machine churned out from 2004 to 2007.

## A.    BEAR STEARNS CONTROLLED EVERY ASPECT OF THE SECURITIZATION PROCESS

44.    Through its well-engineered network of affiliates, Bear Stearns controlled every link in the mortgage-loan-securitization chain, including (i) the origination, and financing of the origination, of enormous volume of loans that provided the cash flow for the mortgage-backed securities, (ii) the "warehousing" or temporary financing of large pools of loans pending their pooling and securitization into mortgage-backed securities, (iii) the underwriting, offering, and sale of the mortgage-backed securities, and (iv) the servicing of loan pools to ensure the continued payment of principal and interest needed to make payments under the mortgage-backed securities.  As Bear Stearns' parent, The Bear Stearns Companies, reported in its 2006 Annual Report, this "vertically integrated franchise allows us access to every step of the mortgage process, including origination, securitization, distribution and servicing."[5]  Bear Stearns directed its affiliates (each owned by The Bear Stearns Companies) to implement each of these components of the mortgage-securitization process.[6]

45.    The securitization process was effectuated through what Bear Stearns referred to as its "mortgage loan conduit."  According to Mary Haggerty, one of the two Bear Stearns Senior Managing Directors (along with Baron Silverstein) tasked with the creation of the conduit in 2001, the mortgage-loan conduit acquired mortgage loans for the purpose of securitizing them, not to hold in inventory:  "[I]f you think of a pipe, water comes in and water goes out as opposed

---

[5] The Bear Stearns Companies Inc., 2006 Annual Report, at 11 (Feb. 13, 2007).

[6] 4/26/2010 Golden Deposition Tr. at 12-13, 52-53 (stating that the "reporting relationship was to New York" and noting that approximately 50 to 60 individuals had dual titles at Bear Stearns and an EMC entity); 12/11/ 2009 Durden Rule 30(b)(6) Deposition Tr. at 45; 1/22/2010 Megha Rule 30(b)(6) Deposition Tr. at 71-73; 4/15/2010 Gray Deposition Tr. at 48; 5/28/2010 Sears Deposition Tr. at 247-48. References to deposition transcripts throughout this Complaint refer to depositions conducted in *Ambac Assurance Corp. v. EMC Mortgage Corp.*, No. 08-CV-9464 (RMB) (S.D.N.Y.) and *Syncora Guarantee Inc. v. EMC Mortgage Corp.*, 09-CV-3106 (PAC) (S.D.N.Y.), which were made available in this action. *See* Case Management Plan and Scheduling Order at 5, *Assured Guaranty Corp. v. EMC Mortgage Corp.*, No. 10-CV-5367 (NRB) (S.D.N.Y. Mar. 11, 2011).

to a pipe leading to a reservoir that's going to be held."[7]  The conduit channeled the loans

through the pipeline by selling the loans to trusts, which in turn issued securities with rights to

the principal and interest payments made on the loans.  The mortgage-loan conduit thus was the

means by which Bear Stearns converted residential mortgage loans to cash for further lending,

and that generated the short-term revenue that drove its outsized executive compensation.  With

no intention of ever holding loans in inventory, but rather with the stated objective of quickly

securitizing loans before they defaulted, the conduit's acquisition-for-securitization model

fostered and facilitated Bear Stearns' acquisition of mortgage loans with deliberate disregard for

their quality or attributes.

46.    The Bear Stearns mortgage and asset-backed trading organization directed and

controlled the operations of the Bear Stearns mortgage-loan conduit.  The trading organization

was within the Mortgage and Asset Backed Securities Department of Bear Stearns' Fixed

Income Division.  The department was managed by Bear Stearns Senior Managing Director

Thomas Marano.  Marano oversaw two trading desks – the Asset Backed Securities and Whole

Loan Desk and the Adjustable Rate Mortgage Desk – run by Bear Stearns Directors Jeffrey

Verschleiser and Michael Nierenberg, respectively.  The Bear Stearns trading organization

determined the volume of securitizations effectuated through the mortgage-loan conduit, based

on the market it could create for the securities issued.  The trading organization set the volume

and pricing of residential mortgage loans acquired for securitization.[8]  In its role as deal

---

[7] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 21.

[8] 10/03/2011 Marano Deposition Tr. at 29-34 ("[I]f the loans were turned into securities and the securities
were sold, . . . the balance sheet would be reduced and if the trader was able to stay within his operating
limits, then there was no problem.  He would go ahead and move on to the next transaction."); 8/5/2011
Lind Deposition Tr. at 53 (the trading desk handled loan repricing); 6/2/2010 Smith Deposition Tr. at
122-23 (the trading desk determined which loans to package and securitize);1/29/2010 Haggerty Rule
30(b)(6) Deposition Tr. at 86-87 (the volume of loans acquired was "highly controlled by the trading
desk").

manager, the trading organization also solicited, liaised with, and disseminated information to securitization participants – including the investors who invested, the rating agencies that rated, and the insurers that insured the mortgage-backed securities.[9]  The trading organization, as lead underwriter, (i) structured the securitizations, including the Transaction,[10] (ii) purchased the mortgage-backed securities issued in the Transaction (the "Notes") on a firm commitment basis pursuant to written agreements with the Depositor,[11] and (iii) marketed, offered, and sold the Notes to investors.[12]  And the trading organization had the ultimate say with respect to the policies and protocols of the mortgage-loan conduit, including the due diligence, quality control, and repurchase protocols to be followed (or not followed) by EMC in relation to the securitized loans.

47.     The Bear Stearns Mortgage Finance Department was responsible for the day-to-day operational decisions of the mortgage-loan conduit.  As noted, the conduit was created in 2001 by the Co-Heads of the Mortgage Finance Department, Bear Stearns Senior Managing Directors Mary Haggerty and Baron Silverstein.  Haggerty and Silverstein housed aspects of the mortgage-loan conduit in Bear Stearns' affiliate EMC, while maintaining complete control and

---

[9] *See* 8/5/2011 Lind Deposition Tr. at 9-10 (as a Bear Stearns trader, Lind worked with investors to meet their "needs and wants" and with rating agencies "for final credit enhancement levels" in structuring new issue securitizations); *id.* at 21-22 (Lind's general practice was to discuss the attributes of securitized collateral with insurers prior to closing).

[10] *See, e.g.,* 8/5/2011 Lind Deposition Tr. at 38-40; Email from Sally N. Kawana (Vice President, Home Equity Group, Bear, Stearns & Co.) to Rafi Warburg (Analyst, Structured Finance, Assured), dated Aug. 25, 2005, AGC_SACO00458043-8074 (attaching Preliminary Term Sheet for the Transaction).

[11] *See* Underwriting Agreement dated as of Aug. 31, 2005 ("Underwriting Agreement").  The parties to the Underwriting Agreement are BSABS and Bear, Stearns & Co.  The agreement is signed by Baron Silverstein on behalf of both parties – as the Vice President of BSABS and as the Senior Managing Director of Bear, Stearns & Co.

[12] The Underwriting Agreement provides that "[i]t is understood that the Underwriters propose to offer the Notes for sale to the public as set forth in the Prospectus."  Underwriting Agreement § 4.

direction of the operations.[13]  Moreover, Bear Stearns held the residential mortgage-loan conduit out to the market – including investors and insurers – as a Bear, Stearns & Co. enterprise.[14]

48.    At the direction and control of Bear Stearns' trading operations, EMC (i) acquired and aggregated the mortgage loans to be securitized,[15] (ii) sponsored the securitizations by selling loan pools to the trusts that issued the securities, and (iii) in some cases, acted as "servicer" for a large number of the securitized loans, with, among other things, the obligation to collect amounts from the borrowers for the benefit of the trusts.  As the "sponsor" of the securitizations, EMC made warranties – which Bear Stearns negotiated and authorized – to the securitization trusts, investors, and insurers.  Moreover, as discussed in detail below, EMC also purported to undertake pre- and post-acquisition reviews and implement other controls – that also were established and approved by Bear Stearns – to ensure the quality of the loans it acquired.

49.    Bear Stearns, acting through EMC and its affiliate EMC Residential Mortgage Corporation ("EMCRM"), also provided financing for the origination of a large volume of loans it acquired for securitization through the residential mortgage-loan conduit.  EMCRM provided warehouse lines of credit to finance lenders that originated defective loans, on the condition that the originators would sell the loans originated to larger entities referred to as "takeout investors,"

---

[13] 10/3/2011 Marano Deposition Tr. at 24 (confirming that "the EMC Mortgage loan conduit . . . was within the purview of the mortgage finance department headed by Mary Haggerty and Baron Silverstein").

[14] 10/3/11 Marano Deposition Tr. 253:4-12. *See also* Email from Mary Haggerty (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance) to Thomas Marano, dated April 11, 2002, EMC-AMB012047937-39 ("Tom, I think co-branding EMC and Bear like Lehman does with Aurora is a good idea.").

[15] Bear Stearns' trading desk dictated the prices at which EMC acquired mortgage loans for securitization. 8/5/2011 Lind Deposition Tr. at 33 (Bear Stearns traders "would ultimately come out with a price of what we think the loans are worth" based on the prices at which "we think we can clear bonds at each rating level").  The "head of the desk," Jeff Verschleiser, determined Bear Stearns' appropriate profit margin in connection with EMC's acquisition of loans for securitization. *Id.* at 34.

including GreenPoint, the originator of the HELOCs in the Transaction.[16]  The takeout investors

in turn sold many of the loans to EMC for securitization.  By this process, Bear Stearns

laundered the initial originators' loans through the takeout investors.[17]

50.     Bear, Stearns & Co. acted as lead underwriter and designated its employees as the

deal managers to broker the EMC-sponsored securities offerings.  It solicited the rating agencies

to rate, financial guarantors such as Assured to insure, and investors to purchase these mortgage-

backed securities.[18]  Bear, Stearns & Co.'s trading organization also made the decisions on the

volume of securitizations to effectuate; likewise, the volume of loans being acquired by the

conduit was "highly controlled by the trading desk" at Bear, Stearns & Co.[19]

51.     Bear Stearns' affiliates also frequently purchased or retained a financial interest in

a portion of the securities issued in the securitization transactions, which Bear Stearns often

repackaged and sold into securities known as "collateralized debt obligations" ("CDOs").

Moreover, Bear Stearns affiliates managed hedge funds that invested in the securities issued

from the Bear Stearns mortgage-loan conduit.  And Bear Stearns provided financial advice and

research regarding structuring the residential mortgage-backed securities and related structured

products that it created and sold.  Finally, as discussed below, Bear Stearns took short positions

betting against securitization counterparties, including the financial guarantors that insured the

mortgaged-backed securities, which Bear Stearns knew were fixed bets because it had loaded up

---

[16] EMC Residential Mortgage Corporation Standard Terms and Procedures, EMC-AMB 004098250-301, at EMC-AMB 004098271 (listing GreenPoint among "approved Takeout Investors").

[17] See, e.g., Bear Stearns Internal Audit Report, "Limited Review of EMC Residential Mortgage," dated June 6, 2006, EMC-AMB 007034316-321.

[18] 4/19/2010 Glory Deposition Tr. at 49-55, 57-59 (testimony regarding EMC and Bear Stearns roles).

[19] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 86-87. See also 10/3/2011 Marano Deposition Tr. at 32-33 (the volume of securitizations EMC could effectuate in a given year was determined by Bear Stearns traders' position limits on loans and securities).

the securitizations with defective loans and refused to repurchase those loans when those defects were identified.[20]

52.   The trading organization's control over the Bear Stearns mortgage-backed securitization business (including the residential mortgage-loan conduit) and the affiliates it directed to carry out its bidding are depicted in the presentation Bear, Stearns & Co. Senior Managing Director Thomas Marano made to the Securities and Exchange Commission ("SEC") in June 2006:[21]

---

[20] *See* Email from Jeffrey Verschleiser (Senior Managing Director, Head of ABS & Wholeloan Desk, Bear, Stearns & Co.), dated Nov. 20, 2007, to Marlene Palcya, EMC-AMB 009600760-63 ("At the end of October [2007], while presenting to the risk committee on our business I told them that a *few financial guarantors were vulnerable* to potential write downs in the CDO and MBS market and *we should be short* a multiple of 10 of the shorts I had put on . . . In less than three weeks we made approximately $55 million on just these two trades.") (emphasis added).

[21] *See* Bear, Stearns & Co., "Overview of Bear Stearns Residential Mortgage Business, June 2006, Tom Marano," sent as an attachment to an email from Edward Buttacavoli to Thomas Marano, dated June 7, 2006, AMB-EMC 010566854-84, at 57.



**B.  BEAR STEARNS EXTRACTED REVENUE AND PROCEEDS AT EVERY STEP IN THE MORTGAGE LOAN SECURITIZATION PROCESS**

53.   Through Bear Stearns and its affiliates, The Bear Stearns Companies recorded gains and earned fees at every phase of its residential mortgage-backed securities business: (i) loan-origination fees on loans originated by Bear Stearns affiliates; (ii) the proceeds of the sale of notes and certificates to investors as consideration for conveying securitized mortgage pools to the securitization trusts; (iii) fees from underwriting mortgage-backed securities; (iv) fees from servicing of the securitized loans serviced by EMC; (v) fees from CDOs into which these securities were repackaged; (vi) gains and fees from trading in these securities and interests

24

in the CDOs into which they were placed; (vii) gains from taking "short" positions in entities that were adversely affected by Bear Stearns' securitization activities; and (viii) management fees and carried interests from hedge funds and other investment vehicles that invested in the vast array of securities and financial products structured by Bear Stearns and its affiliates that ultimately were backed by residential mortgage loans.[22]  As the FCIC concluded in January 2011 after its investigation of Bear Stearns' role in the economic crisis:  "In mortgage securitization, Bear followed a vertically integrated *model that made money at every step, from loan origination through securitization and sale.*"[23]

### C. BEAR STEARNS INCREASED LOAN VOLUME TO SUPPORT ITS SECURITIZATIONS BY SACRIFICING LOAN QUALITY

54.     At the time the Transaction was consummated, The Bear Stearns Companies had long been a leader in all facets of mortgage-loan securitization, at or near the top of the charts for volume of issuance and underwriting of mortgage-backed securities for 15 years running.[24]  The Bear Stearns Companies built this once-stellar reputation on the securitization of large, high-quality loans referred to as "jumbo prime," which was the business it maintained until 2001.[25]

55.     The Bear Stearns Companies then established the mortgage-loan conduit at EMC, which initially focused on the securitization of "Alt-A" loans that were generally considered more risky than prime loans.  The profits from the securitizations grew year after year, but took

---

[22] 10/3/01 Marano Deposition Tr. 96:24-99:24.

[23] FCIC, The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States 280 (Jan. 2011) [hereinafter FCIC Report], *available at* http://fcic.law.stanford.edu/report.

[24] *See, e.g.*, Asset-Backed Alert, Dec. 31, 2006 (ranking Bear Stearns as the fifth-largest issuer of mortgage-backed securities); Q4 2006 The Bear Stearns Companies Earnings Conference Call, Dec. 14, 2006 (stating that, for 2006, "Bear Stearns ranked as the number one underwriter of MBS Securities [mortgage-backed securities] as the Company's securitization volume rose to $113 billion from $95 billion in fiscal 2005, capturing 11% of the overall U.S. mortgage securities market").

[25] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 28, 30.

off in 2003, when Bear Stearns began to securitize "subprime" mortgage loans, which it never squarely defined, but that generally constituted loans issued to borrowers with limited incomes or relatively low FICO scores (*i.e.*, credit scores) due to poor credit history.[26]

56.     From 2003 to 2006, The Bear Stearns Companies' revenue and profit increased by 123.8 percent and 77.6 percent, respectively, driven in large part by mortgage finance and its securitization machine.[27]   Consistently, the volume of EMC's securitizations grew markedly over the same period.  In 2003, EMC securitized 86,000 loans valued at approximately $20 billion. That number nearly tripled in 2004 to 230,000 loans valued at $48 billion.[28]  In 2005, the number jumped to 389,000 loans valued at nearly $75 billion.[29]  And through September 2006, EMC had securitized another 272,000 loans valued at $54.6 billion.[30]  All told, from 2003 to 2007, EMC purchased and securitized just under one million mortgage loans originally valued in excess of $212 billion.[31]

57.     Critical to Bear Stearns' perpetuation of this successful enterprise was an increasing supply of mortgage loans.  As investor demand for mortgage-backed securities created and sold by Bear Stearns grew, so did the need for ever-increasing numbers of loans to securitize.  With a corporate objective of increasing origination and securitization volume, Bear

---

[26] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 32-33 (EMC began purchasing subprime loans for securitization); *see also* 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 29-30 (unable to provide a definition distinguishing Alt-A loans from subprime); 4/15/2010 Glory Deposition Tr. at 178-79 (testifying she had no knowledge of whether the definition of subprime changed over time); 5/28/2010 Sears Deposition Tr. at 36-37 (defining a subprime loan as one given to a borrower with "less than pristine" credit history); 6/2/2010 Smith Deposition Tr. at 93 ("I don't believe there was a definition [of subprime]").

[27] The Bear Stearns Companies Inc., Annual Report (Form 10-K), at 79 (Nov. 30, 2006); The Bear Stearns Companies Inc., Annual Report (Form 10-K), at 77 (Nov. 30, 2005).

[28] *See* Prospectus Supplement for SACO I Trust 2006-8, at S-29 (Sept. 14, 2006).

[29] *See* Prospectus Supplement for SACO I Trust 2006-8, at S-29 (Sept. 14, 2006).

[30] *See* Prospectus Supplement for GreenPoint Mortgage Funding Trust 2007-HE1, at S-32 (Mar. 5, 2007).

[31] *See* Prospectus Supplement for GreenPoint Mortgage Funding Trust 2007-HE1, at S-32 (Mar. 5, 2007).

Stearns and the lenders it funded actively expanded their use of "reduced documentation" or "no documentation" loan programs. While these programs bear various names (*e.g.*, "Stated Income," "No Ratio," "Stated Income Stated Asset," or "SISA"), they share the common characteristic of requiring less documentation from the borrower than traditional full-documentation loan programs. Accordingly, the reduced- or no-documentation programs were designed to be offered only to certain types of pre-qualified borrowers (*e.g.*, self-employed individuals with very strong credit and substantial equity in the mortgaged property), and the originators approving those loans were required to use alternative means of assessing the borrowers' ability to repay the loans. However, over time, Bear Stearns and its stable of originators like GreenPoint disregarded their own protocols and guidelines to expand these programs to riskier categories of borrowers in order to increase loan volume.

58. In addition, to keep the pipeline full, EMC added second-lien loans and HELOCs to its portfolio of mortgage products, many of which were also made on a low- or no-documentation basis. HELOCs, which are the type of loans at issue in this action, provide to the borrower a revolving line of credit that is generally secured by a second-lien mortgage. EMC's HELOC business began in 2005 (the year the Transaction at issue was effectuated) with over 9,300 loans valued at more than $509 million, and grew to more than 18,000 loans valued at over $1.2 billion by the end of 2006.[32] The growth in its second-lien business was meteoric, with purchase volume skyrocketing from approximately 15,000 loans valued at approximately $660 million at the end of 2004 to approximately 116,500 loans valued at approximately $6.7 billion at the end of 2006.[33]

---

[32] *See* Prospectus Supplement to Bear Stearns ALT-A Trust 2007-3, at 44 (April 25, 2007).

[33] *See* Prospectus Supplement to Bear Stearns ALT-A Trust 2007-3, at 44 (April 25, 2007).

59.      The reduced-documentation programs and second-lien products Bear Stearns

exploited had been in use in residential mortgage lending for some time, and were not at the time

considered problematic in and of themselves.  Rather, the programs and products were

appropriate sources of loans *so long as* commensurate controls were implemented and followed

to ensure the quality of the securitized loans.

60.      The other key to the Bear Stearns securitization machine was investor demand for

its mortgage-backed securities.  As discussed in detail below, Bear Stearns made extensive

representations in advance of and at the closing of its securitizations to convince investors and

financial guarantors, including Assured, that it had implemented and was applying the controls

required to ensure the quality of securitized loans.  Bear Stearns underscored its purported

commitment to loan quality to assuage potential concerns regarding the pace of its growth:

> [O]ur [origination and] conduit business . . . saw a significant
> increase in origination volume over the course of the year and
> that's important not only because it secures a direct pipeline of
> product for securitization and thereby allows us to maintain and
> increase share, but also it has *a lot to do with the quality of the
> product* that we're able to put out in the nonagency space.[34]

61.      Bear Stearns' pitch was persuasive, and worked.  Bear Stearns' representations

induced financial guarantors such as Assured to insure payments due on securities issued from

the Bear Stearns securitization pipeline, and induced investors to purchase those securities.

62.      But, as detailed below, Bear Stearns did not implement the requisite controls and

actively concealed material facts regarding its actual securitization practices and internal

---

[34] The Bear Stearns Companies Investor Conference Call regarding Q4 2005 Earnings, Dec. 15, 2005
(emphasis added). *See also* The Bear Stearns Companies Investment Conference Call regarding Q3 2005
Earnings, Sept. 15, 2005 ("The mortgage business, which I think always gets a lot of attention from you
and everybody else because of the – *how significant that business is, is performing exceptionally well*.
We're continuing to expand the franchise, growing both domestically and internationally.  Moving into
the direct mortgage origination business.  So we're very, very pleased with the business and I – we think
it's doing very well.") (emphasis added).

protocols.[35]  What has only recently come to light is that Bear Stearns' expanded securitization

of reduced-documentation second-lien products, including the HELOCs securitized in the

Transaction, was ***not*** accompanied by the implementation – but rather by the abandonment – of

controls required to ensure the quality of the securitized loans.  Bear Stearns' abandonment of

underwriting policies and controls required to ensure the quality of securitized loans has been

(i) revealed by evidence gathered in litigation by financial guarantors who insured and investors

who purchased Bear Stearns' mortgage-backed securities[36] and (ii) affirmed by the admissions of

former employees of Bear Stearns, GreenPoint, and Watterson Prime.

63.     For example, Bear Stearns' internal documents show that its senior traders put

inordinate pressures on EMC staff to meet loan-purchase volume objectives at the expense of

prudent underwriting standards.  As an EMC underwriting manager wrote to her staff:

> I refuse to receive any more emails from JV [Bear Stearns Senior
> Managing Director, Jeff Verschleiser] (or anyone else) questioning
> why we're not funding more loans each day. . . .  [I]f we have
> 500+ loans in this office ***we MUST find a way to underwrite them
> and buy them***.  . . .  I was not happy when I saw the funding
> numbers and I knew that NY would NOT BE HAPPY. . . .  I

---

[35] *See Bear Naked Lenders*, Wall St. J., March 18, 2008, at A22 ("Bear took particular pride in its risk management, but let its standards slide in the hunt for higher returns during the mortgage mania earlier this decade.").

[36] *See, e.g.*, *Ambac Assurance Corp. v. EMC Mortgage Corp.*, Index No. 650421-2077 (N.Y. Sup. Ct.); *Syncora Guarantee, Inc. v. EMC Mortgage Corp.*, No. 09-CV-3106 (PAC) (S.D.N.Y.); *CIFG Assurance North America, Inc. v. EMC Mortgage Corp.*, No. 2009-30395-211 (Tex. Dist. Denton County); *Federal Home Loan Bank of Seattle v. Bear, Stearns & Co., Inc.*, No. 10-CV-151 (RSM) (W.D. Wa. June 10, 2010); *Federal Home Loan Bank of San Francisco v. Credit Suisse Securities (USA) LLC, et. al.*, No. CGC 10-497839 (Cal. Super. Ct. June 10, 2010); *Federal Home Loan Bank of San Francisco v. Credit Suisse Securities (USA) LLC, et. al.*, No. CGC 10-497840 (Cal. Super. Ct. June 10, 2010); *Federal Home Loan Bank of Boston v. Ally Fin., Inc.*, No. 11-1533 (Mass. Super. Ct.).; *In re Bear Stearns Mortgage Pass-Through Certificates Litig.*, No. 08-CV-8093 (S.D.N.Y.); *Massachusetts Mutual Life Ins. Co. v. JPMorgan Chase Bank, N.A.*, No. 11-CV-30094 (D. Mass.); *Plascencia v. Lending 1st Mortgage*, No. 07-CV-4485 (N. D. Cal.); *In re Bear Stearns Co. ERISA Litig.*, No. 08-MDL 1963 (RWS) (S.D.N.Y.).

expect to see 500+ each day. . . . *I'll do whatever is necessary* to make sure you're successful in meeting this objective. [37]

64.     Bear Stearns' "whatever is necessary" approach to increasing loan volume is corroborated by confidential witnesses 1 through 7 – former underwriters, underwriting assistants, or underwriting supervisors at EMC – who confirm that (i) EMC employees faced intense pressure to approve the purchase of defective loans regardless of loan quality; (ii) EMC increasingly approved risky, low- or no-documentation loans without adequate review; (iii) EMC purchased loans it knew were defective and did not comply with underwriting guidelines; and (iv) EMC routinely approved loans that contained exceptions to underwriting guidelines for which there were no reasonable compensating factors.[38]

65.     Specifically, confidential witness ("CW")-1, an underwriting supervisor who worked at EMC between 2005 and 2007, stated that underwriters at EMC were directed by EMC's managers such as Jo-Karen Whitlock and Dawn Gill and executives of Bear, Stearns & Co. to review up to 25 loan files per day.  According to CW-1, who has worked in the residential mortgage industry since 1982, in order to adequately underwrite a loan file an underwriter could review only approximately 5 to 6 loans in an 8-hour workday.  The pressure to underwrite such

---

[37] Email from Jo-Karen Whitlock (EMC Mortgage Corporation Senior Vice President, Conduit Operations), to loan acquisition staff, dated April 4, 2006, EMC-SYN 00596927-928 (emphasis added, capitalization in original).

[38] The statements of other former EMC employees cited in the complaints brought by the Federal Home Loan Bank of Boston and investors who purchased Bear Stearns stock further confirm the fraudulent practices at Bear Stearns.  One former employee, who was responsible for auditing 30 to 50 loan files each week for fraud, regularly found fraud relating to inflated appraisals, altered credit reports, investors using straw buyers for multiple properties and transactions, and titles that had been doctored.  According to this former employee, loans in which she identified fraud remained in the mortgage pools that were sold to investors. *See* Complaint ¶¶ 336-337, *Federal Home Loan Bank of Boston v. Ally Fin., Inc.*, No. 11-1533 (Mass. Super. Ct. filed Apr. 20, 2011).  Several other former employees confirm that Bear Stearns management knew that the loans Bear Stearns was purchasing and securitizing were unusually risky, but management was "buying everything" because "of the potential for profits from securitizing these loans . . . ." *See* Consolidated Class Action Complaint for Violations of the Federal Securities Laws ¶¶ 54-60, *In re The Bear Stearns Companies Inc. Sec, Deriv., and ERISA Litig.*, No. 08-MDL-1963 (RWS) (S.D.N.Y. Feb. 27, 2009).

an exorbitant number of loan files per day came at the cost of quality. CW-1 confirmed that throughout CW-1's time at EMC, for stated-income loans, contrary to EMC's underwriting guidelines, underwriters were directed by management not to question the reasonableness of incomes stated on the borrowers' loan applications and to ignore fraud found in the loan files.

66.     According to CW-1, EMC's policy specified loan criteria that sellers had to satisfy in order for EMC underwriters to approve loans submitted by sellers for purchase by EMC. But, to ensure that the sellers continued to supply EMC with a healthy supply of loans, EMC's management – including Whitlock and Gill – directed that loans that did not satisfy the required conditions be purchased by EMC anyway. "Quit conditioning [these loans] and get these loans into funding" is a directive that CW-1 often heard from EMC's management. On one occasion, when CW-1 brought to Whitlock a pile of loans where the sellers had failed to satisfy the required conditions, Whitlock grabbed the loan files out of her hands and stated, "I'll take care of them." Later, CW-1 discovered that all of these loans were purchased by EMC even though they contained serious defects.

67.     CW-2, an underwriter at EMC between 2004 and 2007 who was assigned to a team of underwriters responsible for reviewing loans submitted by sellers that had a history of submitting defective and fraudulent loans to EMC, was directed by EMC's management to review 15 to 16 loans per day. According to CW-2, representatives of Bear, Stearns & Co., including Haggerty, often attended weekly team meetings at EMC, and exerted pressure on EMC underwriters to review a high volume of loans, compromising the integrity of the review. CW-2 stated that Whitlock and representatives of Bear, Stearns & Co. often explained at these team meetings that underwriters should *not* focus their efforts on finding fraud or defects in loans being purchased by EMC because EMC was going to pass the loans to other investors. On one

31

occasion, when CW-2 discovered that a loan was rampant with both borrower and seller fraud, she contacted the seller to inquire whether certain statements on the loan application were accurate and to request additional documents verifying those statements. The next day, Whitlock called CW-2 into her office and told her that she should not have requested additional verification documents from the seller because the seller supplied a large volume of loans to EMC. Shortly after the meeting, CW-2's employment at EMC was terminated.

68.     CW-3, an underwriter who worked at EMC between 2003 and 2007, recalled being directed to review between 18 to 20 loan files per day, which, according to her, was impossible to do while ensuring quality underwriting. According to CW-3, Whitlock expressly directed underwriters to sacrifice quality in favor of quantity. For example, when Whitlock learned that CW-3 was comparing information related to a borrower's income and assets listed on the loan application with certain documents in the loan file (as required by proper underwriting protocol), Whitlock directed CW-3 to not engage in this exercise because, in Whitlock's words, it was a "waste of time." Upon reviewing a loan file for an "owner occupied" property, CW-3 learned that the borrower did not intend to occupy the property after closing because the borrower's place of employment was not in close proximity to the property. CW-3 brought the issue to the attention of Jose Carrion, a manager at EMC. Carrion criticized CW-3 for raising the issue and directed her to ignore it. On another occasion, CW-3 was criticized by Whitlock for declining a loan that was submitted by a seller that supplied a significant number of loans to EMC. Whitlock told CW-3, "you should have known better than to decline it."

69.     CW-4, who was an underwriter at EMC between 2005 and 2006, stated that when she began working at EMC, there was virtually no training of underwriters and many underwriters lacked the necessary background and skills in order to conduct proper underwriting

of loans.  For instance, according to CW-4, underwriters at EMC often failed to properly calculate debt-to-income ("DTI") ratios and to evaluate borrowers' credit reports.  CW-4 stated that due to pressures by Whitlock and Carrion to underwrite up to 20 loan files per day, it was impossible for her and other underwriters to ensure that the loans submitted by originators complied with the applicable underwriting guidelines.  CW-4 also stated that EMC's management often overturned underwriters' recommendations that loans be declined because they had incurable defects.  CW-4 specifically recalled recommending that loans where the borrowers' stated incomes were not reasonable should be declined, but later noticed that these loans had been approved for purchase by management.

      70.     CW-5, who worked as an underwriter at EMC between 2005 and 2007, stated that she was required to review at least 20 loans per day.  According to CW-5, it was clear that EMC's management knew that the quantity of loans she was required to review came at the expense of quality.  In fact, CW-5 recalled a meeting where Whitlock told underwriters that they should not worry about the quality of their review because EMC's quality control team would revisit the loans after purchase if the loans went delinquent.  (As discussed below, EMC did not do so.)  CW-5 stated that another EMC manager instructed underwriters that they should not focus their review on finding fraud and defects in loans because the loans had already closed and the borrowers had already moved into the properties.  For instance, CW-5 saw many loan files that contained multiple versions of loan applications, or "1003 forms."  CW-5 stated that in the mortgage industry when there are multiple versions of the 1003 form in the loan file, (i) the best practice is to use the one that lists the lowest income for the borrower, and (ii) if the income on the final 1003 form is higher than the income on an earlier version, it is considered a red flag for fraud that should be investigated.  According to CW-5, EMC's management instructed

underwriters to consider only the income on the final 1003 form, even when the income on the final 1003 was clearly higher than the income stated on an earlier version of the 1003 form. CW-5 stated that when an underwriter raised concerns about this practice to an EMC manager, the manager told the underwriter not to worry and to "just look at the FICO score" to approve the loan.

71.    CW-5 was part of a team of underwriters who reviewed loans from GreenPoint. According to CW-5, based on her experience, loans submitted by GreenPoint were of poor quality and often failed to comply with the applicable underwriting guidelines. CW-5 saw a higher rate of defects among GreenPoint loans in comparison with loans submitted by other sellers. CW-5 stated that despite the high rate of defects in GreenPoint-originated loans, EMC wanted to maintain a good relationship with GreenPoint. CW-5 recalled that on one occasion, Whitlock stated: "We have to approve these loans. GreenPoint is a good customer. Without our customers, we don't have jobs."

72.    CW-6, who was an underwriting assistant at EMC between 2005 and 2007, stated that he lacked any prior underwriting experience when he began working at EMC. Further, CW-6 did not receive any training at EMC on how to underwrite loan files. Regardless of the lack of experience, CW-6 was directed to review up to 18 loan files per day. This directive, according to CW-6, came from Bear Stearns executives in New York and was communicated to underwriters at EMC by Whitlock and other managers. Even more, CW-6 stated that he was instructed not to conduct any meaningful review of the loan files submitted by sellers. Specifically, according to CW-6, underwriters and underwriting assistants were asked by EMC's management to not undertake a review of the documents included in the loan files to assess whether those documents corroborated statements made on the loan applications. Further, CW-6 stated that

34

certain sellers contacted Whitlock directly, and he approved the purchase of loans that had failed to satisfy certain required conditions (e.g., failed to supply missing documents such as verifications of employment and bank deposits).

73.     CW-7, who worked at EMC as a contract underwriter between 2006 and 2007, stated that she was required to review up to 20 loan files per day.  CW-7 stated that underwriters who reviewed loans quickly, even at the expense of quality, were retained and promoted.  Those who failed to review the required number of loans were let go.  According to CW-7, even though the underwriting guidelines often required that when calculating DTI ratios for adjustable-rate loans underwriters should use the projected interest rate of the loan after the first interest rate adjustment, EMC's management instructed underwriters to use the "start rate" or "teaser rate" of the loan in effect at the time of closing.  Further, CW-7 stated that when underwriters raised concerns about a stated income that was not reasonable or about other defects, Charles Kelly, an EMC supervisor, often instructed them to "keep it moving" and to not worry about the defects.

74.     According to CW-1 through CW-4, and CW-6, several underwriters notified EMC's management that the high quantity of loans that they were being asked to review in a workday was sacrificing the quality of the underwriting.  For instance, one underwriter sent EMC's management a petition, complaining that underwriters were being asked to review an unacceptable number of loan files per day and that such pressures were resulting in the purchase by EMC of defective and fraudulent loans.  Upon receiving the petition, Whitlock and Gill directed CW-1, who directly supervised the drafter of the petition, to provide the drafter with an adverse "write up" (i.e., demerit).[39]

---

[39] When another EMC coordinator raised questions with his supervisors and colleagues about the quality of loans that he was processing, instead of taking his concerns seriously, he was mocked, and given the nickname "Eagle Eye" for spotting risk factors and red flags in loan files that others did not want to see.

75.     Another former Bear Stearns employee confirmed that, because of the pressure to "just churn the mortgages through the system," Bear Stearns would "fill in the holes" instead of resolving data discrepancies.  For example, "[a] *missing credit score would magically become a 680 in Bear's system.*"[40]  As this former employee explained in a May 2010 email to journalist Teri Buhl at *The Atlantic*, Bear Stearns provided to counterparties like Assured false and misleading loan data as a result of its skewed incentives:

> [A] snap decision would be made up there (in NY) to code a documentation type without in-depth research of the lender's documentation standards. . . . [W]e don't want to waste the resources on deep investigation: that's not how the company makes money, that's not our competitive advantage, it eats into profits, etc. If a documentation type, as given by a lender, is erroneous, Bear can point the finger at the lender thanks to indemnification agreements.  With that type of protection in this kind of situation, a minimal level of scrutiny is required − and thus *why worry too much about it? The loans will be off the books soon enough.*[41]

76.     The same Bear Stearns employee also wrote to another former employee of Bear Stearns in late 2007 and noted:

> I have been toying with the idea of writing a book about our experiences. . . .  Think of all of the crap that went on and how nobody outside of the company would believe us. . . .  [T]he fact

---

See Complaint ¶ 340, *Federal Home Loan Bank of Boston v. Ally Fin., Inc.*, No. 11-1533 (Mass. Super. Ct. filed Apr. 20, 2011).

[40] First Amended Complaint ¶ 137, *Ambac Assurance Corp. v. EMC Mortgage LLC*, No. 650421/2011(CER) (N.Y. Sup. Ct. filed Jul. 18, 2011) [hereinafter Ambac Amended Complaint] (citing Email from Matthew Van Leeuwen (EMC Mortgage Corporation Analyst, Trade Support) to Nick Verbitsky (Blue Chip Films), dated March 30, 2009, EMC-SYN_VL 0006; Email from Matthew Van Leeuwen (EMC Mortgage Corporation Analyst, Trade Support) to Dylan Hoyt (EMC Mortgage Corporation, Due Diligence Underwriter), dated May 16, 2005, EMC-AMB 001718661 (confirming that the EMC analyst was instructed to revise the loan type to a less risky classification)); First Amended Complaint ¶ 165, *Syncora Guarantee Inc. v. J.P. Morgan Securities LLC*, Index No. 651566/2011(CER) (N.Y. Sup. Ct. filed June 24, 2011) [hereinafter Syncora Amended Complaint].

[41] Ambac Amended Complaint ¶ 137 (citing Email from Matthew Van Leeuwen (EMC Mortgage Corporation Analyst, Trade Support) to Teri Buhl (author of *More Corruption: Bear Stearns Falsified Information as Raters Shrugged*, The Atlantic, May 14, 2010), dated May 13, 2010, EMC-SYN_VL 00034-035 (emphases in original removed, emphasis added)); Syncora Amended Complaint ¶ 165.

> ·that data was constantly changing *and we sold loans without the data being correct – wouldn't investors who bought the [R]MBS's [sic] want to know that*?   And how shitty and incompetent things were behind the scenes?   No wonder it is down the crapper . . . .[42]

77.     Another email exchange between these two former Bear Stearns employees further corroborates that Bear Stearns provided false and misleading data to insurers, rating agencies, and investors.   On March 27, 2009, the former employee referenced in the *Atlantic* article asked the other, "[i]f you could talk, what would you talk about?  I spoke [with a documentary film maker] about how crappy [due diligence] was, . . . how data would get changed to make things work out, . . . how the attitude was to buy buy buy, etc."[43]  The second employee responded:

> *Uhhhh securities fraud….ratings agency tapes that were sent out……*
>
> Pricing models…..valuations………the list goes on and on and one [*sic*]……
>
> *"What kinda doc type is that?"* eh it looks like a Full doc……[44]

78.     Yet another former employee of Bear Stearns told a documentary film maker that "*alot [sic] of collateral slip[ped] through the cracks*, more than anyone would want to accept as truth,"[45] that "*collateral was massaged* by me so I knew what [we] were putting out there,"[46] and that "some cut corners."[47]  The former employee further explained that Bear Stearns cared more

---

[42] 6/14/2011 James Deposition Ex. 21; 6/14/2011 James Deposition Tr. at 247-252.

[43] 6/14/2011 James Deposition Ex. 23; 6/14/2011 James Deposition Tr. at 264-272.

[44] 6/14/2011 James Deposition Ex. 23; 6/14/2011 James Deposition Tr. at 264-272.

[45] 10/7/2011 Campbell Deposition Ex. 35; 10/7/2011Campbell Deposition Tr. at 245-265.

[46] 10/7/2011 Campbell Deposition Ex. 35; 10/7/2011Campbell Deposition Tr. at 245-265.

[47] 10/7/2011 Campbell Deposition Ex. 35; 10/7/2011Campbell Deposition Tr. at 245-265.

about its relationship with its sellers, such as GreenPoint, than about making sure that the attributes of the loans it was purchasing and securitizing were properly disclosed:

> I handled over $30B of collateral, and you have something represented as STATED INCOME and there's no income, and another that's full-doc and theres [*sic*] not even a debt to income ratio. And you push back and say this isn't a full doc loan, 'this looks more like a no doc'. Its like, who's word carries a bigger stick and more and more **what carried a bigger stick was keeping the relationship [with] the counterparty [i.e., the seller] . . . rather than trying to upset them**.

> Some really hairy ones were Ameriquest. . . . **Another was Greenpoint, they were a huge player, but I felt like we were their janitors, picking up pools from them that had horrible data points to report off of. . . .** [48]

79.     The testimony and candid email exchanges of these former employees confirms that, by abandoning appropriate underwriting and due diligence to increase loan volume, Bear Stearns secretly conveyed to its securitizations loans that did not comply with the requisite underwriting guidelines and were made to borrowers who did not have the ability to repay them. As a result, Bear Stearns knowingly, or with reckless disregard, marketed and sold in connection with its securitizations billions of dollars worth of securities backed by mortgage loans that did not conform to its representations and disclosures.

80.     The inclusion of defective loans in its securitizations created huge risks of loss to the investors and insurers of the transactions, and ultimately to the shareholders of The Bear Stearns Companies. But the securitization of the loans generated extraordinary compensation for Bear Stearns' executives that was directly correlated with the volume of securitizations done.

---

[48] 10/7/2011 Campbell Deposition Ex. 35; 10/7/2011Campbell Deposition Tr. at 245-265.

This divergence of interests led to the fall of The Bear Stearns Companies,[49] and to the instant action.

### D. BEAR STEARNS EXECUTIVES DROVE BEAR STEARNS' SECURITIZATION MACHINE TO ASSUME INORDINATE RISK FOR PERSONAL GAIN

81.     The Transaction at issue in this litigation is one of the hundreds the Bear Stearns securitization machine churned out at the direction and control of the Bear, Stearns & Co. Mortgage and Asset Backed Securities Department and its trading operations.  The Transaction was effectuated without regard and with deliberate disregard for the quality of the loans securitized to secure the short-term income and revenue returns that fueled the extraordinary compensation of the senior executives of Bear Stearns and The Bear Stearns Companies.  In that respect, the Transaction was a consequence of, and suffered from, the same moral hazard that infected and brought down the entire company in a taxpayer-financed fire sale.

82.     In its final report issued in January 2011, the federal-government task force authorized by Congress to investigate the financial crisis – aptly named the Financial Crisis Inquiry Commission – concluded that the fall of Bear Stearns was attributable in large part to its overexposure to risky mortgage securities, which in turn was a consequence of a compensation structure that rewarded short-term income and revenue growth at the expense of the long-term interests of the firm, resulting in the disregard of requisite controls:

> The Commission concludes the failure of Bear Stearns and its resulting government-assisted rescues were caused *by its exposure to risky mortgage assets*, its reliance on short term funding, and its high leverage.  These were a result of weak corporate governance and risk management.  *Its executive and employee compensation system* was largely based on return of equity, *creating incentives*

---

[49] *See* FCIC Report at 291 (Chapter 15, *March 2008: The Fall of Bear Stearns*).

*to use excessive leverage and to focus on short-term gains* such as annual growth goals.[50]

83.     In reaching this conclusion, the FCIC specifically found, first, that the "[m]ortgage securitization was the biggest piece of Bear Stearns' most-profitable division, its fixed-income business, which generated 45% of the firm's total revenues."[51] Second, the FCIC found that at "Bear, compensation was based largely on return on equity in a given year. . . about half of each bonus was paid in cash . . ." And "typically" the firm paid out 50 percent of revenues as bonuses,[52] increasing to 58 percent in 2007.[53] Thus, the strong incentive was to drive short-term revenue and income from the securitization business to fuel executive compensation.  That is exactly what Bear did.

84.     The Yale Journal on Regulation also analyzed whether the compensation packages of The Bear Stearns Companies' senior executives created a "moral hazard" risk, *i.e.*, by providing the executives with perverse incentives to enhance their individual wealth by taking excessive risks with "other peoples' money."  The article conclusively determined that the enormous revenue and income-based bonuses created the excessive risks that ultimately led to Bear Stearns' failure in 2008:

> [T]he design provided executives with substantial opportunities (of which they made considerable use) to take large amounts of compensation based on short-term gains off the table and retain it even after the drastic reversal of [Bear Stearns'] fortune . . . . *Such a design of bonus compensation provides executives with incentives to seek improvements in short-term earnings figures*

---

[50] *See* FCIC Report at 291 (Chapter 15, *March 2008: The Fall of Bear Stearns*).

[51] *See* FCIC Report at 291 (Chapter 15, *March 2008: The Fall of Bear Stearns*).

[52] 10/3/11 Marano Deposition Tr. 89:4-8 (agreeing that Bear Stearns paid out 48 percent to 50 percent of revenues as bonus compensation); *Id.* at 89:20-24 (testifying that revenue directly impacted the compensation paid).

[53] *See* FCIC Report at 285 (Chapter 15, *March 2008: The Fall of Bear Stearns*).

40

> ***even at the cost of maintaining an excessively high risk of large***
> ***losses down the road.***[54]

85.     To put this in perspective, based on publicly available information, CEO James

Cayne, Executive Committee Chairman Alan Greenberg, Co-President Alan Schwartz, and Co-

President Warren Spector earned an aggregate total of over *$1 billion* in salary, bonus, and stock

benefits since 2001, during the years preceding Bear Stearns' collapse in 2008.  Even after

accounting for the drop in stock value resulting from Bear Stearns' colossal failure, these top

executives made an aggregate *net payoff exceeding $650 million*.  Meanwhile, the firm

disintegrated, its shareholders' investments evaporated, and the loans it funded and securitized –

and the mortgage-backed securities and other financial products linked to them – have wreaked

unprecedented harm on borrowers, investors, and the economy as a whole.

86.     Similarly, in a retrospective review of the SEC's oversight of Bear Stearns

ordered by Congress, the Office of the Inspector General, Office of Audits ("OIG"), concluded

in its final report dated September 25, 2008 that Bear Stearns was overly concentrated in

mortgage-backed securities, its risk-management functions were understaffed and inadequate,

and its internal audit processes were unduly influenced by management.[55]  With respect to the

mortgage- and asset-backed securities business, each of these functions was under the

responsibility of Thomas Marano as Bear, Stearns & Co. Senior Managing Director and

Designated Principal[56] of the Mortgage- and Asset-Backed Securities Department.  In that role,

---

[54] *See* Lucian A. Bebchuk, Alma Cohen & Holger Spamann, *The Wages of Failure:  Executive Compensation at Bear Stearns and Lehman 2000-2008*, 27 YALE J. ON REG. 257, 274 (2010) (emphasis added). *See also* Lucian A. Bebchuk, *How to Fix Bankers' Pay*, DAEDALUS, Fall 2010, Volume 139 (4).

[55] *See* Office of Inspector General, Office of Audits, SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program ix-x, 17-18, 20-23 (Sept. 25, 2008), *available at* http://www.sec-oig.gov/Reports/AuditsInspections/2008/446-a.pdf.

[56] As the "Designated Principal," Marano was responsible for ensuring there were adequate controls and policies and procedures reasonably designed to assure compliance with the securities laws.  *See* Nat'l

Marano was "well aware of the amount of risk that was being taken on in terms of acquiring assets and . . . the activities with respect to securitization . . . ."[57] Consequently, Marano participated in the initial audit by the Consolidated Supervised Entity Program of the SEC in Fall 2005, when the Transaction was effectuated.[58] The SEC audit report from November 2005, which was not disclosed to Assured or the general public, identified the significant risk management and control deficiencies that the OIG concluded in September 2008 *never were redressed*.[59]

87.  Likewise, shortly after the Transaction closed, Bear Stearns' internal audit department issued a report to Marano and senior executives of The Bear Stearns Companies identifying significant deficiencies in the internal quality control and claims operations that Bear Stearns had touted to induce Assured to participate in the Transaction.[60] The controls proposed by the internal audit department *never were implemented*.

88.  The Bear Stearns Companies senior executives allowed Marano free rein to run the residential mortgage-backed securities business (including the securitization conduit) without

---

Assoc. of Securities Dealers ("NASD") Conduct Rules 3010-3012, *available at* http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=3602; New York Stock Exchange Rule 342 ("Offices—Approval, Supervision and Control"), *available at* http://rules.nyse.com/NYSETools/PlatformViewer.asp?selectednode=chp%5F1%5F5%5F3%5F2&manual=%2Fnyse%2Frules%2Fnyse%2Drules%2F. NASD is now known as the Financial Industry Regulatory Authority, or FINRA. *See also* Email from Thomas Marano (Bear, Stearns & Co. Senior Managing Director, Head of MBS, ABS and CMBS) to Elizabeth Ventura and John Quinn, dated Aug. 31, 2005, EMC-AMB010620759-73; 10/3/2011 Marano Deposition Tr. at 46:17-49:24.

[57] 4/26/2010 Golden Deposition Tr. at 252 (Marano reported directly to Co-head of Fixed Income); 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 84-85, 91-92.

[58] 10/3/11 Marano Deposition Tr. 245:22-246:3.

[59] *See* SEC Non-Public Information Memorandum, "CSE Examination of Bear Stearns," dated Nov. 4, 2005, SEC-TM-FCIC-1053369-76; Office of Inspector General, Office of Audits, SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program ix-x, 20-23 (Sept. 25, 2008), *available at* http://www.sec-oig.gov/Reports/AuditsInspections/2008/446-a.pdf.

[60] Email from Stephanie Paduano (Bear, Stearns & Co. Internal Audit Department) dated March 7, 2006, forwarding EMC Reps & Warrants Internal Audit Report dated Feb. 28, 2006, EMC-AMB 001496304-311.

the requisite controls and in disregard of the long-term consequences for the securitization participants (including Assured) or The Bear Stearns Companies' shareholders. They did so in deference to the extraordinary short-term income and revenue the business generated. Indeed, Marano was highly compensated based on annual revenue and income returns. And he in turn bestowed extraordinary compensation on the senior managers of the mortgage-loan conduit to incentivize continued short-term returns.

89.    In particular, Marano set compensation for the four primary managers of the residential mortgage-loan securitization conduit: Jeffrey Verschleiser, Michael Nierenberg, Mary Haggerty, and Baron Silverstein. As noted, Verschleiser and Nierenberg were Bear, Stearns & Co. Senior Managing Directors, Co-Heads of Mortgage Trading, and reported directly to Marano. As such, they were "decision-makers" for the residential mortgage-loan securitization conduit and "were actively involved in running the mortgage business, which included servicing conduit, trading, etc."[61] Nierenberg and Verschleiser directly supervised the Co-Heads of Mortgage Finance, Haggerty and Silverstein, who each were responsible for the daily operations of the residential mortgage-loan conduit.

90.    More specifically, starting in 2001, Haggerty's responsibilities were to "build," and then manage, "all aspects" of "creating a business where we could buy [loans] and securitize them."[62] Between 2000 and 2007, Silverstein was in charge of "taking a pool of mortgage loans and completing and executing the securitization process," including presentations to the rating agencies, coordinating with the trading desk for the securities to be issued, preparing the Registration Statements, Free Writing Prospectuses ("FWPs"), Prospectuses, and Prospectus Supplements (collectively, "Offering Documents") that were publicly filed with the SEC and

---

[61] 4/26/2010 Golden Deposition Tr. at 252.

[62] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 35-36.

used to market the securities, reviewing the due diligence performed for the securitized loan pool, and then coordinating the settlement and closing of the securitization transaction.[63]  When asked at a deposition what his specific role was in the process, Silverstein was resolute: "I would not manage – I would be responsible for each of these processes in relation to a securitization."[64]

91.    After Bear Stearns' acquisition by JPMorgan Chase & Co., JP Morgan hired Haggerty and Silverstein to serve as two of the three Co-Heads of the transaction management group responsible for activities "in connection with sale, purchase, securitization, [and] servicing" of mortgage loans.[65]  Haggerty currently works at JP Morgan as a Managing Director in the Securitized Products Group.  Silverstein was a Managing Director in Mortgage Finance at JP Morgan until December 2008.

92.    Marano set extraordinary compensation for each of the four Bear, Stearns & Co. executives that was directly dependent on and correlated with the revenues and income from the residential mortgage-backed securitization business.  This compensation structure created perverse incentives for Bear Stearns to purchase and securitize loans regardless of their quality in order to secure massive payouts.  Fully embracing these incentives, the executives focused on the quantity of the loans securitized through the Bear Stearns conduit, in lieu of and to the detriment of loan quality.

---

[63] 6/4/2010 Silverstein Deposition Tr. at 36-37; *see also* 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 37-38 (stating that Silverstein was responsible for "the process by which pools of mortgages are sent to a rating agency for analysis and the . . . preparation of the offering documents in connection with a securitization and then the closing and settlement of that securitization").

[64] 6/4/2010 Silverstein Deposition Tr. at 38 (emphasis added).

[65] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 43.  Haggerty admitted that she is also responsible for assisting Bear Stearns in defending litigations such as this one.  *Id.* at 46 (emphasis added).

93.     An in-depth interview by a former employee of Bear Stearns to a documentary

film maker further corroborates the link between executive compensation and the purchase and

securitization of defective loans by Bear Stearns:

> . ∴. At the end of [20]06 I worked on about 50,000 second liens, . .
> . the collateral was a mess, there were so many holes in it.  But the
> whole idea was as soon as we get these second liens we can move
> it on.  It didn't matter that it was Swiss cheese . . . .  The more I
> saw things move through, and didn't know what it looked like or
> understood it, *we didn't care about that, we cared about how*
> *much money was coming in for that stuff, so why try to stop it?*
> . . . .
>
> . . . A lot of great people at [Bear Stearns] lost their jobs. . . . *They*
> *were burned by a few [executives], they ruined it for everybody,*
> *[because] what they were doing wasn't ethical*.
>
> . . . The fact that a little bit of greed in one area led to even more
> greed  .  .  .  it collapsed the whole firm  .  .  .  there weren't
> checks/balances. . . .   [T]here was people in there [who] didn't
> have incredible character . . . .[66]

94.     The means and the motivation were the same – money, and lots of it – to churn

out securitizations from the Bear Stearns machine regardless of the consequences.[67]  As a result,

while Bear Stearns executives reaped enormous profits (which they have retained to this day),

their actions caused the company's sudden collapse in 2008 and destroyed the livelihood of

millions of Americans (including those individuals that obtained loans that never should have

been approved, or whose retirement plans invested in Bear Stearns' securitizations).

---

[66] 10/7/2011 Campbell Deposition Ex. 35 (emphasis added).

[67] In May 2007, Bear Stearns began to acknowledge what it already knew but had failed to disclose:  its
securitizations were doomed to fail. *See, e.g.*, Email from Thomas Marano (Bear, Stearns & Co. Senior
Managing Director, Head of MBS, ABS, CMBS) to Michael Nierenberg (Bear, Stearns & Co. Senior
Managing Director, Head of ARM and CDO Desk) and Jeffrey Verschleiser (Bear, Stearns & Co. Senior
Managing Director, Head of ABS & Wholeloan Desk), among others, dated May 11, 2007, EMC-AMB
003501771-772 ("You guys need to get a hit team on blowing the retained interest bonds out asap.  This
is the biggest source of balance sheet problems.").

## IV.   GREENPOINT FUELED THE BEAR
## STEARS SECURITIZATION MACHINE

95.     While Bear Stearns acquired loans from its vast network of originators, it
fundamentally thrived off of a handful of large mainstay originators that supplied thousands of
toxic loans critical to the success of Bear Stearns' securitization machine.  GreenPoint was one
of Bear Stearns' largest-volume originators of such loans.[68]

96.     Indeed, GreenPoint was the sole supplier of the HELOCs for the Transaction.
Bear Stearns, through EMC, purchased the HELOCs in the Transaction from GreenPoint in a
single bulk loan-purchase transaction, or "sub-deal," in mid-2005.

97.     Bear Stearns purchased and securitized loans originated by GreenPoint even
though Bear Stearns knew that GreenPoint was originating loans that suffered from serious
defects.  To ensure that GreenPoint continued to provide an uninterrupted flow of loans for its
securitizations, Bear Stearns made numerous concessions to appease its favored originator –
concessions which, to the detriment of insurers like Assured, Bear Stearns never disclosed.

### A.   GREENPOINT WAS AMONG THE MORTGAGE INDUSTRY'S WORST ORIGINATORS

98.     GreenPoint was a California-based mortgage bank originator founded in 1992 that
originated mortgage loans and acquired loans through its "correspondent channel" from various
lenders and brokers.[69]  During 2005, GreenPoint originated – directly or through its

---

[68] Between October 1, 2005 and October 1, 2006, EMC acquired over $3.3 billion of loans from
GreenPoint to fuel Bear Stearns' securitization machine.  Of the approximately 400 sellers for which
EMC monitored seller volume, GreenPoint supplied EMC with the second highest volume of loans.  *See*
Seller Monitoring Report, 10/1/2005 to 10/1/2006, EMC-ASSURED 000703552.

[69] North Fork Bancorp. Inc. ("North Fork") acquired GreenPoint in October 2004, which in turn was
subsequently acquired by Capital One Financial Corporation ("Capital One") in March 2006.  North
Fork's acquisition of GreenPoint increased the net income of its mortgage banking segment from $36.6
million in 2004 to $185.5 million in 2005.  *See* North Fork Bancorp., Inc. Form 10-K/A, for the fiscal
year ended December 31, 2005, filed on April 28, 2006.

correspondent lender network – $42 billion in loans.[70]  Rather than maintaining these loans for its own portfolio, GreenPoint generally sold loans into the secondary market or for securitization. Indeed, in 2005, GreenPoint sold $37.1 billion worth of mortgage loans for an average profit of 116 basis points (the spread between the price at which GreenPoint purchased and sold its loans).[71]

99.     GreenPoint's ability to originate and sell for profit a high volume of loans was, in part, facilitated by the use of its correspondent channel.  Correspondent channel lenders were typically smaller banks that funded loans by using warehouse lines of credit.  Indeed, many of GreenPoint's correspondent lenders received warehouse lines of credit directly from EMCRM, a Bear Stearns affiliate.  The correspondent lenders then sold the loans to GreenPoint, which in turn often sold the same loans to EMC.  At no point in this process did any of the loans' originators and purchasers – *i.e.*, the correspondent lender, EMCRM, GreenPoint, and ultimately EMC – have any incentive to ensure the quality of the loans.  As a result, GreenPoint typically purchased and sold poor quality loans despite its public pronouncements that it would not sacrifice quality to drive origination volume and gain on sales.[72]

100.     GreenPoint held itself out as a leading national leader in Alt-A (which are the majority of the HELOCs included in the Transaction) and no-documentation residential loans. Although these non-traditional loan programs purportedly were offered, and should have been reserved for, only those loan applicants that established creditworthiness through other factors,

---

[70] North Fork Bancorp., Inc. Form 10-K/A, for the fiscal year ended December 31, 2005, filed on April 28, 2006.

[71] North Fork Bancorp., Inc. Form 10-K/A, for the fiscal year ended December 31, 2005, filed on April 28, 2006.

[72] *See* North Fork Bancorp., Inc's Form 10-Q for the period ended September 30, 2005, filed November 9, 2005 ("We do not originate subprime loans, nor will we sacrifice quality to drive origination volume and gain on sales.").

GreenPoint implemented a company strategy of exception-based lending, regularly approving loans with exceptions to underwriting guidelines.[73]  GreenPoint exploited its exception-driven business by originating exception-laden loans made to the riskiest borrowers and then off-loading them into the secondary market.  Meanwhile, ████████████████████ ██████████████████████[74] because it knew that loans with exceptions were often defective.  Bear Stearns in turn purchased a massive volume of GreenPoint's exception-laden loans and pooled them into securitizations, pushing the inordinate risks downstream to insurers like Assured.

     101.    Further still, during the time period when the HELOCs were originated, GreenPoint ignored its own policy of assessing the incomes listed on stated-income loans for reasonableness, as required by the underwriting guidelines.  This fact is corroborated by GreenPoint's own documents.  For instance, ██████████████████████

████████████████████████████████

████████████████████████████

██████████████████████████████

██████████████████████████████

██████████████████████████

██████████████████████████

---

[73] *See* ████████████████████████

    *see also* ████████████████████████

████████████████████████████

[74] *See* ████████████████

[75] *See* ████████████████

[76] *See* ████████████████

███████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████ The HELOCs in the Transaction were

originated during ████████████████ As such, Bear Stearns purchased and pooled stated-

income loans that contained unreasonable stated incomes.

102.    In short, GreenPoint was a mortgage mill that disregarded prudent underwriting

standards to recklessly originate defective loans irrespective of borrowers' ability to repay.

Because its model depended on aggregators (such as Bear Stearns) purchasing its loans for

securitization without regard to loan quality, GreenPoint's demise came fast after the

securitization market dried up in the second quarter of 2007.  Without the funding required to

cover its financing costs, and facing large volumes of demands from aggregators (including Bear

Stearns) that GreenPoint repurchase its defective loans, in mid-2007 GreenPoint's parent Capital

One shut down its mortgage-origination operations to put a cap on its exposure.[80]

103.    Reflecting the terrible quality of its loans, GreenPoint since has been named as a

defendant in a wave of lawsuits alleging that it engaged in a pattern of fraudulent and otherwise

---

[77] *See* ████████████████████████████████████
████████████████████████████

[78] ████████████████████████████████████████
██████████████████████

[79] ████████████████████████████████████████
█████████████████

[80] Valerie Bauerlein, *Capital One Shuts Down GreenPoint Mortgage Unit*, WALL ST. J., Aug. 22, 2007.

improper lending practices.[81]  Of note, Rachel Steinmetz, who was employed as a Senior

Underwriter at GreenPoint between 2005 and 2006, commenced a whistleblower action claiming

retaliatory termination against GreenPoint in June 2008, alleging that GreenPoint built its

inventory of loans to be sold to investors by encouraging lax underwriting and engaging in

widespread fraud.[82]  Steinmetz's complaint details specific examples of occasions when she was

forced by GreenPoint's management to approve loans that contained fraudulent information.  For

instance, in 2005, Steinmetz informed her supervisors that a particular loan she had been asked

to approve contained fraudulent statements and insufficient verification documents.[83]  According

to Steinmetz, GreenPoint's management overrode her decision to reject the loan.[84]  On another

occasion in 2005, Steinmetz approved a loan contingent on the borrower's ability to verify that

certain information in the loan file was truthful.  Even though the borrower provided inadequate

---

[81] *See Steinmetz v. GreenPoint Mortgage Funding, Inc.*, No. 08-CV-5367 (S.D.N.Y. June 11, 2008); *Ferguson v. GreenPoint Mortgage Funding, Inc. et al.*, No. 0:08-CV-60854-WPD (S.D. Fla. June 5, 2008); *Lewis v. GreenPoint Mortgage Funding, Inc. et al.*, No. 1:08-CV-00567-TSE-TCB (E.D. Va. June 3, 2008); *Ouziz v. GreenPoint Mortgage Funding, Inc. et al.*, No. 3:08-CV-02201-WHA (N.D. Cal. Apr. 29, 2008); *Perez v. GreenPoint Mortgage Funding, Inc. et al.*, No. 5:08-CV-01972-JW (N.D. Cal. Apr. 15, 2008); *Ramirez v. GreenPoint Mortgage Funding, Inc.*, No. 3:08-CV-00369-EDL (N.D. Cal. Jan. 18, 2008); *Knapp v. GreenPoint Mortgage Funding, Inc. et al.*, No. CIV 466080 (Cal. Super. Ct. Sept. 14, 2007); *Feinstein v. GreenPoint Mortgage Funding, Inc. et al.*, No. 07-CV-1851 (E.D. Pa. May 7, 2007); *Assured Guaranty Mun. Corp. v. DB Structured Prods., Inc., et al.*, Case No. 650705-2010 (N.Y. Sup. Ct., N.Y. County) (suit by monoline insurer in which GreenPoint is a third-party defendant); *U.S. Bank Nat'l Ass'n, as Indenture Trustee for the Benefit of the Insurers and Noteholders of GreenPoint Mortgage Funding Trust 2006-HE1, Home Equity Loan Asset-Backed Notes, Series 2006-HE1 v. Greenpoint Mortgage Funding, Inc.*, Case No. 600352-2009 (N.Y. Sup. Ct., N.Y. County) (suit by monoline insurer).

[82] Amended Complaint ¶¶ 1-6, *Steinmetz v. GreenPoint Mortgage Funding, Inc.*, No. 08-CV-5367 (S.D.N.Y. filed Dec. 24, 2008).

[83] Amended Complaint ¶ 57, *Steinmetz v. GreenPoint Mortgage Funding, Inc.*, No. 08-CV-5367 (S.D.N.Y. filed Dec. 24, 2008).

[84] Amended Complaint ¶ 57, *Steinmetz v. GreenPoint Mortgage Funding, Inc.*, No. 08-CV-5367 (S.D.N.Y. filed Dec. 24, 2008).

documentation to disprove that the loan contained fraud, GreenPoint's managers forged

Steinmetz's signature to approve the loan.[85]

104.    With respect to stated-income loans – which represent over 80 percent of the

HELOCs included in the Transaction – Steinmetz stated that GreenPoint's management allowed

the approval of loan applications where the borrowers' incomes were "grossly overstated."[86]  For

instance, one GreenPoint manager repeatedly instructed Steinmetz:

> Many people that I know, including members of my immediate
> family work off the books and the borrower might have this type of
> income.  You should consider that even though the borrower's
> spouse was not listed on the application – the broker might still be
> calculating spousal income in the total income.  If a borrower has
> some assets in the bank this was proof of income![87]

Even though Steinmetz retorted that the underwriting guidelines prohibit considering the

spouse's income if the spouse is not a co-borrower on the loan, Steinmetz was directed by

GreenPoint's management to approve numerous stated-income loans where the borrowers'

incomes were patently unreasonable and fraudulent.[88]  On one occasion, a GreenPoint manager

directed Steinmetz, "[y]ou should approve the loan because we are trying get a lot of business

from this broker."[89]  The same manager also explained, "[i]n my experience, [GreenPoint] will

frequently make a loan decision based on trying to get volume from a broker."[90]

---

[85] Amended Complaint ¶¶ 51 and 58, *Steinmetz v. GreenPoint Mortgage Funding, Inc.*, No. 08-CV-5367 (S.D.N.Y. filed Dec. 24, 2008).

[86] Amended Complaint ¶ 105, *Steinmetz v. GreenPoint Mortgage Funding, Inc.*, No. 08-CV-5367 (S.D.N.Y. filed Dec. 24, 2008).

[87] *Id.*

[88] Amended Complaint ¶¶ 111-91, *Steinmetz v. GreenPoint Mortgage Funding, Inc.*, No. 08-CV-5367 (S.D.N.Y. filed Dec. 24, 2008) (discussing loans submitted by particular borrowers).

[89] Amended Complaint ¶ 118, *Steinmetz v. GreenPoint Mortgage Funding, Inc.*, No. 08-CV-5367 (S.D.N.Y. filed Dec. 24, 2008).

[90] Amended Complaint ¶ 118, *Steinmetz v. GreenPoint Mortgage Funding, Inc.*, No. 08-CV-5367 (S.D.N.Y. filed Dec. 24, 2008).

105.   Other former GreenPoint employees also have come forward to bring the
mortgage bank's egregious practices to light. For instance, according to CW-8, who was an
underwriter at GreenPoint between 2003 and 2005 and underwrote a number of HELOCs
included in the Transaction, underwriters at GreenPoint were under considerable pressure from
management to approve nearly every single loan that they came across regardless of the loan's
quality. With respect to stated-income loans, CW-8 stated that she and other underwriters at
GreenPoint were directed by management to deem the stated income listed on every loan
application as reasonable. According to CW-8, she was directed to approve loans where the
borrowers' stated incomes diverged significantly from the range set forth by external sources
such as Salary.com. CW-8 recalled approving stated-income loans where landscapers claimed to
be earning over $6,000 per month in Ohio. CW-8 considered this income to be unreasonable for
a landscaper in the region, especially in light of the fact that the borrowers were likely
unemployed for a significant portion of the year because landscaping work is predominately
seasonal in that region. Nevertheless, CW-8 was pressured to approve and did approve such
loans. Consistent with and confirming the testimony of CW-8, all of the HELOCs reviewed by
CW-8 that Bear Stearns included in the Transaction had multiple defects.

106.   CW-9 worked as a loan specialist at GreenPoint in 2005. His job responsibilities
included gathering and assembling documents in connection with loans that GreenPoint funded
through loan brokers, similar to many of the HELOCs included in the Transaction. According to
CW-9, GreenPoint made accommodations to the brokers who supplied it with a high volume of
loans, including acquiring and funding loans that failed to comply with underwriting guidelines
and standards. CW-9 stated that brokers through which GreenPoint funded loans were split into
color-coded groups based on the volume of loans they provided to GreenPoint. The blue group

was designated for brokers who supplied GreenPoint the most number of loans.  According to CW-9, brokers in the blue group often submitted loans that lacked sufficient verification documents and breached underwriting guidelines and standards.  CW-9 stated that despite these defects, GreenPoint funded and closed the loans in order to maintain its relationship with its favored brokers.

107.    Admissions by these former GreenPoint employees – that GreenPoint abandoned its underwriting guidelines to increase volume, failed to assess the reasonableness of the borrowers' incomes on stated-income loan applications, and approved loans it knew were fraudulent to maintain a good relationship with its brokers – demonstrate that Bear Stearns' representations about its "controls" to screen out deficient sellers and defective loans were false and misleading.

**B.     BEAR STEARNS RELIED ON THE LARGE SUPPLY OF DEFECTIVE GREENPOINT LOANS TO FUEL ITS SECURITIZATION MACHINE**

108.    Bear Stearns entered into numerous transactions with GreenPoint as fuel for the Bear Stearns securitization machine.  By 2005, and continuing *past* the demise of GreenPoint's origination business in 2007, GreenPoint was the source of a significant percentage of loans acquired and securitized by Bear Stearns.  For the fiscal year 2005, GreenPoint sold a larger percentage of non-subprime loans to Bear Stearns than any other originator.[91]  Between June 1, 2005 and June 1, 2006, Bear Stearns acquired nearly $12 billion worth of loans from

---

[91] EMC Mortgage Corporation Conduit Reporting Package October 2005, EMC-AMB 004091472. (EMC purchases over $9 million of loans  or 16.8% of non-subprime loans purchased for FY 2005 (12/1/05 to 10/31/05)).

GreenPoint.[92]  And from February 2006 to February 2007, GreenPoint was Bear Stearns' fourth largest originator, supplying Bear Stearns with $1.7 billion worth of loans.[93]

109.    Bear Stearns played a significant role in GreenPoint's success not only by acquiring and securitizing loans originated by GreenPoint, but also by providing warehouse lines of credit to lenders who originated and sold defective loans to GreenPoint (many of which were later purchased and securitized by Bear Stearns).  As noted above, GreenPoint served as a "takeout investor" for many brokers and lenders who were funded by EMCRM.[94]  Bear Stearns funded the origination of loans that were eventually sold to GreenPoint even when it knew that the loans were defective.  For instance, CW-10, who worked as a supervisor at EMCRM between 2005 and 2007, stated that when she noticed from the data sent by lenders that the loans were defective (*e.g.*, incomes listed on stated-income loans were not reasonable), her supervisors directed her to fund those loans so long as the lender had found a takeout investor that had committed to purchase the loans.

### C.    BEAR STEARNS MADE CONCESSIONS TO GREENPOINT TO ENSURE ITS CONTINUED SUPPLY OF LOANS FOR SECURITIZATIONS

110.    As one of its largest suppliers of mortgage loans, GreenPoint had considerable leverage to demand increasing concessions over time from Bear Stearns, particularly as the competition for loan volume increased in 2005 and 2006.  To maintain the uninterrupted supply of loans necessary to feed its securitization machine, Bear Stearns relented and agreed to extend numerous concessions to GreenPoint covering nearly every aspect of the securitization process:

---

[92] Seller Monitoring Report, 6/1/05 to 6/1/06, EMC-AMB 007653656.

[93] Seller Monitoring Report, 2/1/06 to 2/1/07, EMC-AMB 010878621.

[94] *See, e.g.*, EMC Residential Mortgage Corporation, Standard Terms & Procedures, EMC-AMB 004098271 (listing GreenPoint as a takeout investor); Email from Shelly Epp (EMC Mortgage Corporation, Credit Analyst) to Randy Deschenes (EMC Residential Mortgage Corporation, CEO), dated March 15, 2007, EMC-AMB 011822145-46 (noting that GreenPoint is a takeout investor and that Bear Stearns has $10 million in exposure to GreenPoint in claims outstanding).

approving GreenPoint's ever-loosening underwriting guidelines, reducing and postponing due diligence, performing virtually no quality control of GreenPoint loans, and ultimately not enforcing its claims against GreenPoint.

111.    At the outset, these concessions manifested in Bear Stearns' approval of GreenPoint's ever-loosening origination guidelines.  Bear Stearns' Co-Head of Mortgage Finance, Mary Haggerty, testified that in order to remain competitive for the supply of loans, EMC adjusted or matched its guidelines with those of its competitors and would grant "variances" for specific sellers from which it purchased loans.[95]  This policy and practice resulted in a downward spiral as to the rigor of the guidelines, and resulted in EMC adopting a "least common denominator" approach vis-à-vis its competitors with respect to the guidelines adopted.  GreenPoint's guidelines were no exception.  When Bear Stearns added HELOCs to its securitization portfolio in 2005, Bear Stearns initially reviewed and "approved with restrictions" GreenPoint's HELOC Second Lien guidelines.[96]  By 2006, however, Bear Stearns maintained a steady flow of GreenPoint loans by accepting without limitation GreenPoint's increasingly loosened guidelines.[97]

112.    Next, to appease its favored originator, Bear Stearns reduced and adjusted the due diligence conducted on GreenPoint's loans even after it had previously determined that GreenPoint's loan pools, and in particular its HELOC pools, were replete with defective loans.  For example, by the end of 2006 Bear Stearns routinely purchased HELOCs and other loan

---

[95] *See* 1/29/2010 Haggerty Deposition Tr. at 107-108.

[96] *See, e.g.*, Email from Paula Tengram (EMC Mortgage Corporation, Product Analyst), dated July 29, 2005, EMC-AMB 001702497-532 (GreenPoint HELOC Second Mortgage guidelines "approved with restrictions").

[97] By way of example, in 2006 GreenPoint began offering concurrent funding or "piggyback" loans for all products, and expanded no income disclosure documentation from primary residences only to second homes and investment properties.

products from GreenPoint and agreed not to perform any due diligence until **after** the loans were acquired.[98]  Once in house, the "due diligence" Bear Stearns conducted was tantamount to almost no due diligence at all.  Indeed, in 2007, Bear Stearns **reduced** the size of the GreenPoint loan samples it subjected to due diligence.[99]  Both changes reduced the effectiveness of the diligence and were designed to ensure the continued flow of defective loans into Bear Stearns' securitization machine.

113.    Further still, to avoid raising red flags concerning the defective loans it had already purchased from GreenPoint, Bear Stearns undertook *de minimis* quality control over GreenPoint loans, including virtually no quality control over the HELOCs included in the Transaction.  For example, Bear Stearns' appetite for GreenPoint loans nearly doubled from 2004 to 2005.  Meanwhile, the proportion of GreenPoint loans that Bear Stearns selected and reviewed for quality control paled in comparison, and actually declined to a mere *17* loans out of 10,081 purchased from GreenPoint between August 2004 to July 2005.[100]  In contrast, the moment Bear Stearns recognized that GreenPoint would no longer be a major supplier of loans as of August 2007, it gave quality control of GreenPoint loans "priorities since GreenPoint will

---

[98] *See, e.g.*, Email from Steven Trombetta (Bear, Stearns & Co. Managing Director, Wholeloan Mortgage Finance) to Keith Lind (Bear, Stearns & Co. Managing Director, Trading), among others, dated December 18, 2006, EMC-SYN 00298341.

[99] *See*  Email from Baron Silverstein (Bear, Stearns & Co. Senior Managing Director, Co-Head, Mortgage Finance), dated May 29, 2007, EMC-SYN 00416564.

[100] Email from Kevin Flanagan to Mary Haggerty (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance), among others, dated Nov. 19, 2005, EMC-AMB 004091471-507 (attaching October Conduit Reporting Package).  At a deposition, Haggerty testified that such reporting of quality control was designed to be a part of seller monitoring and may effect Bear Stearns' future relationship with a given originator.  *See* Haggerty Deposition Tr. at 479-84.

be closing its doors in the next few months."[101]  As a former Bear Stearns employee candidly

explained to a documentary film maker:

> It was a delicate dance to put loans back on a counterparty if the
> loan wasn't what we wanted.  Because you have [Account
> Executives] trying to keep things as smooth as possible, traders
> who live/die by their trade, trying to keep things pumping, and
> keep things coming in, and whenever you're grabbing the
> emergency brake and say 'this collateral is junk'. . . .  So, pulling
> the emergency brake was not an easy process [with] all the . . .
> boiler room mentality and keeping the pedal down as hard as you
> could for as long as you could [because] everyone downstream was
> making money hand over fist.
>
> . . . .
>
> We would take in product to keep a relationship going and we
> could do that [because] we could still move it.  We'd keep the
> relationship going as long as we were still making money and
> when we weren't making the money, is when we started cutting
> ties [with] counterparties [i.e., the sellers] and trying to keep the
> story alive [with] investors saying 'we're getting away from failing
> counterparties'.[102]

114.    As discussed below, Bear Stearns concealed from securitization counterparties,

including Assured, the disconcerting results of the sparse quality control it did perform prior to

the Transaction that revealed excessive defects in a large percentage of GreenPoint loans.

115.    Bear Stearns also appeased its favored seller, GreenPoint, by delaying the

enforcement of outstanding "early payment default" claims against GreenPoint, frequently

allowing its filed claims to age over 180 days.  An "early payment default" or "EPD" is a loan as

to which the borrower has missed a payment due within the first 90 days after origination.

Because mortgage loans typically are the most significant personal debt incurred by an

individual, the failure to make payments from the outset is viewed as a red flag of fraud or the

---

[101] Email from Fernando Serrano (EMC Mortgage Corp., Quality Control Manager) to Michelle Carr and Amy Adame, dated Aug. 27, 2007, EMC-AMB 009122579.

[102] 10/7/2011 Campbell Deposition Ex. 35; 10/7/2011Campbell Deposition Tr. at 245-65.

borrowers' inability to repay the loan. Bear Stearns allowed its EPD claims against GreenPoint to fester until late 2006, when after being warned in an internal audit that Bear Stearns faced a significant backlog of collecting on claims to sellers, [103] Bear Stearns made a "big push" to resolve GreenPoint claims by the end of the year.[104] Bear Stearns' belated efforts did not go unnoticed, as GreenPoint protested the untimely nature of Bear Stearns' efforts to reconcile $78 million worth of outstanding claims, including EPDs that had been aging since 2004.[105]

116.    Unable to recoup its losses due to its own delay, rather than hold GreenPoint to its obligation to repurchase the defaulted loans, Bear Stearns "resolved" its claims by either entering into a settlement, cancelling its claims, or agreeing to a "Reprice / Bid down," whereby GreenPoint paid only a portion of the repurchase claims.[106] In December 2006, Bear Stearns "resolved" $4.9 million of GreenPoint claims by cancellations, claims paid, and downbids.[107] And in July 2007, Bear Stearns and GreenPoint negotiated an $11 million settlement for claims totaling over $37 million.[108] As a result, Bear Stearns forgave $26 million in claims to GreenPoint because Bear Stearns had failed to submit its claims to GreenPoint on a timely basis.

---

[103] Bear Stearns Internal Audit Report, dated Feb. 28, 2006, EMC-AMB 001496305-11 at p.2.

[104] Email from Pat Moore (EMC Mortgage Corporation Manager, Representations and Warranties Department) to Susan Yasinitsky (GreenPoint) dated Sept. 27, 2006, dated Sept. 27, 2006, EMC-AMB 004930642.

[105] Email from Susan Yasinitsky (GreenPoint) to Brenda Green (Bear Stearns) and Hope Moore (Bear Stearns), dated July 20, 2006, EMC-AMB 008938305.

[106] *See* Email from Mieko Willoughby (Bear, Stearns & Co. Senior Managing Director, Account Executive) to Steve Corn (Bear, Stearns & Co. Associate Director of Mortgage Origination), dated July 19, 2006, EMC-AMB 007122474-480 (attaching Seller Outstanding Report); Email from Paula Applegate to John Thomson and others at GreenPoint, dated Feb. 11, 2005, EMC-AMB 005134913-14 (attaching summary of outstanding repurchase claims for breaches of representations and warranties made by GreenPoint and offering GreenPoint of a "obtaining a 'down bid' from our EMC Scratch & Dent Desk should you wish to consider an alternative to repurchase.").

[107] Seller Monitoring Report, 9/1/05 – 9/1/06, EMC-AMB 003513462 (Claims settlement info "as of 12/4/06").

[108] *Compare* Email from Baron Silverstein (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance) to Mieko Willoughby (Bear, Stearns & Co. Senior Managing Director, Account

117.    In an ultimate concession to GreenPoint, Bear Stearns declined to even file a group of repurchase claims against GreenPoint after identifying HELOCs in the Transaction suffering from material underwriting defects.  In November 2006, Bear Stearns repurchased 34 HELOCs out of the Transaction for breaches of representations and warranties.[109]  Rather than enforce its contractual repurchase rights against GreenPoint for the same breaching HELOCs, Bear Stearns "made the decision not to file these claims" because GreenPoint "would have gone ballistic over the age of these claims."[110]  In May 2007, Bear Stearns confirmed that these HELOCs were never put back to GreenPoint because "it wasn't worth the risk to alienate" its favored originator.[111]  In short, throughout its relationship with GreenPoint – including before, during, and after the Transaction – Bear Stearns condoned and enforced lax underwriting and origination of loans and was careful not to step on the toes of "one of [its] oldest Conduit

_____

Executive) and Pat Moore (EMC Mortgage Corporation Manager, Representations and Warranties Department), dated July 30, 2007, EMC-AMB 001763122-24 (attaching wire list of GreenPoint settled loans) *with* Seller Monitoring Report, EMC-AMB 009266843 (reflecting Claims Data as of July 24, 2007 and noting a target settlement date of July 31, 2007 for claims against GreenPoint of over $37 million).

[109] Email from Cheryl Glory (Bear, Stearns & Co. Managing Director of US RMBS Investor Relations) to Jeff Verschleiser (Bear, Stearns & Co. Senior Managing Director, Head of ABS & Wholeloan Desk) and Keith Lind (Bear, Stearns & Co. Managing Director, Trading), dated May 9, 2007, EMC-ASSURED 0004777864 ("we requested EMC review these loans for MLPA and PSA breaches.  Based on their findings the loans we purchased out around November and claims were filed against GreenPoint.").

[110] Email from Allen Herrington (EMC Mortgage Corporation, Representations and Warranties Department) to Sharrell Atkins (EMC Mortgage Corporation, Quality Control) and Cheryl Glory (Bear, Stearns & Co. Managing Director, US RMBS Investor Relations) et al., dated Nov. 28, 2006, EMC-ASSURED 000523714.

[111] Email from Pat Moore (EMC Mortgage Corporation Manager, Representations and Warranties Department) to Stephen Golden (Bear, Stearns & Co. Senior Managing Director, Warehouse, and EMC Residential Mortgage, President), dated May 9, 2007, EMC-ASSURED 000523718; *see also* Email from Cheryl Glory (Bear, Stearns & Co. Managing Director of US RMBS Investor Relations) to Stephen Golden (Bear, Stearns & Co. Senior Managing Director, Warehouse, and EMC Residential Mortgage, President), EMC-ASSURED 000543990 ("This is the same population of loans that we repurchased from the GP1 deal but have not put claims back to GP yet.").

Sellers" because "the relationship is an important one."[112]  Meanwhile, the workings and

consequences of this relationship were hidden from Assured.

### D.   BEAR STEARNS MADE INCREMENTAL AND UNDISCLOSED PROFITS FROM ITS PURCHASE OF DEFECTIVE LOANS FROM GREENPOINT

118.    Throughout its longstanding relationship with GreenPoint, Bear Stearns knew that

GreenPoint originated defective loans that consistently defaulted and suffered from serious

underwriting failures.  As further discussed below, Bear Stearns internally acknowledged that

GreenPoint-originated HELOCs were high-risk loans, long before misleading Assured into

insuring the performance of this product in the Transaction.  As early as April 2005, a Bear

Stearns deal manager informed Co-Head of Mortgage Finance Baron Silverstein, in an email

later forwarded to Head of Asset-Backed Securities Jeff Verschleiser:  *"these dqs*

*[delinquencies] were not a real surprise on the Greenpoint Helocs*, they've seen a similar

number on previous pools."[113]  Further, a vendor hired by Bear Stearns to perform periodic

quality control on loans previously acquired and securitized found that *43 percent* of the

GreenPoint-originated loans it had reviewed prior to the closing of the Transaction contained

material defects and underwriting failures.[114]

119.    The bottom line was that "Bear did not care" about the quality of GreenPoint

loans because it required the volume to fuel the Bear Stearns securitization machine.  Bear

Stearns was content so long as it could continue to dump the loans into securitizations before

they defaulted.  Bear Stearns' incentive to look the other way, and to conduct virtually no quality

---

[112] Email from Pat Moore (EMC Mortgage Corporation Manager, Representations and Warranties Department) to Thomas Durkin among others, dated May 24, 2007, EMC-SYN 00316139.

[113] Email from Steven Trombetta (Bear, Stearns & Co. Managing Director, Wholeloan Mortgage Finance) to Jeffrey Verschleiser (Bear, Stearns & Co. Senior Managing Director, Head of ABS & Wholeloan Desk), dated April 21, 2005, EMC-AMB 009594578-579 (emphasis added).

[114] ADFITECH_0003_000001 – 000016; ADFITECH_0003_000017 – 000232 (unacceptable defects found in 132 of 302 GreenPoint loans); *see* Section VI.C.1, below.

control review on the GreenPoint loans, increased through 2006 as the sources of loans for securitization became scarce. Moreover, by disregarding its quality control protocols, which would require repurchase of defective loans from the securitizations, Bear Stearns was able to realize significant incremental profit by making claims directly against GreenPoint for loans Bear Stearns *had already securitized*, and pocketing any recoveries obtained.

120.    That is, starting in 2005 and increasing in 2006, Bear Stearns asserted claims against GreenPoint demanding the repurchase of loans that defaulted shortly after purchase, during the "early payment default" period, and that suffered other substantive origination failures. As a general matter, Bear Stearns did not advise the securitization participants that it was making the demands on GreenPoint for the "repurchase" of loans already in the securitizations, despite the fact that its executives admitted that they knew "EPDs" raised red flags for fraud or other material problems in the loan.[115] And Bear Stearns did not advise GreenPoint that the loans that Bear Stearns was demanding GreenPoint to repurchase already were securitized. Rather, in its breach notice and repurchase demands, Bear Stearns instead offered to settle with GreenPoint without requiring GreenPoint to repurchase the loan at face value (which would have required Bear Stearns to repurchase it from the securitizations). This practice allowed Bear Stearns to secure recoveries from GreenPoint (on loans already securitized) that were material in terms of the revenue for Bear Stearns, but just a fraction of the loans acquired and securitized, which were not subject to the represented quality control reviews.

---

[115] Bear Stearns' Senior Managing Director Baron Silverstein acknowledged in his deposition that loans that miss a payment shortly after the loan origination (*i.e.*, within the EPD period) raise "red flags" that the loans never should have been issued in the first instance. 6/4/2010 Silverstein Deposition Tr. at 178.

121.    In just one month, from April 2005 to May 2005, Bear Stearns' claims grew from

26 loans to 146 loans.[116]  And by August 2005, Bear Stearns had identified 430 "problem loans"

worth more than $127 million and submitted 439 outstanding claims against GreenPoint worth

more than $5 million.[117]  Less than a year later, that number had risen to 699 claims.[118]  In 2006,

Bear Stearns submitted *more claims against GreenPoint than against any other seller* with

which Bear Stearns did business.[119]  As a result, Bear Stearns knew that GreenPoint was not a

quality originator but toward the "worst end of scale," based on the high percentages of loans

suffering from both unacceptable defects and delinquencies relative to other originators.[120]

---

[116] *Compare* Email from Paula Applegate (Bear Stearns) to Susan Yasinitsky (GreenPoint) and Rose Medina (GreenPoint), among others, dated April 13, 2005, EMC-AMB 004093982-3 (attaching GreenPoint Outstanding Seller Report), *with* Email from Paula Applegate (Bear Stearns) to Susan Yasinitsky (GreenPoint)  and Rose Medina (GreenPoint), among others, dated May 12, 2005, EMC-AMB 004094978-9 (attaching GreenPoint Outstanding Seller Report).

[117] *See* Email from Alan Lu (EMC Mortgage Corporation, Claims Analyst) to Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage, President), Pat Moore (EMC Mortgage Corporation Manager, Representations and Warranties Department) and Allen Herrington (EMC Mortgage Corporation, Representations and Warranties Department), dated Aug. 16, 2005, EMC-AMB 007070898-99.

[118] *See* Email from Alan Lu (EMC Mortgage Corporation, Claims Analyst) to Pat Moore (EMC Mortgage Corporation Manager, Representations and Warranties Department) and Allen Herrington (EMC Mortgage Corporation, Representations and Warranties Department), among others, dated March 20, 2006, EMC-AMB 009088665-66.

[119] Seller Monitoring Report, 1/1/06 to 12/31/06, EMC-AMB 007653616 (total count of Bear Stearns' claims against GreenPoint is highest of any active seller). *See also* Email from Steve Corn (Bear, Stearns & Co. Associate Director of Mortgage Origination) to Mieko Willoughby (Bear, Stearns & Co. Senior Managing Director, Account Executive) and Pat Moore (EMC Mortgage Corporation Manager, Representations and Warranties Department), among others, dated March 10, 2006, EMC-AMB 006803400-402.

[120] Seller Monitoring Report, 1/1/06 to 12/31/06, EMC-AMB 007653616 (Bear Stearns graded sellers in its originator network using a scale of 1 to 10, where a grade of 10 signified the "worst end of the scale"; Bear Stearns assigned GreenPoint a rating 7 in category for unacceptable loan defects, and a rating of 6 in the category for the number of loans suffering from delinquencies of sixty days or more).

122.    By January 2007, only one originator in the Bear Stearns network had more potential EPD claims against it than GreenPoint.[121]  As of June 14, 2007, Bear Stearns ranked GreenPoint as within the "Top 20" of sellers ranked by "EPD Exposure," *i.e.*, by risk of early payment default.  However, reflecting Bear Stearns' long-standing practice to acquire GreenPoint loans regardless of their quality, of the "Top 20" sellers with default exposure, *GreenPoint was one of only three from which Bear Stearns continued to acquire loans*.[122]

123.    By July 2007, on the eve of GreenPoint's demise, Bear Stearns had so many claims outstanding against GreenPoint for defective loans that it finally decided not to purchase additional loans *until* GreenPoint made good on those demands, at the same time conceding that the GreenPoint HELOCs were fraudulent.  Verschleiser wrote to Silverstein and others: "TO BE CLEAR WE WILL NOT FUND **ANY** GREENPOINT PURCHASES UNTIL THESE LOANS ARE REPURCHASED.  In addition, we need to discuss the heloc loans in general, *the performance is horrible, I think the ltv's [i.e., loan-to-value ratios] are bogus and the underwriting is poor*.  We should not be buying no ratios or investors and ltvs need to come down to 85 ltv."[123]

124.    Bear Stearns nonetheless continued to purchase loans from its mainstay supplier right up to the bitter end, even after GreenPoint's parent company ceased its mortgage

---

[121] Email from Kristine Yao to Alan Lu (EMC Mortgage Corporation, Claims Analyst), Allen Herrington (EMC Mortgage Corporation, Representations and Warranties Department), and Patricia Moore (EMC Mortgage Corporation Manager, Representations and Warranties Department), dated Jan. 10, 2007, EMC-AMB 009088694 (attaching "EPD Referrals" and revealing that Bear Stearns identified 108 potential claims against GreenPoint); *see also* EMC-AMB 004099954 ("EPD Summary" reflecting that as of April GreenPoint had second-highest balance in EPD loans of any active seller).

[122] EMC-SYN 00391176, 00391179 (PowerPoint presentation at Slide 15); *see also* EMC-SYN 00391201 (Excel spreadsheet showing same data).

[123] Email from Jeffrey Verschleiser (Bear, Stearns & Co. Senior Managing Director, Head of ABS & Wholeloan Desk) to Baron Silverstein (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance), among others, dated July 23, 2007, EMC-SYN 00423466-467 (capitalization and emphasis in first sentence in original; emphasis added thereafter).

operations.  On August 20, 2007, Bear Stearns downgraded GreenPoint's rating to "F" on its highly touted "Seller Monitoring" report, "as a result of the parent company's decision to cease mortgage operations."[124]  Yet GreenPoint remained an "Active" seller and Bear Stearns purchased an additional $680 million worth of adjustable-rate mortgages from GreenPoint *after* October 1, 2007, in the face of an analyst's recommendation on August 20, 2007 to suspend GreenPoint as a seller.[125]

## V.     THE TRANSACTION

125.    In or around early 2004, Bear Stearns created the "SACO" shelf, which permitted it to offer residential mortgage-backed securities on a "shelf registration basis."  Securitization transactions from the same "shelf" generally have the same structure with respect to the credit quality, lien type, and documentation type of the loans being securitized.  The use of shelves makes it unnecessary for rating agencies, investors, and insurers to completely re-evaluate the basic structure of transactions from the same shelf.[126]  Bear Stearns' presentations to investors and insurers (including Assured) disclosed that Bear Stearns used the SACO shelf to securitize "prime [*i.e.*, high FICO score] and Alt-A" loans secured by second liens on the borrowers'

---

[124] Seller Monitoring Report, 10/1/06 – 9/30/07, EMC-AMB 010909740.

[125] Seller Monitoring Report, 10/1/06 – 9/30/07, EMC-AMB 010909740 ("Analyst Recommended Action 08/20 Recommend suspending seller.").

[126] *See* Yuli Wang, *Cracks in the Foundation: A Transactions Study of Non-Agency Residential Mortgage-Backed Securities* 38 (2009), *available at* http://nrs.harvard.edu/urn-3:HUL.InstRepos:3746196.

properties.[127]  Between January 2004 and June 2007, Bear Stearns used the SACO shelf for approximately 31 transactions that securitized over $13.5 billion in residential mortgage loans.[128]

126.   The HELOCs at issue in the Transaction were securitized by Bear Stearns through the SACO shelf.  The process of securitization for the Transaction began in June 2005 when Bear Stearns committed to buy over 6,000 HELOCs from GreenPoint at a premium price that was approximately 3 percent higher than the aggregate outstanding principal balance of those loans.[129]  GreenPoint and Bear Stearns finalized their purchase contract in late July 2005[130] and Bear Stearns funded the acquisition on August 3, 2005.[131]

127.   While Bear Stearns was acquiring the HELOCs from GreenPoint, it was also in the process of securitizing them into the Transaction.  Bear Stearns prepared and filed a Prospectus, dated June 24, 2005, and Prospectus Supplement, dated August 31, 2005 (collectively, the "ProSupp") with the SEC, pursuant to which Bear Stearns began to market and sell the securities to be issued in connection with the Transaction to investors.  On August 31,

---

[127] *See* EMC Mortgage Corporation Investor Presentation, dated Oct. 17, 2005, EMC-AMB 001958934 – 9040, at EMC-AMB 001959031 (discussing the loan attributes and transaction structures relating to each "Bear Stearns / EMC" shelf).

[128] *See* EMC Mortgage Corporation Investor Presentation, dated Oct. 17, 2005, EMC-AMB 001958934 – 9040, at EMC-AMB 001959031; EMC Mortgage Corporation Investor Presentation, dated June 27, 2007, EMC-AMB 001424986 – 5131, at EMC-AMB 001425108.

[129] Email from Keith Lind (Bear, Stearns & Co. Managing Director, Trading) to a number of Bear Stearns employees, dated June 15, 2005, EMC-AMB 007483365 ("We buy 338,000,000 UPB of Alt-A Heloc loans from Greenpoint (GP0502) @ 103-18+ released for a 8/1/05 settlement. . . . We will be securitizing this pool at the end of August.").

[130] Email from Victoria Johnson (Thacher Proffitt & Wood LLP, counsel for Bear Stearns) to Susan Davia (GreenPoint), EMC-AMB 008916068 (attaching the Seller's Purchase, Warranties and Interim Servicing Agreement, dated as of July 1, 2005).

[131] Email from Steven Trombetta (Bear, Stearns & Co. Managing Director, Wholeloan Mortgage Finance) to Jessica Espino (GreenPoint), dated Aug. 5, 2005, EMC-AMB 005068700 (attaching "funding memo" for the transaction).

2005, Bear Stearns contractually agreed to purchase the securities issued in connection with the Transaction and "to offer [them] for sale to the public as set forth in the Prospectus."[132]

128.   To ensure that investors would purchase the securities backed by the HELOCs, Bear Stearns solicited Assured to provide a financial guaranty insurance policy for the Transaction.  On August 8, Bear Stearns prepared a Preliminary Term Sheet for the Transaction that set forth its structure and the various types of credit enhancements it contained, and disseminated it to Assured.[133]  Bear Stearns, through Matthew Perkins (Senior Managing Director, Bear, Stearns & Co.), acknowledged that Assured's agreement to issue its insurance policy would be subject to, among other things, the following conditions:

- "the completion of due diligence in scope and substance satisfactory to Assured . . . in its good faith judgment with respect to the risk proposed to be assumed by Assured";

- "the preparation, negotiation, due execution and delivery of mutually acceptable documentation";

- "the absence of any material change in the portfolio composition or transaction structure from that set forth in the Preliminary Term Sheet and in the condition (financial or otherwise), operations, operations, performance or properties of EMC, Bear Stearns or any of their affiliates, or the assets underlying the [p]roposed Transaction"; and

- "confirmation acceptable to Assured . . . that (i) Aaa/AAA ratings from Moody's Investor Service, Inc. ('Moody's') and Standard & Poor's . . . ('S&P'), respectively, will be assigned to the Class A-1 Notes (before giving effect to [Assured's] Policy) and (ii) Baa2/BBB ratings from Moody's and S&P,

---

[132] *See* Underwriting Agreement § 4.

[133] Email from Sally N. Kawana (Vice President, Home Equity Group, Bear, Stearns & Co.) to Ken Rosenberg (Director, Structured Finance, Assured) and Rafi Warburg (Director, Structured Finance, Assured), among others, dated Aug. 8, 2005, attaching Preliminary Term Sheet for the Transaction, EMC-ASSURED 000527478-7508. *See also* Email from Sally N. Kawana (Vice President, Home Equity Group, Bear, Stearns & Co.) to Ken Rosenberg (Director, Structured Finance, Assured) and Rafi Warburg (Director, Structured Finance, Assured), among others, dated Aug. 16, 2005, attaching Preliminary Term Sheet for the Transaction, EMC-ASSURED 000494912-4942; Email from Sally N. Kawana (Vice President, Home Equity Group, Bear, Stearns & Co.) to Rafi Warburg (Analyst, Structured Finance, Assured), dated Aug. 25, 2005, attaching Preliminary Term Sheet for the Transaction, EMC-ASSURED 000567426-7458.

respectively, will be assigned to the Class M-1 Notes (before giving effect to [Assured's] Policy)."[134]

129.    The Transaction at issue closed on September 9, 2005.  As the Sponsor and Seller of the Transaction, EMC pooled and securitized approximately 6,028 HELOCs, with an aggregate principal balance of approximately $346 million, that EMC had previously purchased from GreenPoint.  These HELOCs in turn served as collateral for the public issuance of approximately $337 million in securities that were guaranteed by Assured.

130.    The Transaction was effectuated through the following series of agreements (the "Transaction Documents") executed by EMC and other Bear Stearns affiliates that governed, among other things, the rights and obligations of the various parties with respect to the HELOCs and the securities that resulted from their securitization.

131.    EMC, acting as the Seller, sold and assigned its entire interest in the HELOCs to its affiliate BSABS pursuant to a Mortgage Loan Purchase Agreement dated as of September 9, 2005 ("MLPA").  Under the MLPA, EMC made numerous detailed representations and warranties concerning the HELOCs, the related mortgagors, and the related mortgaged properties, and committed to specified remedies if those representations and warranties proved to be untrue.  EMC's contractual warranties were modeled after and at least as broad as the warranties made by GreenPoint to EMC in connection with EMC's acquisition of the HELOCs.

132.    BSABS, as depositor, in turn, sold and assigned all of its rights, title, and interest in the HELOCs to the SACO I Trust 2005-GP1 (the "Trust") pursuant to a Sale and Servicing Agreement dated as of September 9, 2005 ("SSA"), including its sale and assignment to the Trust of the remedies available to BSABS against EMC under the MLPA in the event that

---

[134] Email from Susana Tow (Bear, Stearns & Co.) to Ruth Cove (Assistant General Counsel, Assured), dated Sept. 9, 2005, attaching executed copy of Engagement Letter, EMC-ASSURED 000556675-6677.

EMC's representations and warranties in the MLPA proved untrue.[135]  Pursuant to the Indenture and the SSA, the Trust simultaneously granted to the Indenture Trustee (*i.e.*, Citibank, N.A.) all of its rights, title, and interest in and related to the HELOCs, and all its interest under the SSA, for the benefit of the Noteholders and the Note Insurer (*i.e.*, Assured).[136]

133.    Under the Indenture, the Trust then issued five classes of Notes, including the Class A-1 Notes and the Class M-1 Notes insured by Assured (collectively, the "Insured Notes"), which were registered with the SEC.  These securities were underwritten, marketed, and sold to investors by Bear, Stearns & Co. by means of the related ProSupp.

134.    In order to enhance the credit rating and marketability of the securities and its return on the Transaction, Bear Stearns sought and obtained a financial guaranty insurance policy from Assured, which guaranteed to the holders of the Insured Notes their receipt of certain payments relating to the Insured Notes (the "Policy").

135.    As a condition precedent to the Policy's issuance and as an inducement to Assured, EMC entered into the I&I Agreement with Assured, whereby, among other things, EMC and its affiliates made numerous representations and warranties to and for the benefit of Assured with respect to the Transaction, including that the representations and warranties made

---

[135] Pursuant to a Servicing Agreement dated as of Aug. 1, 2005, EMC and GMAC Mortgage Corporation ("GMAC") agreed that GMAC would service the HELOCs.  The Servicing Agreement was then assigned by EMC to the Trust pursuant to the Assignment, Assumption and Recognition Agreement dated as of Sept. 9, 2005 ("AAR").  Pursuant to Section 1 of the AAR, EMC granted, transferred and assigned to the Trust all its rights, title and interest in and relating to the HELOCs, including those under the Servicing Agreement.  In Section 2 of the AAR, EMC made additional representations and warranties to the Trust, GMAC and Assured.  And in Section 5, EMC agreed to indemnify the Trust and Assured for any harm relating to the breaches of EMC's representations and warranties or covenants.  Finally, Section 14 provides that Assured "shall be considered a third party beneficiary to this AAR . . . entitled to all the related rights and benefits accruing to [Assured] as if it were a direct party to this AAR . . . ."

[136] *See* SSA §§ 2.01(a), 2.08.

by EMC and its affiliates in the Operative Documents[137] were true and correct as of the closing date, and that each such representation and warranty was made "for the benefit of, [Assured] as if the same were set forth in full" therein, without limitation or restriction as to any recourse or remedy for breach thereof.[138]   Under the I&I Agreement, EMC agreed to afford Assured any relief "existing at law or in equity" and to reimburse and indemnify Assured in full in the event that, among other things, EMC's representations and warranties proved to be untrue.[139]   EMC, the Trust, and BSABS also agreed that they "shall be jointly and severally liable for all amounts due and payable to [Assured] hereunder by any such parties."[140]

136.    Relying on Bear Stearns' pre-contractual representations detailed below and EMC's representations and warranties, covenants, and indemnities contained in and encompassed by the I&I Agreement, the Indenture, the Underwriting Agreement, the ProSupp, the MLPA, the AAR, and the SSA, Assured issued the Policy (Policy Number D-2005-69). Under the Policy, Assured agreed to insure certain payments of interest and principal with respect to the Insured Notes.

## VI.    BEAR STEARNS' FRAUDULENT INDUCEMENT BASED ON FALSE AND MISLEADING PRE-CONTRACTUAL REPRESENTATIONS TO ASSURED

137.    Bear Stearns made material misrepresentations to Assured and omitted material facts in its pre-contractual representations and disclosures to Assured to induce Assured to participate in the Transaction.  The affirmative representations and disclosures Bear Stearns made concerning its purported securitization policies and practices to ensure the quality of the

---

[137] The I&I Agreement defines "Operative Documents" to include, among other documents, the I&I Agreement, the MLPA, and the SSA.

[138] *See* I&I Agreement § 2.01(m).

[139] *See* I&I Agreement §§ 3.03, 3.04 and 5.02(a)(iii).

[140] *See* I&I Agreement § 3.06.

loans were materially false and misleading in that they markedly diverged from Bear Stearns' actual practices. Bear Stearns also affirmatively misrepresented and concealed material information about its assessments of GreenPoint and the true attributes of the HELOCs it acquired and securitized in the Transaction.

A.   **BEAR STEARNS SOLICITED ASSURED TO PARTICIPATE IN THE TRANSACTION**

138.   In advance of closing the Transaction, Bear Stearns made myriad representations and disclosures directly to Assured to induce its participation in Transaction. First, Bear Stearns made marketing presentations and disclosures concerning its securitization operations and the particular transaction contemplated, which it reinforced through emails and oral communications. Second, Bear Stearns disseminated mortgage-loan "tapes" (data files with key information for each loan proposed for securitization) that Bear Stearns represented contained true and accurate loan attributes critical to assess the risks associated with the loans to be securitized. Third, Bear Stearns secured ratings from the rating agencies on various classes of securities to be issued in the contemplated transaction. Fourth, Bear Stearns disseminated draft and final Offering Documents to Assured purporting to describe the transaction and its associated risks.

*1.   Bear Stearns' Marketing Presentations, Deal Correspondence, and Oral Communications*

139.   During the relevant time periods leading up to the Transaction, Bear Stearns routinely made presentations to financial guarantors, including Assured, to induce their participation in Bear Stearns' securitizations.[141] The presentations were made at Bear Stearns "Investor Days," and were supplemented by direct communications with securitization participants in advance of particular transactions. Bear Stearns' investor-relations department

_____

[141] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 121.

and deal managers disseminated these presentations based on information assembled by, and in conjunction with, employees from its mortgage-loan conduit.[142]  As part of the presentations, Bear Stearns provided financial guarantors with information (*e.g.*, PowerPoint presentations known as "marketing decks") concerning the Bear Stearns mortgage-loan conduit and its purported securitization practices.[143]

140.    Cheryl Glory – the Bear Stearns' Managing Director for United States Residential Mortgage Backed Securities Investor Relations – acknowledged that the representations were intended to convey to financial guarantors that Bear Stearns implemented stringent protocols to ensure that the securitizations contained quality loans for the benefit of the financial guarantors.[144]  The Co-Head of Mortgage Finance, Mary Haggerty, also confirmed that Bear Stearns made these presentations with the understanding that the information "would contribute to the investor's decision to invest in the securitizations," and in order to "solicit their participation in transactions."[145]

141.    In 2003, Bear Stearns began to solicit Assured to issue financial guaranty insurance for mortgage-backed securities transactions and invited Assured to and provided Assured with several marketing presentations.  On October 2, 2003, Bear Stearns invited Assured employees, including Jack Gray, to Bear Stearns' mortgage-conduit headquarters in Texas for an investor presentation.[146]  Gray, then Assured's Director of Structured Finance,

---

[142] 4/19/2010 Glory Deposition Tr. at 69-71.

[143] 4/19/2010 Glory Deposition Tr. at 166-67 (testifying that it was Bear Stearns' practice to provide marketing packages in advance of securitizations).

[144] 4/19/2010 Glory Deposition Tr. at 109-10 (Bear Stearns intended investors and financial guarantors to believe they benefited from the quality control processes), 110-119 (Bear Stearns intended investors and financial guarantors to rely on the benefits from the seller approval and monitoring processes).

[145] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 113, 121.

[146] *See* EMC Mortgage Corporation Investor Presentation, Oct. 2, 2003, AGC_SACO 01017042-153.

attended the presentation, along with Assured's John Zimmerman.  Assured personnel, including

Gray, attended another Bear Stearns investor presentation on May 3, 2004, which focused on

many of the same issues.[147]  On January 7, 2005, Bear Stearns employee Scott Lynn sent

Assured's Gray another investor presentation, dated November 15, 2004.[148]  And lastly, on

October 17, 2005, while the Transaction Documents were being finalized, Assured attended

another investor presentation.[149]

     142.    These presentations followed a standardized format and contained numerous

representations intended to convince Assured that it would benefit from controls and policies

purportedly in place to ensure the quality of securitized loans:

- "Skin in the Game": Bear Stearns represented that it "retain[ed] Back-End Interests in the Deals," or "Skin in the Game."[150]

- Seller Approval and Monitoring:  Bear Stearns lauded its purported processes for screening and monitoring the originators from which it acquired loans for its securitizations.

- Due Diligence:  Bear Stearns described the "due diligence" protocols it purported to have implemented to prevent defective mortgage loans from entering the securitizations.

- Quality Control:  Bear Stearns touted the quality control that it purportedly conducted after the securitizations closed to identify and flush out defective loans that may have circumvented its due diligence protocols.

- Repurchase Processes:  Bear Stearns conveyed that it had an entire "conduit team" devoted to asserting breach-of-representation-and-warranty claims, on

---

[147] *See* EMC Mortgage Corporation Investor Presentation, May 3, 2004, AGC_SACO00498247-8296.

[148] *See* EMC Mortgage Corporation Investor Presentation, Nov. 15, 2004, AGC_SACO 00487783-902.

[149] *See* EMC Mortgage Corporation Investor Presentation, Oct. 17, 2005, EMC-AMB 001958935-9040.

[150] In a November 7, 2006 memorandum prepared in connection with the SEC's Risk Management Reviews of Consolidated Entities, the SEC explained: "Residual interests are generally the most difficult pieces of the capital structure for investment banks to sell, for instance because purchasers of other securitized product look for the organizing back to hold these pieces of the capital structure *as a profession of confidence in the deal* . . . ." (emphasis added).  *See* Memorandum from several analysts to Erik R. Sirri (Director, Division of Market Regulation, SEC), among others, dated Nov. 7, 2006, produced to the FCIC, SEC_TM_FCIC_002428.

behalf of the securitization participants, for the repurchase of breaching loans identified through the quality control process.

- Historical Performance: Bear Stearns provided appendices with extensive data regarding the historical performance of its prior securitizations and the loans therein.

143.    From October 2003 and leading up to September 2005 when the Transaction closed, Bear Stearns continued its campaign to solicit Assured's business through meetings and oral communications wherein it reinforced and supplemented the disclosures in its marketing decks to make Assured comfortable with the purported thoroughness of Bear Stearns' securitization processes and the quality of its products.  For instance, on December 3, 2003, Assured's Jack Gray met with Bear Stearns' Pattie Sears to discuss Bear Stearns' due diligence process.[151]  And on July 13, 2004, Assured employees, including Jack Gray, met again with Bear Stearns' Ernie Calabrese and John Mongelluzzo to further discuss Bear Stearns' due diligence of loans.

144.    In connection with its marketing of the Transaction, Bear Stearns never informed Assured that its securitization practices had changed in any material way from the previous disclosures, communications, and investor presentations provided to Assured.  Assured therefore reasonably expected that Bear Stearns would adhere to its representations about its securitization policies and practices.  As described in detail below, Bear Stearns' marketing decks and oral communications to Assured were materially false and misleading because Bear Stearns' actual securitization practices did not resemble those touted in its representations.

---

[151] Contemporaneous notes of Dec. 2, 2003 meeting among Jack Gray (Director, Structured Finance, Assured), and Pattie Sears (Due Diligence Manager, EMC Mortgage Corporation), among others, AGC_SACO01017621.

73

### 2. Bear Stearns' Distribution of Mortgage Loan Tapes and Other Collateral Data

145.    As part of its initial solicitation to participants in a contemplated securitization,

Bear Stearns distributed by email material information concerning the contemplated transaction

structure and the loans proposed for securitization.  In its initial distributions to the financial

guarantors and rating agencies, Bear Stearns included the mortgage-loan tape listing the data

metrics pertaining to critical attributes of the loans in a proposed securitization pool.

146.    Consistent with this practice, in the weeks leading up to the September 9, 2005

closing of the Transaction, Bear Stearns sent to Assured material information about the

HELOCs that was set forth in (i) a preliminary loan tape[152] and then a "final" loan tape[153] of the

HELOCs and (ii) statistical data of stratified segments of the HELOCs (often referred to as

"strats").[154]  Bear Stearns knew that Assured and the rating agencies would rely, and intended

---

[152] *See* Email from G. Scott Tabor (Mortgage Finance, Bear, Stearns & Co.) to Ken Rosenberg (Director, Assured) and Jack Gray (Director, Structure Finance, Assured), dated July 15, 2005, attaching preliminary loan tape, EMC-ASSURED 000537729-730; Email from G. Scott Tabor (Mortgage Finance, Bear, Stearns & Co.) to Ken Rosenberg (Director, Assured), dated July 27, 2005, attaching preliminary loan tape, EMC-ASSURED 000538592-593; Email from Sally N. Kawana (Vice President, Home Equity Group, Bear, Stearns & Co.) to Rafi Warburg (Analyst, Structured Finance, Assured), dated Aug. 8, 2005, attaching preliminary loan tape, EMC-ASSURED 000569685-686.

[153] Email from G. Scott Tabor (Mortgage Finance, Bear, Stearns & Co.) to Rafi Warburg (Analyst, Structured Finance, Assured), dated Aug. 30, 2005, attaching final loan tape, EMC-ASSURED 000527099-100.

[154] Email from Sally N. Kawana (Vice President, Home Equity Group, Bear, Stearns & Co.) to Ken Rosenberg (Director, Structured Finance, Assured) and Rafi Warburg (Director, Structured Finance, Assured), among others, dated Aug. 8, 2005, attaching Preliminary Term Sheet for the Transaction, EMC-ASSURED 000527478-7508; Email from Sally N. Kawana (Vice President, Home Equity Group, Bear, Stearns & Co.) to Ken Rosenberg (Director, Structured Finance, Assured) and Rafi Warburg (Director, Structured Finance, Assured), among others, dated Aug. 16, 2005, attaching Preliminary Term Sheet for the Transaction, EMC-ASSURED 000494912-4942; Email from Sally N. Kawana (Vice President, Home Equity Group, Bear, Stearns & Co.) to Rafi Warburg (Analyst, Structured Finance, Assured), dated Aug. 25, 2005, attaching Preliminary Term Sheet for the Transaction, EMC-ASSURED 000567426-7458.

that they rely, on the veracity of the tape data to evaluate the intended securitization and assess the "market risks" pertaining to the loans.[155]

147.    The following are some of the key metrics included on the loan tape that Bear Stearns disseminated to Assured for the Transaction:

- the combined LTV ("CLTV") ratio for each loan, which measures the total amount of mortgage debt that encumbers a property against the value of the property;

- the FICO (or credit) score for each borrower;

- the DTI ratio, also referred to as the back ratio, for each borrower, which compared payments due on a borrower's monthly debts to a borrower's income;

- the occupancy status of the property, which listed whether the property was the borrower's primary or secondary residence, or an investment property;

- the "doc-type" of each loan, which described the program pursuant to which the loan was originated, and which specified the information borrowers were required to disclose concerning their income, employment, and assets, and how such information would be verified; and

- the amount of each borrower's monthly payment, which is critical for purposes of Assured's and rating agencies' cash flow modeling.

148.    Assured required the mortgage-loan tape and relied on the veracity of the data reflected therein as a critical component in its decision of whether to provide insurance for the deal.  Assured used the data on the tape as fixed inputs to its models, and analyzed the loan metrics, which were central to assessing the risk associated with the loan pool and calculating the expected rates and severity of defaults by the borrowers.  The rating agencies also required and relied on the tape data as a critical component in determining the ratings to be assigned to each class of securities being issued.  As described below, Bear Stearns' internal documents and

---

[155] 6/2/2010 Smith Deposition Tr. at 67-72, 83; 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 213-15; 4/19/2010 Glory Deposition Tr. at 65.

employee testimonials evince that the loan-level data Bear Stearns provided to Assured and rating agencies was false and misleading.

### 3. Bear Stearns' Affirmative Representations to Secure Rating Agency Ratings

149.    Bear Stearns provided information to rating agencies, such as S&P's, Moody's, and Fitch Ratings ("Fitch") to secure "shadow ratings" and "final ratings" required to induce financial guarantors to insure the securities issued in connection with its securitizations, including the Transaction at issue. A shadow rating is a rating given by the rating agencies to the insurer that is an assessment of the value or risk of a mortgage-backed securitization transaction without consideration of the protection afforded by a financial guaranty insurance policy.[156] A final rating is an assessment of the value or risk of the security taking into consideration the financial guaranty policy.

150.    Bear Stearns knew that Assured used the shadow rating in deciding whether to participate in the Transaction. In fact, Assured expressly conditioned the issuance of its financial guaranty insurance policy on the ability to secure a specified shadow rating and a final rating for the Transaction. Pursuant to Section 3.01(k) of the I&I Agreement, the issuance of Assured's Policy was conditioned upon the Class A-1 Notes and the Class M-1 Notes (to be insured by the Policy) being rated at least "AAA" and "BBB" by S&P, respectively, and at least "Aaa" and "Baa2" by Moody's, respectively, in each case without regard to the benefit of the Policy. Section 3.01(k) further conditioned the issuance of the Policy on both classes of the Notes being rated "AAA" by S&P, "Aaa" by Moody's, and "AAA" by Fitch when taking the

---

[156] 4/19/2010 Glory Deposition Tr. at 55-56 ("It's only upon wrapped transactions where the wrapper does not necessarily need to have a rating issued for it to be sold because you're relying on the wrapper's rating."); 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 204. ("A shadow rating is a rating which is not necessarily published . . . it is an expected rating given that certain set of criteria or circumstances are met.").

Policy into consideration.  Likewise, by letter dated August 29, 2005, Assured informed Bear,

Stearns & Co. that the issuance of the Policy was subject to, among other things, confirmation

acceptable to Assured that the Class A-1 Notes will be rated "AAA" and "Aaa" by S&P and

Moody's, respectively, and that the Class M-1 Notes will be rated "BBB" and "Baa2" by S&P

and Moody's respectively, each before giving effect to the Policy.[157]  Bear, Stearns & Co.,

"acting on behalf of itself and its affiliates," including EMC, executed its agreement and

acceptance of this letter.[158]

 151. To secure the shadow ratings and thus the final ratings, Bear Stearns disseminated

the same data to the rating agencies that it provided to insurers like Assured, including loan

tapes and Offering Documents.  As a Bear Stearns Managing Director characterized the process:

> So there is a process when you request a rating agency to look at or
> engage in a specific transaction.  You provide them a pool of
> collateral and you provide them structure.  As a result of them
> providing you [get] back ratings and a rating agency gets picked
> for a transaction, you will then go down the path of providing to
> them marketing materials, such as the term sheet and a pro supp,
> for them to sign off and understand and then there is a PSA that
> they will review and provide comments on.[159]

 152. In connection with the Transaction, Bear Stearns, as underwriter, disseminated the

mortgage-loan data required by the rating agencies.[160]  This data that Bear Stearns disclosed to

the rating agencies was the same data that it provided to Assured.  According to Bear Stearns,

---

[157] Email from Susana Tow (Bear, Stearns & Co.) to Ruth Cove (Assistant General Counsel, Assured), dated Sept. 9, 2005, attaching executed copy of Engagement Letter, EMC-ASSURED 000556675-6677.

[158] *Id.*

[159] 4/19/2010 Glory Deposition Tr. at 61-62; *see also id.* at 40-55; *see also* 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 195-97 (same).

[160] *See, e.g.*, Email from Gordon Tabor (Mortgage Finance, Bear, Stearns & Co.) to "Main S&P" (Standards & Poor's), dated Aug. 24, 2005, attaching initial data for the Transaction, EMC-ASSURED 000539537; Email from Gordon Tabor (Mortgage Finance, Bear, Stearns & Co.) to RMBS@fitchratings.com (Fitch), dated Aug. 24, 2005, attaching initial data for the Transaction, EMC-ASSURED 000540070.

the rating agencies used the loan data to model the risk and generate the ratings for the securitizations. The rating agencies developed models to evaluate "the expected loss or expected probabilities of default for various rating standards," which "took as a given the veracity of the attributes and metrics on the mortgage-loan file provided to them."[161] As described below, the loan-level data Bear Stearns provided to the rating agencies – as well as Assured – in connection with the Transaction was materially false and inaccurate.

153. Bear Stearns also gave the rating agencies marketing presentations similar to those provided to Assured, which touted Bear Stearns' broader securitization practices and controls purportedly in place to ensure the quality of the loans it securitized.[162] Bear Stearns did not disclose that quality control reviews of some of its largest volume sellers, including GreenPoint, revealed systematic underwriting failures, which Bear Stearns ignored. Bear Stearns also did not disclose that it continued to securitize loans acquired from the very sellers it bragged of having terminated and suspended.

154. S&P, Moody's, and Fitch each issued to Assured a shadow rating for the notes in the Transaction derived from the information and data that Bear Stearns disseminated to them in advance of the Transaction.

155. Bear Stearns also solicited and obtained from the rating agencies *final* ratings of the certificates issued in the Transaction, which similarly were derived from the information and data provided by Bear Stearns but also took into account Assured's Policy.[163] Accordingly, on

---

[161] 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 196, 200. Bear, Stearns & Co. Senior Managing Director Mary Haggerty also confirmed that the "[r]ating agencies typically received collateral information on the individual pools that they were being asked to rate in connection with a transaction and there would be discussion with the rating agencies about the overall platform in general." 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 117-18.

[162] 4/19/2010 Glory Deposition Tr. at 63-64.

[163] 4/19/2010 Glory Deposition Tr. at 55.

September 9, 2005, S&P's issued a rating letter to Bear Stearns assigning final ratings after a review of "information presented to us," and stating that "Standard and Poor's relies on the issuer and its counsel, accountants, and other experts for the accuracy and completeness of the information submitted in connection with the rating . . . process."[164]  On September 9, 2005, Moody's and Fitch also issued final rating letters to Bear Stearns.[165]  Fitch's letter noted that the rating was "based on information provided to us by the issuer and its experts and agents . . . . Fitch does not audit or verify the truth or accuracy of such information."[166]

### 4.    *Bear Stearns' Representations and Disclosures in the Offering Documents to Market and Sell the Notes*

156.    Bear Stearns marketed the securities issued in the Transaction pursuant to Offering Documents[167] that it publicly filed with the SEC pursuant to the Securities Act of 1933. As a matter of law, in the Offering Documents, Bear Stearns was required to (i) disclose all material facts concerning the securities offered, (ii) not make any untrue statement of material fact concerning the securities, and (iii) not omit to state a material fact necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading.

157.    Bear Stearns filed the Registration Statement and FWP with the SEC several days in advance of the contemplated closing date for a securitization; it then filed the ProSupp with the SEC at or around the closing date.  The ProSupp filed in connection with the Transaction

---

[164] SACO I Trust 2005-GP1, Mortgage-Backed Notes, Series 2005-GP1 Rating Letter from Standard & Poor's to Ernie Calabrese (Bear Stearns & Co. Inc. Managing Director, Mortgage Finance), dated Sept. 9, 2005.

[165] Email from G. Scott Tabor (Mortgage Finance, Bear, Stearns & Co.) to Ken Rosenberg (Director, Assured), Sept. 9, 2005, attaching Fitch and Moody's rating agency letters, AGC_SACO 01033386.

[166] Fitch Ratings, SACO I, Inc., SACO I Trust 2005-GP1, Sept. 9, 2005, AGC_SACO 01033390.

[167] As noted above, the Offering Documents are defined to include the Registration Statements, Free Writing Prospectuses, Prospectuses, and Prospectus Supplements.

states that "Bear, Stearns & Co. Inc., as the underwriter, will offer the notes listed above at varying prices to be determined at the time of sale."[168]

158.    In advance of the closing date of the Transaction, Bear Stearns also prepared and sent to Assured drafts of the FWP and the ProSupp to induce its participation in the Transaction. Bear Stearns knew and intended that Assured would rely on these drafts and final Offering Documents in assessing whether to participate in the Transaction.  That was the very purpose for which Bear Stearns created and disseminated the documents.

159.    The Offering Documents contained disclosures regarding GreenPoint's loan-origination business and products including numerous statements purporting to describe the underwriting standards that GreenPoint applied to assess borrowers' ability to repay their debts and to ensure the quality of the HELOCs in the Transaction.[169]  For example, the ProSupp disclosed that "[t]he HELOCs were originated or purchased by GreenPoint . . . generally in accordance with the underwriting criteria described herein."[170]  Further, "[u]nderwriting guidelines are applied . . . to evaluate the borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral."[171]

160.    The Offering Documents also contained detailed appendices purporting to represent critical statistical data for stratified segments of the loan pools, including CLTV ratios, DTI ratios, credit scores, property ownership characteristics, and document types.[172]  These characteristics were used by Assured to evaluate the risks and expected performance of the underlying loan pools for the securities issued in the Transaction.

---

[168] Prospectus Supplement for SACO I Trust 2005-GP1 at S-1 (Aug. 31, 2005).

[169] Prospectus Supplement for SACO I Trust 2005-GP1, at S-25 (Aug. 31, 2005).

[170] Prospectus Supplement for SACO I Trust 2005-GP1, at S-25 (Aug. 31, 2005).

[171] Prospectus Supplement for SACO I Trust 2005-GP1, at S-25 (Aug. 31, 2005).

[172] *See* Prospectus Supplement for SACO I Trust 2005-GP1, Schedule A (Aug. 31, 2005).

161.    The Offering Documents provided that "[i]t is a condition to the issuance of the Notes that each class of Notes be assigned at least the ratings designated" in the ProSupp.[173] The rating agencies assigned ratings of "AAA" (S&P's), "Aaa" (Moody's), and AAA (Fitch) for the Insured Notes that had the benefit of Assured's Policy.[174]

162.    As shown in detail below, the myriad disclosures by Bear Stearns in the Offering Documents regarding underwriting guidelines purportedly followed to ensure borrowers' ability to repay, due diligence protocols supposedly in place to ensure loan quality, and the characteristics of the securitized HELOCs were materially false and misleading.

**B.    BEAR STEARNS' REPRESENTATIONS CONCERNING ITS DUE DILIGENCE WERE FALSE AND MISLEADING**

163.    In advance of the Transaction, and to induce Assured to provide the Policy, Bear Stearns knowingly made materially false and misleading statements about the scope and integrity of the due diligence protocols purportedly in place to prevent defective loans from entering into Bear Stearns' securitizations, and into the Transaction in particular.  Contrary to Bear Stearns' representations to Assured that the due diligence process entailed a robust loan-file audit to assess whether the loan complied with the applicable underwriting guidelines and federal and state law, Bear Stearns had designed the due diligence process to permit the acquisition and securitization of defective loans.[175]  As has been revealed by numerous confidential witnesses, many of whom were involved with conducting due diligence of the HELOCs included in the

---

[173] Prospectus Supplement for SACO I Trust 2005-GP1, at S-74 (Aug. 31, 2005).

[174] Prospectus Supplement for SACO I Trust 2005-GP1, at S-74 (Aug. 31, 2005).

[175] A former Watterson Prime due diligence consultant who reviewed loans for Bear Stearns, Tracy Warren, confirmed during deposition testimony that Watterson Prime's due diligence review was nothing more than a rubber stamp of originators' findings to satisfy the "client's" – Bear Stearns' – objective of purchasing a large volume of loans for securitization. *See* 8/25/2010 Warren Deposition Tr. at 41-43 (Q. "So, [your supervisors] were aware that there were issues with respect to the borrowers' ability to pay, but they told you to focus on technical compliance with the guidelines as stated?" (over objection) A. "Yes.").

Transaction, the due diligence process was highly flawed and fraudulently manipulated by Bear Stearns.

### 1.    Bear Stearns' Representations to Assured Regarding Due Diligence

164.    Beginning in October 2003 and continuing up to the Transaction, Bear Stearns repeatedly stressed the high quality of its due diligence practices to Assured at investor conferences, in investor presentations, and in private meetings between Bear Stearns and Assured.

165.    In December 2003, for example, Pattie Sears, Bear Stearns' Due Diligence Manager, promoted the company's due diligence procedures during a meeting with Assured's Jack Gray.[176] At this meeting, Sears told Gray that third-party firms Bear Stearns employs for due diligence utilize a 3-tier system of grading loans and assessing whether the loans comply with the applicable underwriting guidelines. Specifically, loans graded as "1" comply with the applicable underwriting guidelines and are purchased by Bear Stearns.[177] Loans graded as "2" have defects violating the underwriting guidelines, but have compensating factors sufficient to overcome the defect.[178] Loans graded as "3" do not comply with the underwriting guidelines and have no compensating factors sufficient to overcome the defect.[179] Later, on July 13, 2004, Ernie Calabrese and John Mongelluzzo, Bear Stearns' Vice President of Due Diligence, met with

[176] Contemporaneous notes of Dec. 2, 2003 meeting among Jack Gray (Director, Structured Finance, Assured), and Pattie Sears (Due Diligence Manager, EMC Mortgage Corporation), among others, AGC_SACO01017621.

[177] Contemporaneous notes of Dec. 2, 2003 meeting among Jack Gray (Director, Structured Finance, Assured), and Pattie Sears (Due Diligence Manager, EMC Mortgage Corporation), among others, noting that loans graded as "1" are "100% OK," AGC_SACO01017621.

[178] Contemporaneous notes of Dec. 2, 2003 meeting among Jack Gray (Director, Structured Finance, Assured), and Pattie Sears (Due Diligence Manager, EMC Mortgage Corporation), among others, noting that loans graded as "2" were "outside of guidelines but good mitigants," AGC_SACO01017621.

[179] Contemporaneous notes of Dec. 2, 2003 meeting among Jack Gray (Director, Structured Finance, Assured), and Pattie Sears (Due Diligence Manager, EMC Mortgage Corporation), among others, noting that loans graded as "3" are "bad," AGC_SACO01017621.

Jack Gray and Rafi Warburg of Assured to further emphasize Bear Stearns' "extensive due

diligence process" designed to identify and prevent the securitization of defective loans that did

not meet the underwriting guidelines.  Then, in the investor presentation that Bear Stearns sent to

Assured on January 7, 2005, Bear Stearns touted the "Proven Performance" of its "Extreme

depth in Due Diligence," which it claimed to include an in-depth review of loan files to ensure,

among other things, "Conformity with Underwriting Guidelines," and then a "Review of Due

Diligence Results," including "Exception Reports" to determine which loans are "[u]nacceptable

for purchase."[180]

166.    At the same time, Mongelluzzo emphatically refused to allow financial guarantors

to participate in Bear Stearns' due diligence, stating they "will just have to go with our

methodology."[181]  By continuing to promote the quality of Bear Stearns' due diligence protocols

to Assured,[182] Mongelluzzo was able to obtain Assured's acquiescence to Bear Stearns' flawed

due diligence methodology.

167.    On August 1, 2005, in response to Assured's request for the results of the due

diligence on the HELOCs, Mongelluzzo represented to Assured that Bear Stearns performed due

diligence on a 20 percent sample of the HELOCs proposed for the Transaction, "similar to our

---

[180] EMC Mortgage Corporation Investor Presentation, Nov. 15, 2004, AGC_SACO 00487783-902.

[181] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Sally Kawana (Vice President, Home Equity Group, Bear, Stearns & Co.), dated July 8, 2005, EMC-ASSURED 000553499.

[182] Email from Brad Andres to Sally Kawana (Vice President, Home Equity Group, Bear, Stearns & Co.), dated July 14, 2005, EMC-ASSURED 000553499.

other alt-a process."[183]  Mongelluzzo further represented that Bear Stearns had performed "the usual credit/compliance/appraisal review that we do for bulk purchases."[184]

168.    By email dated August 4, 2005, Mongelluzzo transmitted the results of the due diligence to Assured.[185]  The results showed, among other things, (i) that Watterson Prime, at Bear Stearns' direction, had conducted due diligence on a sample of 1,264 HELOCs taken from a pool of 6,319 HELOCs proposed for the Transaction, (ii) that 1,043 HELOCs received a grade of 1, which meant that they complied with the applicable underwriting guidelines, (iii) that 118 HELOCs received a grade of 2, which meant that these HELOCs had compensating factors sufficient to overcome the defects, and (iv) that only 100 HELOCs out of the 1,264-loan sample were removed from the pool because they contained defects that could not be overcome by sufficient compensating factors (*i.e.*, graded as 3s).[186]  The removal of 100 HELOCs resulted in a drop rate of 7.9 percent.  EMC's Conduit Procedures Manual stated that when there is a "greater than 3% drop rate the Deal Manager should be informed and recommend the sample selection be increased."[187]  Bear Stearns failed to increase the sample size or to inform Assured that it was operating against internal protocols.

---

[183] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Rafi Warburg (Analyst, Structured Finance, Assured), dated Aug. 1, 2005, EMC-ASSURED 000482095.

[184] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Rafi Warburg (Analyst, Structured Finance, Assured), dated Aug. 1, 2005, EMC-ASSURED 000482095.

[185] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Rafi Warburg (Analyst, Structured Finance, Assured), dated Aug. 4, 2005, EMC-ASSURED 000481645-1648.

[186] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Rafi Warburg (Analyst, Structured Finance, Assured), dated Aug. 4, 2005, EMC-ASSURED 000481645-1648.

[187] *See* Email from Jose Carrion (EMC Mortgage Corporation Subprime Underwriting Manager) to Jo-Karen Whitlock (EMC Mortgage Corporation Senior Vice President, Conduit Operations), dated May 17, 2006, EMC-AMB 004416519-523, at 524 (attaching the EMC Conduit Manual, Bulk Underwriting Chapter, dated April 30, 2005 and March 1, 2006).

**2.**      ***Bear Stearns Knowingly Misrepresented the Purpose and Scope of Due Diligence and Provided False Due Diligence Results to Assured***

169.     Bear Stearns knew – and indeed contemporaneously acknowledged – that financial guaranty insurers, including Assured, relied on Bear Stearns' due diligence disclosures because they did not have sufficient time to review loans given the rapid pace of Bear Stearns' securitizations.[188]  Moreover, Bear Stearns knew that insurers like Assured relied on Bear Stearns' due diligence because there was a fundamental asymmetry of information between the parties.  That is, Bear Stearns – not the insurer – was in privity with the loan seller and had access to the loan files needed to perform due diligence, which took place at the time Bear Stearns acquired mortgage loans from sellers, not at the time of securitization.  But Bear Stearns made the above representations and disclosures regarding its due diligence protocols and the due diligence performed on the HELOCs with knowledge, or reckless disregard, that they were false and materially misleading when made.

170.     Bear Stearns knew that due diligence was especially inadequate with respect to GreenPoint loans, including the HELOCs in the Transaction.  Indeed, on August 29, 2005, after the due diligence for the Transaction was completed but before the Transaction closed, Bear Stearns personnel suggested that Bear Stearns use "more due diligence up front" in order to

---

[188] Email from Ernest Calabrese, Jr. (Managing Director, Mortgage Finance, Bear, Stearns & Co.) to John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) among others, dated Sept. 14, 2005, EMC-AMB 001699864-865 ("These parties have been either performing there [sic] own due diligence (usually not enough time) or piggybacking off of the Clayton/Price results.").  Bear, Stearns & Co. Senior Managing Director Mary Haggerty also confirmed that securitization participants relied on Bear Stearns' disclosures as to the scope of due diligence that was performed.  1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 155.  See also Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Pattie Sears (Due Diligence Manager, EMC Mortgage Corporation) and Jose Carrion (EMC Mortgage Corporation Subprime Underwriting Manager), dated March 23, 2005, EMC-AMB 001699111.

avoid "what has happened on the past Greenpoint deals."[189]  Bear Stearns failed to disclose to Assured its contemporaneous concern about the quality of due diligence on GreenPoint deals.

171.    Before the Transaction closed, Bear Stearns also knew that due diligence was of increased importance because its own monitoring of GreenPoint revealed a high percentage of underwriting failures and other defects.[190]  GreenPoint even told Bear Stearns' head of due diligence that it was "selling everything under the sun."[191]  In July 2005, Bear Stearns traders and executives internally commented on the unusually high risk and poor quality of the loans in the Transaction, showing their surprise that GreenPoint approved up to "40% of first time home buyer with no down payment wow!" [192]  Nonetheless, Bear Stearns purchased and securitized these high-risk loans in the Transaction knowing that the need for effective due diligence was even more critical.

172.    Bear Stearns' disclosure to Assured regarding the due diligence conducted on the HELOCs included in the Transaction – that 1,043 HELOCs out of the 1,264 pool did not have any defects, that 118 HELOCs out of the 1,264 pool had sufficient compensating factors to overcome defects, and that only 100 HELOCs had defects that warranted their removal from the Transaction – was also false and misleading.

173.    The falsity of this disclosure and Bear Stearns' fraudulent scheme is corroborated by statements by a number of former employees of Watterson Prime – CW-7, CW-9, and CW-11

---

[189] *See* Email from Patty Lester (EMC Mortgage Corporation, Vice President, Special Loans) to Janet Gonzales (EMC Mortgage Corporation, Vice President, Trading), dated Aug. 26, 2005, EMC-AMB 008918775.

[190] *See* below at Section VI.B.

[191] *See* Email from Dianne Hill (GreenPoint) to John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence), dated July 13, 2005, EMC-ASSURED 000482090.

[192] Email exchange between Scott Eichel (Bear, Stearns & Co. Senior Managing Director, ABS/MBS Credit Trading) and Jeff Verschleiser (Bear, Stearns & Co. Senior Managing Director, Head of ABS & Wholeloan Desk), dated July 6, 2005, EMC-ASSURED 000480417.

through CW-37. These confidential witnesses, 9 of whom reviewed a total of 264 HELOCs (approximately 21 percent of the due diligence pool) while conducting pre-closing due diligence of the Transaction, confirm that (i) Bear Stearns directed Watterson Prime to overlook defects in loans and to grade defective loans (that should have been graded as 3s) as non-defective in Watterson Prime's database known as "StratQ," (ii) to the extent Watterson Prime still found defects in loans, Bear Stearns directed Watterson Prime to find compensating factors, which were often insufficient to overcome the defects, and to grade such loans as 2s in StratQ, and (iii) to the extent any loans graded as 3s remained in the due diligence pool, Bear Stearns directed Watterson Prime to change the grade assigned to these loans from 3s to either 1s or 2s. CW-9 and CW-11 revealed that Watterson Prime underwriters adopted the slogan "Bear don't care" to describe Bear Stearns' pervasive disregard for the true magnitude of defective loans reviewed.

174.    CW-11 worked at Watterson Prime between 2004 and 2008 and reviewed many of the HELOCs included in the Transaction during the pre-closing due diligence process. According to CW-11, Watterson Prime's managers, including Tony Neske, repeatedly reminded underwriters that the client wanted Watterson Prime to avoid grading loans as 3s. In fact, CW-11 recalled receiving instructions to overlook defects and grade loans as 1s and 2s on nearly every Bear Stearns job that she worked on. On one job, CW-11 and other underwriters were instructed to approve all loans where the borrowers' last name began with "Z," regardless of the quality of the loans. CW-11 and other underwriters succumbed to these pressures and ignored defects in most of the loans they reviewed.

175.    After six months of working as a due diligence underwriter, CW-11 also began working as a "quality control underwriter." As a quality control underwriter on Bear Stearns

jobs, CW-11 often provided a summary of the loans graded as 3s to Bear Stearns' due diligence manager, John Mongelluzzo. According to CW-11, Mongelluzzo, after reviewing the loans graded as 3s, often instructed CW-11 to change the grade on these loans to 1s or 2s. CW-11 stated that Watterson Prime's computer system overwrote earlier findings of 3s and did not show that the loans' grades had been changed or who made the change. For example, CW-11 recalled that on numerous occasions, loans failed to comply with state law because fees and charges assessed against the borrowers were not adequately disclosed to borrowers. As a quality control underwriter, CW-11 logged on to StratQ and deleted evidence of certain charges so that the loans would appear to be in compliance with state law when in fact they were not.

176.    CW-12 worked at Watterson Prime between 2004 and 2010 and reviewed many of the HELOCs included in the Transaction. CW-12, who also became a quality control underwriter at Watterson Prime, stated that at the end of each day on Bear Stearns jobs she provided a summary of the loans graded as 3s to Mongelluzzo, who was also often on site at the review. According to CW-12, Mongelluzzo, after reviewing the loans that were graded as 3s, often instructed her to change the grades on these loans in StratQ to 1s. CW-12 often made these changes on Bear Stearns jobs at the direction of Mongelluzzo.

177.    CW-13, who reviewed many of the HELOCs included in the Transaction, started working at Watterson Prime as an underwriter in early 2005. According to CW-13, underwriters were told by Watterson Prime's management that Bear Stearns did not want Watterson Prime underwriters to spend the time necessary to assess the reasonability of the borrower's stated income, as required by the underwriting guidelines. CW-13 recalls reviewing loans where inexperienced security guards stated that they made over $8,000 per month, janitors over $10,000 per month, landscapers over $8,000 per month, and barbers and beauticians with little or

no experience over $8,000 per month. Based on his 20-year experience in the mortgage industry, CW-13 knew that all of these stated incomes were unreasonable and absurd. But, according to CW-13, these loans were graded as 1s in StratQ because of management's and Bear Stearns' directives. CW-13 also came across loans where the borrowers lacked the requisite funds for closing under the underwriting guidelines and the borrowers were going to be exposed to significant "payment shock" as a result of the loans. When CW-13 brought these issues to Watterson Prime's management, CW-13 was instructed to "go find a compensating factor." CW-13 stated that a majority of the times, the compensating factors he found did not overcome the defects and were simply added to make the loan appear stronger.

178.   During the course of his employment at Watterson Prime, CW-13 was promoted to Watterson Prime's "trailing docs" department. This department was responsible for locating documents that were missing from loan files, the absence of which either prevented an underwriter from completing review of the loan file or led the underwriter to grade the loan as a 2 or 3 in StratQ. Once the missing documents were obtained, trailing docs staff often logged into StratQ and finished reviewing the loan and assigned the final grade for the loan. As an employee of the trailing docs department, CW-13 was frequently told by team leads to change the grades on loans graded as 3s to 1s and 2s without any justification. According to CW-13, to the extent trailing docs staff graded loans as 2s, they were instructed by Watterson Prime's management to find compensating factors even if none actually existed. CW-13 stated that Watterson Prime employees often joked that "even breathing was considered a compensating factor."

179.   CW-14 worked at Watterson Prime as an underwriter between 2003 and 2007 and reviewed many of the HELOCs included in the Transaction. CW-15 worked at Watterson Prime as an underwriter between 2004 and 2007 and reviewed many of the HELOCs included in the

Transaction. According to CW-14 and CW-15, due diligence underwriters preferred working on

Bear Stearns jobs because the scope of the review was easy and narrow: "as per the client, we

were instructed not to focus on finding certain defects." CW-14 and CW-15 both stated that on

numerous Bear Stearns jobs, underwriters were instructed by Watterson Prime's management

that Bear Stearns wanted underwriters to grade loans as 1s and 2s despite the following defects,

among many others:

- Loans with insufficient "residual income." The applicable underwriting guidelines often required that after making payments on his or her debt obligations (including monthly mortgage payment), the borrower retain a certain "residual income" for everyday living expenses such as groceries, health care, etc. Underwriters were instructed that Bear Stearns did not care about the "residual income" requirement and, as such, they should grade loans lacking sufficient residual income as 1s.

- Loans with insufficient "PITI reserves." The applicable underwriting guidelines often required that the borrower, upon closing, have a certain amount of cash in his or her bank account to pay the principal, interest, taxes, and insurance (known as "PITI") for a given number of months. Underwriters were instructed that Bear Stearns did not care about this particular requirement of the underwriting guidelines and, as such, they should grade loans lacking sufficient PITI reserves as 1s.

180.    Many of the confidential witnesses – including CW-7, CW-9, and CW-13 through

CW-15, who conducted due diligence on the HELOCs included in the Transaction – stated that

Watterson Prime supervisors instructed underwriters that Bear Stearns tolerated deviations from

certain ratios (e.g., DTI and CLTV) required by the underwriting guidelines, so long as the

deviations were less than 5 percent. Several of these witnesses recall working on Bear Stearns

jobs where the underwriting guidelines permitted a DTI of up to 50 percent, but the witnesses

were instructed to grade as 1s loans that had DTIs 55 percent or below.

181.    Consistent with Bear Stearns' undisclosed policy to direct Watterson Prime to

avoid finding defects, and to the extent any defects were found, to change the results, Bear

Stearns knowingly withheld important information from Assured about defects and other failings

uncovered through due diligence. On July 28, 2005, Watterson Prime sent Bear Stearns its

report grading 260 loans as "3s," indicating that those loans are "unacceptable for purchase"

under the underwriting guidelines.[193] The next day Watterson Prime sent an email to Bear

Stearns and GreenPoint stating, "[w]e are committed to clearing as many of these issues

[problem loans] as possible."[194] In just over 24 hours, the number of loans graded as "3s"

dropped from 260 to 144.[195] On August 2, 2005, Watterson Prime confirmed that it "has been

working hard on clearing outstanding issues."[196] That same day Mongelluzzo sent an email to

GreenPoint, stating that he told Watterson Prime to "let [GreenPoint] have the entire day and

they [*i.e.*, Watterson Prime] will ***clear any and all things you get in today*** so we have as little

fallout as possible."[197] By August 4, 2005, Watterson Prime reduced this number yet again, to

103 HELOCs.[198]

     182.    When Assured asked Bear Stearns to provide due diligence information as of

August 1, 2005, Mongelluzzo did not disclose Watterson Prime's daily reports – the same daily

---

[193] Email from Todd Haberly (Watterson Prime) to Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) and others attaching "Preliminary 3s Report," dated July 28, 2005, EMC-AMB 007237646-47.

[194] Email from Bill Weeks (Watterson Prime), dated July 29, 2005, EMC-AMB 007238370.

[195] Email from Jesse Harty (Watterson Prime) to John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence), dated July 29, 2005, EMC-AMB 007235887-89.

[196] Email from Bill Weeks (Watterson Prime, dated Aug. 2, 2005, EMC-AMB 007237008.

[197] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Dianne Hill (GreenPoint), dated Aug. 2, 2005, EMC-AMB 007237013 (emphasis added).

[198] *See* Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Rafi Warburg (Analyst, Assured), dated Aug. 4, 2005, EMC-ASSURED 000481685, (attaching "final" due diligence reports). This downward trend is consistent with Watterson Prime's practice to aggressively clear loans. According to CW-13, the Watterson Prime project lead responsible for the due diligence of the Transaction specifically instructed due diligence underwriters that they "should 'clear' (approve) the loans quickly and that Watterson Prime would "clean it up on the back end." During this "clean-up" process, Watterson Prime personnel altered and deleted data on the due diligence reports to make the results seem more favorable. CW-13 stated that the project manager responsible for the Transaction routinely removed information from due diligence reports regarding closing charges that otherwise rendered the loans in violation of state law. After deleting this material information, the loans appeared to be in compliance and thus were improperly included in securitizations.

reports that Mongelluzzo had already received and reviewed – and told Assured to wait for the final version.[199]   After purging Watterson Prime's preliminary reports, Bear Stearns provided Assured with its newly revised "final" due diligence results on August 4, 2005 that Bear Stearns knew omitted material information regarding the high number of HELOCs that Watterson Prime initially deemed "unacceptable for purchase."[200]   Bear Stearns never disclosed that many of the HELOCs were previously graded as "3s" (unacceptable for purchase) but changed to "1s" (no defects) just days before sending the final report sent to Assured.  Had Bear Stearns disclosed the original number of loans graded as "unacceptable for purchase," it would have revealed that Watterson Prime originally considered more than 20 percent of the loans in the due diligence pool to be defective.

183.    In 2009 and 2010, Assured hired third-party consultants to review the documentation pertaining to a sample of HELOCs for compliance with EMC's and Bear Stearns' representations and warranties.  The results of this review confirm that Bear Stearns directed Watterson Prime to improperly change the defect rating on many of these HELOCs, and, as a result, disseminated materially false and misleading due diligence results to Assured and other securitization participants that Bear Stearns knew did not reflect the true attributes of the HELOC pool.  Third-party consultants reviewed 23 of 157 HELOCs for which Watterson Prime inappropriately changed the rating from a "3" to a "1."  The review demonstrated that for 21 of those 23 HELOCs – or 91.3 percent – Bear Stearns should have disclosed them as being graded as "3," consistent with Watterson Prime's original determination.  By way of example, Bear

---

[199] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Rafi Warburg (Analyst, Assured), dated Aug. 1, 2005, EMC-ASSURED 000482095.

[200] *See* Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Rafi Warburg, dated Aug. 4, 2005, attaching "final" due diligence reports, EMC-ASSURED 000481685.

Stearns directed Watterson Prime to downgrade the rating from a "3" to a "1" on each of the following HELOCs without proper documentation or justification:

- Loan No. ▮▮▮▮▮: The July 29, 2005 due diligence report rated this HELOC as a "3," noting that it violated the underwriting guidelines because the borrower was "[s]hort $7260 for 3 months reserves for stated income." On the August 4, 2005 report, Watterson Prime deleted the notation indicating that the borrower had a shortage of reserve funds.

- Loan No. ▮▮▮▮▮: The July 29, 2005 due diligence report rated this "Stated Income/Stated Assets" HELOC for an investment property as a "3" because under the underwriting guidelines an investment property could not be purchased under a Stated Income/Stated Asset loan program. On the August 4, 2005 report, Watterson Prime changed the loan type, making it appear as if it was a Stated Income/Verified Assets loan. Stated Income/Verified Asset loans are generally considered less risky because the borrower's assets are verified and could be used to purchase investment properties.

- Loan No. ▮▮▮▮▮: The July 29, 2005 due diligence report rated this HELOC as a "3" because the CLTV ratio exceeded the 80 percent threshold by 15 percent. On the August 4, 2005 report, Watterson Prime failed to disclose that the CLTV ratio exceeded the guideline maximum.

184.     As a result of the foregoing internal practices and policies, Bear Stearns furthered its fraudulent scheme by secretly pooling a large volume of HELOCs into the Transaction without their having been subject to anything remotely close to the due diligence protocols publicly touted to Assured to solicit its participation in the Transaction.

### 3.     *Bear Stearns Knowingly Conducted and Concealed Its "Bad Due Diligence"*

185.     Bear Stearns' disclosures and representations regarding its due diligence were materially false and misleading because Bear Stearns knew, but deliberately concealed, that the due diligence firms it retained were directed not to screen out defective loans to prevent their securitization. Bear Stearns rejected repeated recommendations to address these problems and, even worse, as discussed above, it intentionally implemented protocols designed to falsify the

due diligence results and conceal from securitization counterparties defects its due diligence firms had identified.

186.   Bear Stearns ensured that the diligence protocols facilitated, and did not impede, the free flow of loans for securitization. This directive was set early and enforced firmly. Thus, in February 2005 – at the same time Bear Stearns was touting its due diligence practices to Assured – Bear Stearns' Co-Head of Mortgage Finance, Mary Haggerty, gave explicit directions to reduce the amount of due diligence "in order to make us more competitive on bids with larger sub-prime sellers."[201]  Haggerty has since admitted that limiting the due diligence was an accommodation to suppliers that ensured the flow of mortgage loans available to Bear Stearns.[202]

187.   Recognizing that the existing protocols allowed the purchase and securitization of defective loans, in April 2005, Mongelluzzo repeatedly advised the Co-Heads of Bear Stearns' mortgage finance department (Senior Managing Directors Haggerty and Silverstein) to revise due diligence protocols. Mongelluzzo proposed to rank loans slotted for due diligence by risk criteria and apply incremental resources to the review of each successive gradation of loan.[203]

---

[201] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) conveying instructions from Mary Haggerty (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance) to reduce due diligence, dated Feb. 11, 2005, EMC-AMB 001718713-714. In fact, Bear Stearns conducted due diligence on only 20 percent of the loans in the Transaction, less than even the "reduced" rate of 25 percent that Haggerty called for.

[202] 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 194. *See also* 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 251-52 ("Q. Was it your understanding that in February 2005 that EMC reduced the amount of due diligence it was undertaking in order to make it more competitive on bids with large subprime sellers? . . . A. It does appear as though they did.").

[203] *See* Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Mary Haggerty (Bear, Stearns & Co. Senior Managing Director, Co-Head, Mortgage Finance) and Baron Silverstein (Bear, Stearns & Co. Senior Managing Director, Co-Head, Mortgage Finance), dated April 26, 2005, EMC-AMB 001597507-508 (proposing "New Due Diligence Processes," including "[i]dentify higher risk loans within sample to DD firms so that more seasoned UW's are reviewing the loans."). *See also* Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Mary Haggerty and Baron Silverstein (Bear, Stearns & Co. Senior Managing Directors, Co-Heads Mortgage Finance), dated May 11, 2005, EMC-AMB 001597504 ("We should also identify the top 25% of loans with the sample that we feel pose the largest risk potential. Both Clayton and PWC upon having those

Silverstein conceded that this proposed change was "significant" and not mere "incremental Darwinian creep" in the evolution of a diligence process. [204]  As Mongelluzzo and other Bear Stearns executives have testified, however, Bear Stearns did not implement this – or any significant changes – to its due diligence protocols prior to the closing of the Transaction.[205]  In fact, although Mongelluzzo renewed his proposal to allocate greater resources to riskier loans almost two years later, when Bear Stearns recognized its scheme was beginning to unravel, it *never* was implemented.[206]

188.   Revealing of its actual motivation, *i.e.*, to allow the free flow of loans into its securitizations regardless of quality, Bear Stearns also rejected Mongelluzzo's proposal made as early as May 2005 "to track loans that are overridden by our due diligence managers and track the performance of those loans."[207]  Haggerty previously had been advised by the due diligence department that maintaining the documentation of the due diligence firms' analysis would allow Bear Stearns to track "trends in the reasons for rejection" and for "trades that actually turn into deals determine how different credit performance is for loans that had been flagged as

---

loans tagged/identified can place their most seasoned underwriters to review the loans and also perform additional QC on the loans.  Both of these processes are ones that we can use to market our process to investors and the rating agencies going forward.").

[204] 6/4/2010 Silverstein Deposition Tr. at 178; *see also* 4/21/2010 Mongelluzzo Deposition Tr. at 172.

[205] 9/8/2011 Mongelluzzo Deposition Tr. at 160-64; 4/21/2010 Mongelluzzo Deposition Tr. at 175.

[206] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Mary Haggerty (Bear, Stearns & Co. Senior Managing Director, Co-Head, Mortgage Finance) and Baron Silverstein (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance), among others, dated March 6, 2007, EMC-AMB 001431086; 9/8/2011 Mongelluzzo Deposition Tr. at 167-69; 4/21/2010 Mongelluzzo Deposition Tr. at 174-75.

[207] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Mary Haggerty (Bear, Stearns & Co. Senior Managing Director, Co-Head, Mortgage Finance) and Baron Silverstein (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance), dated May 11, 2005, EMC-AMB 001597504.

'exceptions' vs. those that were not."[208] But that is what Haggerty and others at Bear Stearns wanted avoid. Bear Stearns did not want to track or document the particular reasons for its overrides and the "exceptions" it made to underwriting guidelines to allow defective loans to be purchased.

189. Bear Stearns thus did not implement Mongelluzzo's proposal; instead, it did the opposite by maintaining a policy of directing its due diligence review firms to "purg[e] all of the older reports on the trade leaving only the final reports."[209] A Bear Stearns due diligence manager confirmed that, pursuant to this policy, she did not retain the "daily reports" submitted by the due diligence firms.[210] By company policy, therefore, Bear Stearns spoliated evidence of the audit trails concerning the high incidence of Bear Stearns' overrides and waivers leading up to its final purchase decisions.[211] As a former Watterson Prime consultant that conducted due diligence on Bear Stearns loans confirmed, "the vast majority of the time the loans that were rejected were still put in the pool and sold."[212]

---

[208] Email from Mary Haggerty (Bear, Stearns & Co. Senior Managing Director, Co-Head, Mortgage Finance), dated April 25, 2005, EMC-AMB 001699079-080.

[209] *See* Email from Jose Carrion (EMC Mortgage Corporation Subprime Underwriting Manager) to Jo-Karen Whitlock (EMC Mortgage Corporation Senior Vice President, Conduit Operations), dated May 17, 2006, EMC-AMB 004416519-525, at EMC-AMB 004416524 (attaching the EMC Conduit Manual, Bulk Underwriting Chapter, dated April 30, 2005 and March 1, 2006). *See also* EMC Conduit Manual, Bulk Underwriting Chapter, dated Sept. 30, 2003, EMC-ASSURED 000818571-590, at EMC-ASSURED 000818581-82 (providing that only the final Due Diligence Summary is shared with distribution list).

[210] *See* 5/28/2010 Sears Deposition Tr. at 101-03.

[211] Email from Jose Carrion (EMC Mortgage Corporation Subprime Underwriting Manager) to Jo-Karen Whitlock (EMC Mortgage Corporation Senior Vice President, Conduit Operations), dated May 17, 2006, EMC-AMB 004416519-525 at EMC-AMB 004416524 (attaching the EMC Conduit Manual, Bulk Underwriting Chapter, dated April 30, 2005 and March 1, 2006).

[212] 8/25/2010 Warren Deposition Tr. at 51. *See also* Chris Arnold, *Auditor: Supervisors Covered Up Risky Loans*, National Public Radio, dated May 27, 2008, http://www.npr.org/templates/story/story.php?storyId=90840958; Email from Anthony Neske (Watterson Prime LLC) to John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence), dated May 29, 2008, EMC-AMB 005964024-025 (discussing the Watterson Prime employee's public admissions).

190.     As evidence regarding Watterson Prime's inadequacies mounted, Bear Stearns continued to use that firm for "due diligence" and to ignore suggestions that would have improved the due diligence process after the Transaction closed.  Bear Stearns' actions and words after closing of the Transaction further confirm Bear Stearns' knowledge and reckless disregard of the flaws with its due diligence process with respect to the Transaction and Watterson Prime in particular.  For example, just two months after the Transaction closed and after months of experience with Watterson Prime's failures, Verschleiser requested that EMC track the material issues that Watterson Prime missed in its reviews.[213]  By early 2006, Mongelluzzo also proposed that the entire due diligence process be removed from both Watterson Prime and other due diligence firms and be brought in-house because he knew that the diligence firms were not screening certain defects from the loans purchased for securitization.[214]  Bear Stearns' senior executives shared the due diligence department's views regarding the inadequacies of due diligence firms such as Watterson Prime.  In response to Mongelluzzo's proposal, Verschleiser stated in no uncertain terms that "we are *wasting way too much money on*

---

[213] *See* Email from Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage, President), dated Nov. 1, 2005, EMC-AMB 003500070 ("JV has asked us to start logging loans that we believe Clayton or PWC [Watterson Prime] missed material issues on . . .  Linda please start the list with the loans from yesterday and let's keep it on the shared drive.").  Due to Watterson Prime's affiliation with PricewaterhouseCoopers, Bear Stearns often referred to Watterson Prime as "PWC" in its internal documents.

[214] Email from Jeffrey Verschleiser (Bear, Stearns & Co. Senior Managing Director, Head of ABS & Wholeloan Desk) to, among others, Michael Nierenberg (Bear, Stearns & Co. Senior Managing Director, Head of ARM and CDO Desk), dated March 23, 2006, EMC-AMB 001542438-439 (responding to Mongelluzzo's proposal); 4/21/2010 Mongelluzzo Deposition Tr. at 195-96. *See also* 6/4/2010 Silverstein Deposition Tr.  at 116-17 ("evaluating bringing in-house our due diligence efforts versus outsourcing to Clayton and Prime and other due diligence firms").

***Bad Due Diligence***."[215]   Bear Stearns rejected Mongelluzzo's proposal and kept the due diligence firms in place.

191.     At his deposition, Co-Head of Mortgage Finance Baron Silverstein contended that Bear Stearns rejected the significant change to its diligence structure "because there weren't significant cost savings associated with bringing it in-house."[216]   But Bear Stearns' own internal analysis showed a potential cost savings in the year of implementation, $3.6 million in savings in the second year, and $6.7 million annual savings by the fifth year.[217]   The truth is that Bear Stearns rejected Mongelluzzo's proposal to bring due diligence in-house because the ***internally*** berated but ***publicly*** praised third-party due diligence firms provided the false veneer of credibility to the process that Bear Stearns marketed to Assured and other securitization participants.

192.     By late 2006, Bear Stearns had concluded that its securitization scheme was collapsing and it began to take steps to create the façade that appropriate protocols had been in place – when they had not.   In connection with layering on this belated and false veneer, Mongelluzzo proposed in a March 6, 2007 email to (among others) Haggerty and Silverstein "***I***

---

[215] Email from Jeffrey Verschleiser (Bear, Stearns & Co. Senior Managing Director, Head of ABS & Wholeloan Desk) to Michael Nierenberg (Bear, Stearns & Co. Senior Managing Director, Head of ARM and CDO Desk), among others, dated March 23, 2006, EMC-AMB 001542438-439.

[216] 6/4/2010 Silverstein Deposition Tr. at 120-21.

[217] Due Diligence – "Build Initiative" Presentation, dated May 1, 2006, EMC-SYN 00597826-828. *See also* Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Jeffrey Verschleiser (Bear, Stearns & Co. Senior Managing Director, Head of ABS & Wholeloan Desk) and Michael Nierenberg (Bear, Stearns & Co. Senior Managing Director, Head of ARM and CDO Desk), among others, dated Feb. 15, 2006, EMC-AMB 001542438-439 ("I ultimately think if we brought all of the DD in house we would run savings of about $6MM annually based on our current DD spend."); Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Baron Silverstein (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance) and Mary Haggerty (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance), dated Feb. 9, 2006, EMC-AMB 001753888 ("I ultimately think we could save in excess of $5mm per year.").

*think we need to completely revamp how we do due diligence.*"[218]  As the Bear Stearns executives admit, Mongelluzzo's primary recommendation to "revamp" the process was to allocate more resources to riskier loans – the very proposal he made almost two years earlier but that Bear Stearns never adopted (see above).

193.    As Mongelluzzo's internal correspondence reveals, Bear Stearns did not begin to adopt any of what it recognized as requisite enhancements to its due diligence process until well into 2007, in a thinly veiled attempt to create a cover story.  This duplicity is evident from the blatantly misleading testimony Mongelluzzo gave to the FCIC on September 29, 2010.  When questioned by the FCIC about Bear Stearns' due diligence protocol, Mongelluzzo *volunteered*, without prompting, attributes of the protocols that he asserted Bear Stearns implemented to ensure that the highest quality of due diligence was conducted.  Mongelluzzo told the FCIC that Bear Stearns (i) "test[ed] all of the due diligence firms and their contract underwriters, and if they couldn't pass the underwriting test, they weren't permitted to work on our transactions,"[219] (ii) "instituted a process where we went out and audited the individual diligence firms to see what their processes were and what they were doing internally as well,"[220] and (iii) "spearheaded . . . a due diligence committee within [Securities Industry and Financial Market Association or "SIFMA"] so that all of the Wall Street firms could get together and talk about standards." [221] But the truth is that, as Mongelluzzo admitted at a subsequent deposition, Bear Stearns (i) did not

---

[218] Email from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to Baron Silverstein (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance) and Mary Haggerty (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance), dated March 6, 2007 (EMC-AMB001909137).

[219] FCIC Interview of John Mongelluzzo, dated Sept. 29, 2010, Tr. at 22.

[220] FCIC Interview of John Mongelluzzo, dated Sept. 29, 2010, Tr. at 43.

[221] FCIC Interview of John Mongelluzzo, dated Sept. 29, 2010, Tr. at 48-49.

start its testing of underwriters until February 2007,[222] (ii) did not implement its audit program of due diligence vendors until April 2007,[223] and (iii) the recommendations made by the SIFMA committee – which was formed in February 2007 – were never adopted by Bear Stearns.[224] Bear Stearns' after-the-fact enhancements therefore merely serve to underscore the grave deficiencies of its due diligence protocols during the period from 2005 through to the first quarter of 2007 when the vast majority of Bear Stearns securitizations were effectuated, including the Transaction.

194.    Indeed, by April 2007, the problems with Watterson Prime had grown so severe that Mongelluzzo advised his team that Bear Stearns "will temporarily cease using them for due diligence services."[225] An EMC manager directed the due diligence department to "make sure this stays within EMC only."[226] Thereafter, Bear Stearns conducted its first-ever audit of Watterson Prime. The audit concluded that "***Watterson Prime does not seem to have a formal training program. This is a concern to me regarding consistency of data collection.***"[227] In other words, as of June 2007, the due diligence firm that reviewed the second largest volume of Bear Stearns loans, including those in the Transaction at issue, still did not have a formal training program. This was directly contrary to Bear Stearns' representations concerning the high quality of its due diligence.

---

[222] 9/8/2011 Mongelluzzo Deposition Tr. at 44.

[223] 9/8/2011 Mongelluzzo Deposition Tr. at 80.

[224] 9/8/2011 Mongelluzzo Deposition Tr. at 105, 117-23.

[225] E-mail from John Mongelluzzo (Bear, Stearns & Co. Vice President, Due Diligence) to, among others, Pattie Sears (Due Diligence Manager, EMC Mortgage Corporation) and Jose Carrion (EMC Mortgage Corporation, Subprime Underwriting Manager), dated April 13, 2007, EMC-AMB 001747707-708.

[226] E-mail from Jose Carrion (EMC Mortgage Corporation Subprime Underwriting Manager) to, among others, Jo-Karen Whitlock (EMC Mortgage Corporation Senior Vice President, Conduit Operations) and Pattie Sears (Due Diligence Manager, EMC Mortgage Corporation), dated April 13, 2007, EMC-AMB 001747707-708 (emphasis added).

[227] Memorandum, dated June 5, 2008 (EMC-ASSURED 000741667-68).

195.     Due to Watterson Prime's prolonged history of not catching the types of defects that Bear Stearns wanted it to catch, by July 2008, the Bear Stearns due diligence manager who was the point of contact with Watterson Prime advised that Watterson Prime not be hired in the future, explaining: "I think Watterson-Prime tells you what you want to hear and *does not always deliver*. The slick salesman syndrome. *Our major issues*, ARM issues, prepayment penalty issues, etc, *were always WP*."[228] This is exactly the problem with the loans in the Transaction.

### C.     BEAR STEARNS' REPRESENTATIONS CONCERNING ITS QUALITY CONTROL PRACTICES WERE FALSE AND MISLEADING

196.     In advance of the Transaction, Bear Stearns knowingly made materially false and misleading statements to Assured, rating agencies, and potential investors about the scope and benefits of its "quality control," which re-underwrote loans "post settlement," after Bear Stearns purchased and securitized those loans.

197.     Bear Stearns' investor presentations to Assured explained that "[i]n addition to pre-settlement due diligence, the QC [Quality Control] Department performs a routine review of closed loans purchased on a bulk and flow basis with the goal of maintaining optimal levels of quality, accuracy and efficiency."[229] Bear Stearns told Assured that quality control comprised a comprehensive review and "reverification of [the] credit package" for loans selected through

---

[228] Email from Pattie Sears (Due Diligence Manager, EMC Mortgage Corporation) to Debbie Rich (EMC Mortgage Corporation, Quality Control), dated July 16, 2008, EMC-AMB 006177517; 5/28/2010 Sears Deposition Tr. at 181-188.

[229] *See* EMC Mortgage Corporation Investor Presentation, May 3, 2004, AGC_SACO00498247- 296, at AGC_SACO00498274; *see also* EMC Mortgage Corporation Investor Presentation, Nov. 15, 2004, AGC_SACO 00487783-902, at AGC_SACO 00487830; 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 179 (confirming that due diligence "was done prior to the settlement of the purchase of the loans, whereas, the quality control reviews were done after EMC settled the purchase of the – of the loan."); 4/26/2010 Golden Deposition Tr. at 17 (confirming that quality control refers to the "post-purchase review of loans that EMC and Bear Stearns securitized").

"[s]tatistical and targeted sampling from both Flow and Bulk transactions."[230]   Bear Stearns

further emphasized to insurers and investors, including Assured, that it was also performing

quality control based on internal referrals from other departments, including all loans that

experience "90+ day delinquencies" in payment.[231]   Bear Stearns thus represented to Assured

that the scope of its quality control was expansive.

198.   Bear Stearns' internal policies, like its representations to Assured, mandated

quality control "to insure that [it] purchase[d] loans from highly reputable Sellers, that the

property values are supported and that a sound underwriting judgment was rendered and devoid

of any fraud characteristics."[232]   Accordingly, Bear Stearns' policies called for quality control

reviews on "statistical and discretionary sampling of loans that reflect the scope of our business"

selected "on a monthly basis from the previous month's production," as well as "EPD or

manually selected loans that are past due."[233]   Bear Stearns' "Quality Control Plan" further

required 100 percent reviews of "[p]otential fraud cases and other loans identified as high risk"

---

[230] *See* EMC Mortgage Corporation Investor Presentation, Nov. 15, 2004, AGC_SACO 00487783-902, at AGC_SACO 00487829; EMC Mortgage Corporation Investor Presentation, Oct. 2, 2003, AGC_SACO 01017042-153, at AGC_SACO 01017086.

[231] *See* EMC Mortgage Corporation Investor Presentation, dated Oct. 17, 2005, EMC-AMB 001958934-9040, at 001958970 (representing that quality control reviews loans based on, among other things, "[i]nternal referrals from Servicing such as 90+day delinquencies as well as other departments at EMC").

[232] EMC's Production Conduit Procedures Manual, EMC-AMB 008907708-893, at EMC-AMB 008907857-89 and 884 ("Underwriters are looking for misrepresentations made by any parties to the transaction including:  sellers, borrowers, appraisers, loan officers, or underwriters.  Underwriters are also looking for trends by sellers and report on those trends to senior management for corrective action to protect EMC from loss.").

[233] EMC's Production Conduit Procedures Manual, EMC-AMB 008907708-893.  Internal policy documents also establish that Bear Stearns viewed the randomly selected loan samples to provide "the basis for statistical inference (i.e. generalizing from sampled findings to the overall population)," and "[a]s such, they are the most important sample group."  *See* EMC's Quality Control Review Guidelines attached to the Contractor Services Agreement between EMC and Adfitech, dated Jan. 26, 2005, EMC-AMB 000229896-918 at EMC-AMB 000229910; 9/29/2011 Jewell Deposition Tr. at 220 (Bear Stearns relied on "the statistical sample to get an accurate reflection of the total population of loans that the conduit was bringing in over that month"); 5/20/2010 Serrano Deposition Tr. at 25-27 (acknowledging that "the random sample would be representative of the pool that was purchased that month").

including "[a]ll loans that go 90 days delinquent."[234]  In full recognition that its bad due

diligence failed to screen out defective loans from securitizations, Bear Stearns' executives knew

that quality control was important, and that it would "determine which reps and warrants issues

would result in claims so it could be communicated externally to investors, sellers, rating

agencies, etc. and followed internally."[235]

199.    Bear Stearns represented to Assured that its expansive quality control measures

and corresponding repurchase processes were in place for the benefit of the securitizations.  In

particular, Bear Stearns emphasized these benefits in its investor presentations and represented to

John Gray of Assured that its quality control audits were designed to identify loans that breached

the express representations and warranties that EMC extended to insurers and investors so they

could be removed from the securitization.[236]  Bear Stearns also claimed to be actively monitoring

the quality of its originators, such as GreenPoint, to evaluate "Performance of Purchases from

---

[234] Quality Control Plan, EMC-AMB1 00001527-36; *see also* EMC's Production Conduit Procedures Manual, EMC-AMB 008907708-893 at 768 ("EPD loans > 90 days are automatically targeted for QC. All 90 day delinquencies are automatically targeted for QC.").

[235] *See* Email from Stephen Golden (Bear, Stearns & Co. Senior Managing Director, Warehouse, and EMC Residential Mortgage, President) to Thomas Marano (Bear, Stearns & Co. Senior Managing Director, Head of MBS, ABS and CMBS), Mary Haggerty (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance), and others, dated Aug. 6, 2005, EMC-AMB 004092799 ("For the record we should continue to QC and file claims for two reasons, the first is to make sure the controls/procedures that are [s]et-up in the conduit are working and being followed.  The second is that we don't fully re-underwrite the overwhelming majority of the loans purchased and the extent of due diligence we do is determined by product type, seller and channel.  All of the sellers know this and could easily reverse engineer our controls.  This is why each seller signs the reps and warranties and we have to enforce it through the QC process.").

[236] *See, e.g.,* EMC Mortgage Corporation Investor Presentation, Oct. 2, 2003, AGC_SACO 01017042-153, at AGC_SACO 010176103.  In its investor presentations disseminated to Assured immediately following the Transaction, Bear Stearns continued to emphasize these benefits by touting its "Conduit team dedicated to claims of breaches of reps and warranties discovered by the Quality Control group investigations."  *See* EMC Mortgage Corporation Investor Presentation, dated Oct. 17, 2005, EMC-AMB 001958935-9040.

Seller[s]" by tracking key metrics that were predictors of loan quality, including the level of "Early Payment Defaults, Delinquency, QC Findings and Repurchases."[237]

200.   Bear Stearns' quality control and repurchase processes provided a veneer of an added layer of protection against the risk of defective loans securitized in the Transaction.  The existence and implementation of such processes was material to Assured's participation in the Transaction.  Cheryl Glory – the Bear, Stearns & Co. Managing Director for United States Residential Mortgage Backed Securities Investor Relations – has testified that these representations were intended to convey to investors and financial guarantors, like Assured, that Bear Stearns implemented stringent protocols for the benefit of the investors and financial guarantors.[238]  Similarly, Bear Stearns' vice president and manager of the quality control group has confirmed that the purpose of performing quality control "was to mitigate risk" for the benefit of securitization participants by identifying "problem loans" that need to be repurchased from securitizations.[239]

201.   Bear Stearns' representations leading up to the Transaction to convince Assured that it had in place robust and comprehensive quality control practices were false and misleading in material respects.  First, Bear Stearns performed *de minimis* quality control reviews on GreenPoint loans prior to the closing of the Transaction, but even that feeble effort revealed unacceptable defects in nearly half of the loans – and those defects were never disclosed to Assured.  Second, Bear Stearns performed virtually no quality control to identify and remove

---

[237] *See* EMC Mortgage Corporation Investor Presentation, Nov. 15, 2004, AGC_SACO 00487783-902.

[238] 4/19/2010 Glory Deposition Tr. at 109-10 (Bear Stearns intended investors and financial guarantors to believe they benefited from the quality control processes), 110-119 (Bear Stearns intended investors and financial guarantors to rely on the benefits from the seller approval and monitoring processes).

[239] 9/29/2011 Jewell Deposition Tr. at 68-72 (the purpose of quality control was to "mitigate risk," which "provided a benefit to investors . . . to make help make sure that [Bear Stearns was] providing a quality product"), 74-75 (the quality control group was responsible "for reviewing loans to determine whether they constituted a breach of the PSA" whereby Bear Stearns "would have to buy it out of the security").

defective HELOCs from the Transaction and intentionally disregarded red flags of fraud and other material problems in origination of the HELOCs.  Third, Bear Stearns concealed from Assured that the purpose of its quality control and repurchase operations was to identify and pursue Bear Stearns' claims against loan sellers, *not* to comply with its obligations to the securitization trusts.

### 1.    *Bear Stearns Knowingly Concealed Its* *De Minimis Quality Control Operations As Well As* *Pervasive Defects Found in GreenPoint Loans*

202.    Bear Stearns fraudulently misrepresented the scope of its quality control review to give Assured the false impression that Bear Stearns did business only with reputable sellers consistently producing high-quality loans.  With respect to GreenPoint in particular, Bear Stearns represented that this originator produced quality loans that passed not only due diligence, but quality control as well.

203.    In  truth, Bear Stearns disregarded its protocols and undertook minimal quality control of GreenPoint-originated loans and GreenPoint itself, one of Bear Stearns' largest and most favored sellers, and the sole originator of loans in the Transaction.  Bear Stearns did so to avoid finding defects in the loans that it had already purchased from GreenPoint and sold into securitizations.

204.    Leading up to the Transaction, the scope of Bear Stearns' quality control review of GreenPoint was far less extensive than represented to Assured.  Between January 2004 and December 2004, Bear Stearns subjected only 28 of 5,523 GreenPoint-originated loans (a mere 0.5 percent) to quality control review.[240]  For the twelve-month period just two months before the Transaction closed, between August 1, 2004 and July 31, 2005, Bear Stearns performed

---

[240] EMC Mortgage Corporation Conduit Reporting Package 2004, EMC_AMB 004091573-1606 at EMC_AMB 004091594.

quality reviews on a mere *17* loans out of 10,081 (less than 0.2 percent) purchased from GreenPoint – representing virtually no meaningful review of GreenPoint.[241]

205.    Further still, the sparse quality control that Bear Stearns did undertake consistently found defects in a large percentage of the GreenPoint loans. Bear Stearns never shared this information with Assured. Specifically, Bear Stearns engaged a third-party firm, Adfitech, Inc. ("Adfitech"), to perform quality control reviews on its behalf,[242] and instructed Adfitech that the purpose of quality control is "to review loans to evaluate if they meet investor quality guidelines, if sound underwriting judgment was used, and if the loan is devoid of all misrepresentation or fraud characteristics."[243]   With this as its directive, Adfitech conducted quality reviews on samples of loans that EMC acquired from GreenPoint, among other originators. Between 2002 and September 2005, when the Transaction closed, Adfitech found unacceptable defects in 132 out of 302 GreenPoint loans, yielding a staggering pre-Transaction defect rate of over 43 percent for all GreenPoint loans it reviewed on behalf of Bear Stearns.[244]

---

[241] Email from Kevin Flanagan to Mary Haggerty (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance), among others, dated Nov. 19, 2005 (attaching Oct. Conduit Reporting Package), EMC-AMB 004091471-507 at EMC-AMB 004091498; Haggerty Dep. Tr at 478-90 (Identifying the Conduit Reporting Packages as "a summary report of various data points around the one to four family mortgage acquisition business at EMC" that includes "[t]he percentage of loans in the column that says QC Selection that are listed as unacceptable risk," which was "designed to be a data point in seller monitoring").

[242] 5/20/2010 Serrano Deposition Tr. at 22-23 (the QC Contractor "undertook all the monthly sampling quality control review of loans for the bulk and flow channel of EMC").

[243] Contractor Services Agreement between EMC and Adfitech, dated Jan. 26, 2005, EMC-AMB 000229896-918 at 909. Bear Stearns reinforced these protocols with Adfitech in its "Loan Origination Quality Control Policy as of February 2007, which expressly stated that the purpose of quality control was to, among other things, "assure that all loans . . . comply with insurer and guarantor requirements," and also called for Bear Stearns to "report to the investor or government agency any violation of law or regulation, false statements, material defect or program abuses within 30 days of discovery." Email from Greg Anderson (Adfitech quality control supervisor) to Sherrie Dobbins (EMC Mortgage Corporation Assistant Manager, Quality Control Underwriting and Vendor Management) and Fernando Serrano (EMC Mortgage Corp., Quality Control Manager), dated Feb. 2, 2007, EMC-AMB 006975253-267 at EMC-AMB 006975255, 261.

[244] ADFITECH_0003_000001 – 000016; ADFITECH_0003_000017 – 000232.

Only six of these loans were referred to quality control for "Delinquency" reviews, and five of the delinquent loans, or 83 percent, had at least one unacceptable defect.

206.    These quality control reviews were done on Bear Stearns' behalf, prior to the Transaction closing, and revealed material information regarding GreenPoint loans that would have influenced Assured's decision to issue the Policy.  Despite this knowledge, Bear Stearns fraudulently marketed the Transaction to Assured based on the strength of its purportedly robust quality control and seller-monitoring operations without disclosing the exceedingly high defect rates uncovered through its pre-Transaction reviews on GreenPoint loans.

### 2.    *Bear Stearns Performed Virtually No Quality Control on the HELOCs and Intentionally Disregarded Red Flags of Borrowers' Inability to Pay*

207.    Bear Stearns' inadequate quality control directly affected the Transaction to Assured's detriment.  Bear Stearns' quality control database reveals that Bear Stearns performed quality control on only approximately 40 of the 6,028 HELOCs, *or less than 1 percent* of the HELOCs securitized in the Transaction, which were referred to quality control on an *ad hoc* basis from other departments within Bear Stearns.[245]  Moreover, even though quality control should have included representative samples of GreenPoint's loan production, after acquiring the six-thousand-plus HELOCs from GreenPoint in August 2005, Bear Stearns did not include a single one of those loans as part of its monthly quality control audits.  Bear Stearns' vice president and manager of quality control has confirmed that as of mid-2007, Bear Stearns had

---

[245] *See* March 28, 2011 production of quality control data extracted from the Cogent system, EMC-ASSURED 000476911; EMC-ASSURED 000523591-592; ADFITECH_009-11; ADFITECH_0014. *See also* Email from Fernando Serrano (EMC Mortgage Corp., Quality Control Manager) to Michelle Carr and Amy Adame dated Aug. 27, 2007, EMC-AMB 009122579 – 80 (showing status of Bear Stearns' quality control over GreenPoint loans as of Aug. 2007).  As discussed above, after reviewing 34 of the HELOCs that were referred to quality control by the "Investor Relations" group in October 2006, Bear Stearns identified material defects in all 34 loans and repurchased them out of the trust due to securitization breaches of EMC's contractual warranties.

drastically reduced the samples of production loans selected for quality control and was excluding all second-lien products, like the HELOCs securitized in the Transaction.[246]

208.    Bear Stearns also abandoned virtually all quality control of loans that were 90 days delinquent or suffered from an early payment default, contrary to its marketing presentations and in disregard of its internal protocols, which provided that "EPD loans > 90 days are automatically targeted for QC [and a]ll 90 day delinquencies are automatically targeted for QC."[247]  The need for quality control on such loans was particularly important because Bear Stearns knew that loans that are delinquent in payment shortly after origination are more likely to "contain some form of misrepresentations and should not have been made."[248]  Bear Stearns' Co-Head of Mortgage Finance explained that EPDs (and first payment defaults, or "FPDs") are indicators of fraud or an inability to pay with respect to a loan, suggesting that the loan never should have been granted in the first instance.[249]  The former head of Bear Stearns' Fraud Prevention Group concurred, testifying that an "EPD or FPD is an indicator that there could be a possibility of red flags that could eventually be an indicator of misrep[resentation]."[250]  Bear Stearns' Head of Mortgage-Backed Securities, Thomas Marano, agreed:  "I viewed [EPDs] as a

---

[246] See 9/29/2011 Jewell Deposition Tr. at 194-97, 201 (agreeing that the reduction in Bear Stearns' quality control samples did not comply with investor requirements); see also Email from Tamara Jewell (EMC Mortgage Corp., Vice President and Manager of Quality Control) dated May 18, 2007, EMC-AMB 010719904-11 ("We are still sampling a 1% random sample in production but not the 5 or 10% random sampling that QC was completing before.  Also, we are not currently sampling seconds.").

[247] EMC's Production Conduit Procedures Manual, EMC-AMB 008907708-893 at 768.

[248] Bear Stearns Whole Loan Repurchase Project: Repurchases, Current Processes, dated June 21, 2006, EMC-AMB 004919710-740 at p. 30 ("Loans which become delinquent more than 90+ days in their first year.  Although a fraud flag can be raised, many such loans contain some form of misrepresentation and should not have been made.").

[249] 6/4/2007 Silverstein Deposition Tr. at 192.

[250] 4/15/2007 Gray Deposition Tr. at 113-14.

red flag for fraud or a possibility that payments were not being applied to the right servicer. . . . Generally those were the first two things."[251]

209.    Bear Stearns did not disclose to Assured, and deliberately concealed, that it was secretly ignoring these red flags of fraud or other failures because it did not want to document breaches of EMC's contractual warranties.  The manager of repurchase operations has admitted that when Bear Stearns recovered on an EPD claim it "would not evaluate the reps and warranties it gave on that very same loan to securitization participants to assess whether there might be other breaches of reps and warranties other than an EPD breach."[252]  A Bear Stearns quality control manager revealed Bear Stearns' reasoning:  "I don't think we want to do anything with EPDs separate from the 90 Day DQs that are done in the 90 Day DQ shell because if we end up keeping the loan we don't want to find a PSA breach, right?"[253]  Leaving the insurers and investors with the massive risks and losses on these loans, Bear Stearns pursued more short-term gains by closing additional securitizations.

210.    Bear Stearns perpetuated this scheme by fraudulently inducing Assured's participation in the Transaction and then disregarding its commitments to review red flags on the high number of delinquent and defaulted HELOCs in the Transaction.  By December 2005, barely three months after the Transaction had closed, Bear Stearns remarked on the "high

---

[251] 10/3/2011 Marano Deposition Tr. at 195.

[252] 1/22/2010 Megha Rule 30(b)(6) Deposition Tr. at 94-95.  *See also* 2/3/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 455 (noting that prior to 2007 when counsel for Bear Stearns directed Bear Stearns to change its wrongful practices, "to the extent that EMC obtained a settlement on an EPD claim, it had not subject[ed] those loans to a separate rep and warranty review" for the benefit of the securitization counterparties).

[253] Email from Tamara Jewell (EMC Mortgage Corp., Vice President and Manager of Quality Control) to Robert Glenny (EMC Residential Mortgage, Analytics Group/Seller Approval) and Randy Deschenes (EMC Residential Mortgage, CEO), dated July 30, 2007, EMC-AMB 009526626-627.  *See also* 9/29/2011 Jewell Deposition Tr. at 211-12 (confirming that "if a loan went EPD [as defined] to miss a payment within the first 30, 60, or 90 days, it would not be included within the 90-day shell unless it went a full 90 days delinquent in the first 15 months").

delinquencies [*sic*] rate of SCO 2005-GP1" loans.[254]  As of May 2006, Bear Stearns had internally identified over 254 HELOCs in the Transaction on Problem Loan Worksheets (or "PLWs") due to early defaults within the EPD period, thus alerting Bear Stearns to red flags of fraud.  But Bear Stearns simply decided to "cancel" these EPDs without any further review.[255] Bear Stearns also recklessly disregarded information from the trustee reports issued in connection with the Transaction, which show that roughly 1,280 HELOCs in the Transaction experienced a delinquency of greater than 90 days (1,159 of those HELOCs have defaulted and have been charged off, resulting in realized losses to the Trust exceeding $66 million).  Bear Stearns did not submit these "problem loans" to quality control for review to assess whether they breached the contractual warranties EMC had made to Assured.

211.    Contrary to its representations to Assured, Bear Stearns' *de minimis* quality control thus did not provide any meaningful mechanism for reviewing and repurchasing defective loans from the Transaction.  As a result, Bear Stearns knowingly, or with reckless disregard, made materially false statements about the scope of its quality control to induce Assured's participation in the Transaction

### 3.    *Bear Stearns Concealed that Its Quality Control Process Was Designed to Line Its Pockets at the Expense of Transaction Participants*

212.    As represented to Assured, Bear Stearns' quality control department was supposed to assess whether loans in Bear Stearns' securitizations complied with various express representations and warranties that EMC extended to insurers and investors (referred to as a

---

[254] Dec. 20, 2005 Email from Liza Bowles to Sally Kawana (Vice President, Home Equity Group, Bear, Stearns & Co.), EMC-ASSURED 000566606.

[255] Email and report forwarded by Stephen Golden (Bear, Stearns & Co. Senior Managing Director, Warehouse, and EMC Residential Mortgage, President) to Baron Silverstein (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance), dated May 1, 2006, EMC-AMB 001752128-29.

"securitization breach review").[256]  Bear Stearns knew, however, that its representations to Assured regarding the purpose and benefit of its quality control and repurchase protocols – which it claimed were in place to identify post-closing loans breaching EMC's contractual warranties and to repurchase those defective loans from the Transaction – were false and misleading.

213.    Bear Stearns deliberately concealed that at the time of the Transaction Bear Stearns did not even have a formal policy for reviewing and repurchasing breaching loans from the securitization trusts.  Bear Stearns' quality control manager confirmed that until at least late 2007 there were no "protocols in place to assess securitization breaches with respect to loans acquired through the bulk and flow conduit" (the bulk conduit being the source of the HELOCs at issue).[257]

214.    In truth, Bear Stearns' quality control practices were dedicated exclusively to securing for Bear Stearns additional consideration from the sellers that supplied it with the toxic loans.  That is, when Bear Stearns discovered loans that breached warranties made to securitizations, it concealed its quality control findings and allowed the defective loans to remain in the trusts and cause losses to insurers and investors as Bear Stearns pursued and settled claims against the sellers of the defective loans.  For example, when a securitized loan defaulted during

---

[256] 4/26/2010 Golden Deposition Tr. at 59-60 ("[T]he person who were [*sic*] QC'ing the loans then made a determination on whether or not it was a securitization breach. . . . it was actually the individual who reviewed the loan did the original QC."); *see also* 9/29/2011 Jewell Deposition Tr. at 74-75 (the quality control group was responsible "for reviewing loans to determine whether they constituted a breach of the PSA" whereby Bear Stearns "would have to buy it out of the security"); 2/3/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 485 (as of December 2005, the department that "reviewed mortgage loans to assess whether or not the loans were in breach of a representation or warranty given by EMC to participants in a securitization" was "done by the quality control department"); Quality Control Plan, EMC-AMB 00001527-36 ("This Quality Control Plan enables EMC to ensure or verify . . . [c]ompliance with FNMA, FHLMC and *other investor's requirements*.") (emphasis added).

[257] 5/20/2010 Serrano Deposition Tr. at 47; *id.* at 44 (noting that as of September 2006, Bear Stearns' securitization breach review "was not something that was executed correctly"). *See also* 9/29/2011 Jewell Deposition Tr. at 214-15; 5/25/2011 Adame Deposition Tr. at 77-78.

the EPD period or breached warranties made *to* EMC by a loan seller, Bear Stearns deliberately decided not to review that loan for breaches of EMC's representations made to the securitization counterparties (such as Assured) unless "the seller has already agreed to purchase these loans."[258] Indeed, the repurchase of loans from a securitization was not even to be considered unless and until there was a recovery from the seller of that loan.

215.     Bear Stearns knew well that its quality control operations were devoted exclusively to pursuing and recovering on claims against sellers, to the detriment of securitization participants.  Accordingly, if Bear Stearns determined that it could not recover from certain sellers because they had gone out of business or were placed by Bear Stearns on "suspended" or "terminated" status, Bear Stearns executives gave specific directions to exclude loans acquired from these "non-viable" sellers from quality control review.[259]  Rather than honor its obligations to securitization counterparties and accept the consequences of having already   .  purchased defective loans from the worst originators in its network, Bear Stearns decided to *stop*

---

[258] EMC-AMB 010726678.  EMC-AMB 010726678.  *See also* EMC-AMB 009649870-076 ("Once the lender has confirmed that the they are going to repurchase the loans, it is necessary to buy the loan out of a security if in a deal."); EMC-AMB 002571130-132 at 131 ("No loan(s) will be added to the Conduit Buy out Log . . . without confirmation of repurchase funds received or a firm commitment from the seller to repurchase or the funding of a down-bid.").  (The Conduit Buy-out Log is the file Bear Stearns used to track loans that were to be repurchased from a securitization under its repurchase commitments.).  *But see* 9/29/2011 Jewell Deposition Tr. at 215 (agreeing that "whether EMC could or could not collect from the seller had nothing to do with whether EMC itself breached its own reps and warranties in the PSA agreements to the securitization participants").

[259] 9/29/2011 Jewell Deposition Tr. at 214 (confirming the instructions from Bear Stearns' executives to exclude "non-viable sellers" from quality control); Email from Norton Wells (EMC Mortgage Corp. Executive Vice President, Quality Control) to Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage, President) dated July 19, 2007 and attaching EMC's Quality Control Plan 2007, EMC-AMB 009526626-41 (quality control reviews to be performed on "all loans that go 90 days delinquent within the first 15 months excluding non-viable sellers).

*performing post-purchase quality control on loans purchased from suspended or terminated*

*sellers* even though Bear Stearns had sold those same loans into securitizations.[260]

**D.     BEAR STEARNS MADE MATERIAL MISREPRESENTATIONS AND OMITTED
MATERIAL FACTS CONCERNING THE QUALITY AND ATTRIBUTES OF THE LOANS**

216.    In addition to making material misrepresentations and omissions regarding the

protocols in place to ensure the quality of securitized loan pools, Bear Stearns also made

material misrepresentations and omissions regarding the particular HELOCs pooled into the

Transaction.

217.    Bear Stearns knowingly, and with intent to defraud, provided Assured loan-level

data and stratified data relating to the HELOCs in advance of closing of the Transaction.  This

data was materially false and misleading.  For instance, on July 15, 2005,[261] July 27, 2005,[262]

and August 8, 2005[263] Bear Stearns sent Assured preliminary loan tapes that set forth key

metrics for assessing the borrowers' ability to repay their loans and the sufficiency of the

mortgaged properties as collateral.  A final tape followed on August 30, 2005.[264]  Additionally,

Bear Stearns sent Assured and investors preliminary term sheets for the Transaction on August

---

[260] 5/20/2010 Serrano Deposition Tr. 180-184; E-mail from Norton Wells (EMC Mortgage Corp.
Executive Vice President, Quality Control) to, among others, Mary Haggerty (Bear, Stearns & Co. Senior
Managing Director, Co-Head Mortgage Finance), Stephen Golden (Bear, Stearns & Co. Managing
Director, Warehouse and EMC Residential Mortgage, President), and Fernando Serrano (EMC Mortgage
Corp., Quality Control Manager), dated April 18, 2007, EMC-AMB 006009144-145 ("Loans from these
[Terminated, Suspended and "F" rated] Sellers are being excluded from sampling per instructions.").

[261] Email from G. Scott Tabor (Mortgage Finance, Bear, Stearns & Co.) to Ken Rosenberg (Director,
Assured) and Jack Gray (Director, Structure Finance, Assured), July 15, 2005, EMC-ASSURED
000537729-7730.

[262] Email from G. Scott Tabor (Mortgage Finance, Bear, Stearns & Co.) to Ken Rosenberg (Director,
Assured), July 27, 2005, EMC-ASSURED 000538592-8593.

[263] Email from Sally N. Kawana (Vice President, Home Equity Group, Bear, Stearns & Co.) to Rafi
Warburg (Analyst, Structured Finance, Assured), Aug. 8, 2005, EMC-ASSURED 000569685-9686.

[264] Email from G. Scott Tabor (Mortgage Finance, Bear, Stearns & Co.) to Rafi Warburg (Analyst,
Structured Finance, Assured), Aug. 30, 2005, EMC-ASSURED 000527099-7100.

2, 2005,[265] August 8, 2005,[266] August 16, 2005,[267] and August 25, 2005.[268]  These term sheets

set forth, among other things, certain statistics bearing on the quality of the HELOCs.  Bear

Stearns knew that Assured would rely, and intended that Assured rely, on the veracity of the

loan tapes and preliminary term sheets to evaluate the Transaction and assess the "market risks"

pertaining to the loans.[269]

218.    As noted above, in the Offering Documents, Bear Stearns represented that the

HELOCs securitized in the Transaction were originated or purchased by GreenPoint in

accordance with the underwriting criteria referenced in the Offering Documents.  In addition, the

Offering Documents presented data metrics that Bear Stearns represented accurately reflected

the attributes of the securitized HELOCs, as well as credit ratings that Bear Stearns secured for

the Transaction based on information provided to the rating agencies by Bear Stearns.

219.    A loan-level review undertaken by Assured after the Transaction closed revealed

that the information provided by Bear Stearns to Assured prior to the closing of the Transaction –

on the preliminary and final loan tapes and in the Offering Documents – was materially false and

misleading.  As discussed in Section IX.A, below, a forensic review of 906 HELOCs included in

---

[265] Email from Sally N. Kawana (Vice President, Home Equity Group, Bear, Stearns & Co.) to Ken Rosenberg (Director, Structured Finance, Assured), Jack Gray (Director, Structured Finance, Assured), and Gary Miller (Calyon), Aug. 2, 2005, EMC-ASSURED 000527335-7365.

[266] Email from Sally N. Kawana (Vice President, Home Equity Group, Bear, Stearns & Co.) to Ken Rosenberg (Director, Structured Finance, Assured), Rafi Warburg (Analyst, Structured Finance, Assured), and Jerome Michel (Calyon), Aug. 8, 2005, EMC-ASSURED 000527478-7508.

[267] Email from Sally N. Kawana (Vice President, Home Equity Group, Bear, Stearns & Co.) to Ken Rosenberg (Director, Structured Finance, Assured), Rafi Warburg (Analyst, Structured Finance, Assured), Sam Pilcer (Calyon), and Jerome Michel (Calyon), Aug. 16, 2005, EMC-ASSURED 000557400-4300.

[268] Email from Sally N. Kawana (Vice President, Home Equity Group, Bear, Stearns & Co.) to Ken Rosenberg (Director, Structured Finance, Assured) and Ruth Cove (Counsel for Assured), Aug. 25, 2005, EMC-ASSURED 000556616-6648.

[269] 6/2/2010 Smith Deposition Tr. at 67-72, 83; 12/11/2009 Durden Rule 30(b)(6) Deposition Tr. at 213-15; 4/19/2010 Glory Deposition Tr. at 65.

the Transaction showed that at least 820 HELOCs – 88.5 percent – breached one or more of EMC's representations and warranties. Contrary to Bear Stearns' representations, the HELOCs included in the Transaction did not correctly bear the attributes reflecting the borrowers' ability to repay their loans and the sufficiency of the mortgaged properties as collateral. Further, an overwhelming number of the HELOCs were not originated in compliance with the applicable underwriting guidelines. The HELOCs were of much poorer credit quality and much more likely to default than Assured reasonably expected based on Bear Stearns' representations and disclosures.

      **E.**      **TO CONCEAL ITS FRAUD, BEAR STEARNS THREATENED THE RATING AGENCIES**

      220.    The ProSupp used to market the securities issued in the Transaction states that "[t]he rating agencies may suspend, reduce or withdraw the ratings at any given time."[270] Further, "[a]ny reduction in, or suspension or withdrawal of, the rating assigned to a class of offered notes would probably reduce the market value of such class of offered notes and may affect [the investors'] ability to sell them."[271]

      221.    By mid-October 2007, the rating agencies had become increasingly concerned with the accuracy of the disclosures made by Bear Stearns regarding its mortgage-backed securities. As a consequence, S&P and Moody's downgraded the ratings on Bear Stearns' mortgaged-backed securities. Bear, Stearns & Co. Senior Managing Director Thomas Marano was indignant at the gall of the rating agencies to contravene the will of Bear Stearns. In no uncertain terms, he directed his staff to cut off all fees due to the rating agencies:

> My intention is to contact my peer at each firm as well as the investors who bought the deals. From there, we are going to

---

[270] Prospectus Supplement for SACO I Trust 2005-GP1 at S-15 (Aug. 31, 2005).

[271] Prospectus Supplement for SACO I Trust 2005-GP1 at S-15 (Aug. 31, 2005).

demand a waiver of fees.  In the interim, ***do not pay a single fee to
either rating agency.  Hold every fee up***.[272]

Even the Bear Stearns Managing Director hired from a rating agency to liaise with the agencies

conceded that Bear Stearns' attempt to browbeat the rating agencies was improper.[273]  Bear

Stearns' attempt to coerce the rating agencies to manipulate their ratings was just one of the

many improper measures it took to avoid recognition of its liability arising from its

securitizations.

### F.   BEAR STEARNS' INDIVIDUAL AND CORPORATE HEDGING STRATEGY DEMONSTRATES ITS KNOWLEDGE OF THE DEFICIENCIES IN THE COLLATERAL BACKING ITS SECURITIZATIONS

222.    In late 2007, Bear Stearns implemented a strategy of shorting financial guaranty

insurers, including Assured, that had insured Bear Stearns securitizations.  At the same time,

Bear Stearns' Head of MBS, Thomas Marano, liquidated his personal exposure to various

financial guaranty insurers.  These strategies amounted to a contemporaneous recognition and

acknowledgement by Bear Stearns, based on inside knowledge, of the poor-quality collateral

backing its securitizations, and constitute a bad-faith attempt to profit from its own misconduct.

223.    Knowing that Bear Stearns' fraudulent and breaching conduct was resulting and

would continue to result in grave harm to insurers, in October 2007 Bear, Stearns & Co. Senior

Managing Director Jeffrey Verschleiser recommended to Bear Stearns' risk committee that "we

should be short a multiple of 10 of the shorts I had put on," because "a few ***financial guarantors***

---

[272] Email from Thomas Marano (Bear, Stearns & Co. Senior Managing Director, Head of MBS, ABS and CMBS) to Silverstein (Bear, Stearns & Co. Senior Managing Director, Co-Head Mortgage Finance), Cheryl Glory (Bear, Stearns & Co. Managing Director of US RMBS Investor Relations), among others, dated Oct. 17, 2007, EMC-AMB 001424910-912 (emphasis added).

[273] 4/19/2006 Glory Deposition Tr. at 73.  *See also id.* at 82-83 (after being confronted with Marano's email, Ms. Glory conceded that it is "not normal course of business").

*were vulnerable* to potential write downs in the CDO and MBS market."[274]  Bear Stearns in fact executed those trades and "in less than three weeks . . . made approximately $55 million on just these two trades."[275]

224.   Contemporaneous with Bear Stearns' corporate short trades, its Head of MBS, Thomas Marano, directed his personal financial advisor on November 6, 2007 to assess his exposure to various financial guaranty insurers and exit those positions.[276]  The advisor in fact executed those trades, informing Marano "we will have you *all out* by next Monday."[277]

225.   Bolstered by the success of its shorting scheme, Bear Stearns continued its trading strategy into 2008, continuing to short both financial guaranty insurers and the banks with large exposure to the securities they insured.  On February 17, 2008, a Bear Stearns trader told colleagues and Senior Managing Director Jeffrey Verschleiser, "*I am positive fgic is done and ambac is not far behind*."[278]  The next day, in the same email chain, the trader again wrote to Verschleiser and others to clarify which banks had large exposures to certain financial guarantors, asking "*who else has big fgic or abk [Ambac] exposures besides soc gen?*"[279]  A colleague replied: "I believe the five with the biggest exposures are Barclays, CIBC, Merrill, Soc

---

[274] Email from Jeffrey Verschleiser (Bear, Stearns & Co. Senior Managing Director, Head of ABS & Wholeloan Desk, Bear, Stearns & Co.), dated Nov. 20, 2007, EMC-AMB 009600760-763.

[275] Email from Jeffrey Verschleiser (Bear, Stearns & Co. Senior Managing Director, Head of ABS & Wholeloan Desk, Bear, Stearns & Co.), dated Nov. 20, 2007, EMC-AMB 009600760-763.

[276] Email from Thomas Marano (Bear, Stearns & Co. Senior Managing Director, Head of MBS, ABS, and CMBS), dated Nov. 6, 2007, EMC-AMB 012124275.

[277] Email from Kenneth Ramos (Bear, Stearns & Co. Managing Director, Private Client Services) to Thomas Marano (Bear, Stearns & Co. Senior Managing Director, Head of MBS, ABS, and CMBS), dated Nov. 6, 2007, EMC-AMB 012124275 (emphasis in original).

[278] Email from Adam Siegel (Bear, Stearns & Co. Senior Managing Director, ABS/MBS Credit Trading), dated Feb. 17, 2008, EMC-AMB 012117052-063.

[279] Email from Adam Siegel (Bear, Stearns & Co. Senior Managing Director, ABS/MBS Credit Trading) to Jeffrey Verschleiser (Bear, Stearns & Co. Senior Managing Director, Head of ABS & Wholeloan Desk), among others, dated Feb. 18, 2008, EMC-AMB 012117048-051.

Gen and UBS. I think ABN, BNP, DB, HSBC and RBS have less."[280] Bear Stearns in fact entered into short positions with respect to those banks based on the knowledge of the banks' exposure to monoline-insured residential mortgage-backed securities.[281] At the same time, Bear Stearns entered into single-name corporate credit-default swaps shorting Assured and other insurers to hedge Bear Stearns' retained positions in its insured securitizations.[282]

226.   As it was "shorting" financial guaranty insurers and the banks holding the Bear Stearns securities they insured, Bear Stearns continued to conceal the defects related to the collateral backing the securities issued in connection with the Transaction.

## VII. ASSURED'S RELIANCE ON BEAR STEARNS' REPRESENTATIONS WAS JUSTIFIABLE AND ITS DUE DILIGENCE WAS REASONABLE AND CONSISTENT WITH THE RISK ALLOCATION IN THE TRANSACTION

227.   Bear Stearns knowingly and with intent to induce reliance thereon made the foregoing material misrepresentations to Assured and investors and actively concealed material information. Assured reasonably relied to its detriment on the material misrepresentations and omissions Bear Stearns made to induce Assured's participation in the Transaction.

---

[280] Email from Warren Saft (Bear, Stearns & Co. trader), to Jeffrey Verschleiser (Bear, Stearns & Co. Senior Managing Director, Head of ABS & Wholeloan Desk, Bear, Stearns & Co.), among others, dated Feb. 18, 2008, EMC-AMB 012117048-051.

[281] Email from Beau Paulk (Bear, Stearns & Co. employee) to Thomas Marano (Bear, Stearns & Co. Senior Managing Director, Head of MBS, ABS and CMBS), Michael Nierenberg (Bear, Stearns & Co. Senior Managing Director, Head of ARM and CDO Desk), and Jeff Verschleiser (Bear, Stearns & Co. Senior Managing Director, Head of ABS & Wholeloan Desk), among others, dated March 17, 2008, EMC-AMB 011189682-83 (attaching "Department Hedge Summary" as of March 14, 2008).

[282] Email from Beau Paulk (Bear, Stearns & Co. employee) to Marano (Bear, Stearns & Co. Senior Managing Director, Head of MBS, ABS and CMBS), Michael Nierenberg (Bear, Stearns & Co. Senior Managing Director, Head of ARM and CDO Desk), and Verschleiser (Bear, Stearns & Co. Senior Managing Director, Head of ABS & Wholeloan Desk), among others, dated March 17, 2008, EMC 011189682-83 (attaching "Department Hedge Summary" as of March 14, 2008); Email from Thomas Marano (Bear, Stearns & Co. Senior Managing Director, Head of MBS, ABS, and CMBS) to Scott Eichel (Bear, Stearns & Co. Senior Managing Director, ABS/MBS Credit Trading), and Adam Siegel (Bear, Stearns & Co. Senior Managing Director, ABS/MBS Credit Trading), dated Feb. 20, 2008, EMC-AMB 005486578-580.

228.    Bear Stearns' misrepresentations and omissions concerned matters that Bear

Stearns had knowledge of, and/or the ability to dictate, evaluate, and manage.  Bear Stearns was

the purchaser and the initial owner of the HELOCs and the corresponding loan files.  As such,

Bear Stearns had the ability to dictate the parameters of the HELOCs purchased, including their

attributes and guidelines pursuant to which they were underwritten.  Bear Stearns also had the

ability and purported to conduct the requisite due diligence in advance and quality control after

the HELOCs were acquired.  Bear Stearns also had recourse against GreenPoint in the event any

HELOC was determined to be defective, or failed to comply with the represented attributes.  In

contrast, Assured (i) never owned the HELOCs or the loan files, (ii) did not have the opportunity

to re-underwrite the HELOCs before deciding whether to participate in the Transaction, and

(iii) was not in privity with and did not have recourse against GreenPoint for any defective

HELOCs.

229.    It was therefore understood, as a fundamental premise of the Transaction, that

Assured would rely on Bear Stearns' representations, and Bear Stearns would bear risk of loss in

the event those representations were false.  Lacking the accurate depiction of Bear Stearns'

practices and procedures, Assured's reliance on Bear Stearns' disclosures and representations

was reasonable and consistent with the industry practice and the parties' bargained-for exchange.

230.    As was the general practice and the parties' agreement, Bear Stearns and Assured

each assumed different risks and undertook due diligence in accordance with their respective

roles in the Transaction.  Bear Stearns, as the sponsor and seller (through EMC) and as the

underwriter and deal manager (through Bear, Stearns & Co.), thus accepted the origination and

underwriting risk that the HELOCs did not conform to the represented attributes and actual and

prudent underwriting guidelines.  Assured, as the insurer, in turn agreed to bear the market risk

that HELOCs bearing the represented attributes and underwritten to the applicable guidelines would not perform as projected.

231.     Consistent with this reasoned risk allocation between sophisticated parties, Assured justifiably relied on Bear Stearns' representations, and undertook due diligence commensurate with the risk it agreed to assume in the Transaction. Assured's reliance and diligence was also contemporaneously documented in the Structured Finance Underwriting Committee Submission, also known as the "Credit Memorandum," that Assured prepared to obtain internal approval from its Credit Committee for the Transaction.

232.     Thus, among other things, the Credit Memorandum reflects that Assured used the HELOC attributes provided by Bear Stearns on the initial and final mortgage-loan tapes to model and assess the market risk of loss on the Transaction. Assured further secured and scrutinized Bear Stearns' representations concerning its institutional competence, processes, and protocols for approving sellers, conducting due diligence, and quality control, and for repurchasing defective HELOCs from its securitizations. Based on data from the initial tape and Bear Stearns' representations about its practices and procedures, Assured's Credit Committee voted to approve and bid on the Transaction in August 2005.

233.     Finally, and significantly, Assured demanded and received, as a condition precedent to participating in the Transaction, Bear Stearns' contractual representations and warranties concerning, among other things, the HELOC attributes, the guidelines pursuant to which the HELOCs were originated and underwritten, and Bear Stearns' operations. The Credit Memorandum notes:

> Bear will make certain representations and warranties as to the accuracy in all material respects of certain information . . . furnished to the Indenture Trustee. In addition, Bear will make representations and warranties with respect to the mortgage loans

that are standard for a transaction of this type . . . . Upon discovery of a breach of any such representation and warranty, which materially and adversely affects the interest of the noteholders or [Assured] in the related mortgage loan, Bear will be required to repurchase the affected mortgage loan.[283]

234. The contractual representations and warranties that Assured secured from Bear Stearns (through EMC), and on which Assured relied, were the means by which the parties memorialized and allocated the respective risks in the Transaction, and therefore were the essential inducement for Assured to participate in the Transaction.[284]

## VIII. EMC'S EXPRESS REPRESENTATIONS, WARRANTIES, AND CONTRACTUAL COVENANTS IN THE TRANSACTION DOCUMENTS

### A. EMC'S EXPRESS REPRESENTATIONS AND WARRANTIES REFLECT THE BARGAINED-FOR RISK ALLOCATION

235. Under the Transaction Documents, the principal and interest payments from the HELOCs were to provide the cash flow necessary to make the monthly principal and interest payments due on the Notes. Assured's insurance Policy required it to make payments to the purchasers of the Insured Notes to the extent there was a shortfall of cash flow available from the loans, once the protection provided by subordinated classes of securities and other credit enhancement was eroded. Assured agreed to assume this risk of payment default, which depended upon the truth of the information Bear Stearns provided to Assured regarding the quality of the securitized HELOCs and Bear Stearns' purportedly thorough due diligence and

---

[283] Assured Guaranty Corp., Assured Guaranty Structured Finance Underwriting Committee Submission, Bear, Stearns SACO I Trust 2005-GP1, Aug. 11, 2005, AGC_SACO00444839 at 844.

[284] When asked whether "EMC deemed it important to make representations and warranties in order to persuade the RMBS investors to purchase from Bear Stearns," Mary Haggerty testified that "Bear Stearns was marketing the certificates. It was viewed as a positive that EMC was making the reps and warranties." 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 131. *See also* 9/29/2011 Jewell Deposition Tr. at 168-69 (agreeing that the "representations and warranties provided in regards to the quality of those loans was designed to address and mitigate those risks . . . to protect the RMBS investor by lowering the risk of investing in Bear Stearns' securities").

quality control practices. Bear Stearns assumed the risk and the burden of assessing the validity and accuracy of the characteristics and attributes that it represented and warranted the HELOCs possessed (including that the loans were originated pursuant to the appropriate underwriting guidelines and were not fraudulently procured).

236.    That was a reasoned risk allocation. Before and through the closing of the Transaction, EMC was in privity with GreenPoint with respect to the HELOCs "backing" the Notes. EMC purchased the HELOCs that it conveyed to the Trust from GreenPoint pursuant to a contract in which GreenPoint made representations and warranties to EMC concerning the HELOCs and agreed to repurchase HELOCs that did not conform with those representations and warranties. Pursuant to EMC's sales contract with GreenPoint, before and through the closing of the Transaction, EMC owned the HELOCs and possessed the related loan origination, credit, and servicing files, which afforded it access to and control over information required to effectively evaluate the characteristics and attributes of these loans. To the extent that EMC identified defects in the HELOCs, it had the right before and through the closing of the Transaction to demand that GreenPoint repurchase the defective HELOCs. EMC thus had the means before and after the closing of the Transaction to assess the quality of the HELOCs and had recourse back to GreenPoint in the event a defect was discovered.

237.    In contrast, as Bear Stearns knew, Assured (i) was not in privity with GreenPoint with respect to the HELOCs securitized in the Transaction, (ii) did not own the HELOCs, (iii) did not and would not have access to the loan origination, credit, and servicing files before the closing of the Transaction, and (iv) lacked direct recourse against GreenPoint with respect to the HELOCs.

238.    It therefore made sense for the sophisticated parties to agree, and they did agree, that: (i) EMC would bear the risk and the burden of assessing the validity and accuracy of the characteristics and attributes of the HELOCs conveyed to the Trust; and (ii) Assured would bear the burden of evaluating whether HELOCs *bearing these characteristics and attributes* would perform after the closing of the Transaction as it had projected.

239.    EMC's numerous representations and warranties to Assured, and the broad remedies afforded for their breach, conveyed EMC's blanket commitment that the HELOCs EMC had sold to the Trust conformed to EMC's representations and warranties and were not tainted by fraud, error, omission, misrepresentation, negligence, or similar occurrence in their origination.  In providing this commitment, Bear Stearns assured Assured that EMC would bear the risk of loss in the event that any of its representations and warranties proved inaccurate.

240.    The representations, warranties, covenants, and remedies that EMC provided, and on which Assured relied, were the means by which the parties effectuated their reasoned and bargained-for risk allocation, and therefore, were one of the essential inducements for Assured to participate in the Transaction.

### 1.    *Loan-Level Representations and Warranties*

241.    EMC made myriad representations and warranties in the MLPA regarding, among other things, the attributes of the HELOCs and the practices used to originate, underwrite, and service them.  As demonstrated by their number, scope, and particularity, these Loan-Level Representations were designed to convey absolute confidence that EMC was standing behind the quality of the HELOCs and, specifically, accepting the risk of loss should any of the HELOCs be found to have been included in the Transaction in violation of any representation or warranty. EMC represented and warranted as to each of the HELOCs in the pool that, among other things:

- MLPA § 7(a): "[T]he information set forth in the Mortgage Loan Schedule on the Closing Date is complete, true and correct."

- MLPA § 7(j): "[N]o fraud, error, omission, misrepresentation, gross negligence or similar occurrence with respect to a Mortgage Loan has taken place on the part of any Person, including without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination or servicing of the Mortgage Loan."

- MLPA § 7(n): "Each loan at the time it was made complied in all material respects with applicable local, state, and federal laws, including, but not limited to, all applicable anti-predatory lending laws."

- MLPA § 7(w): "[T]here was no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and there was no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and the related Mortgage Loan Seller has not waived any default, breach, violation or event of acceleration."

- MLPA § 7(z): "The origination, servicing and collection practices with respect to each Mortgage Note and Mortgage including, the establishment, maintenance and servicing of the escrow accounts and escrow payments, if any, since origination, have been conducted in all respects in accordance with the terms of Mortgage note and in compliance with all applicable laws and regulations and, unless otherwise required by law or Fannie Mae/Freddie Mac standards, in accordance with the property, prudent, and customary practices in the mortgage origination and servicing business. . . ."

- MLPA § 7(ee): "The Mortgagor has received all disclosure materials required by applicable law with respect to making of the Mortgage Loan."

- MLPA § 7(jj): "Each Mortgage Loan at the time of origination was underwritten in general in accordance with guidelines not inconsistent with the guidelines set forth in the Prospectus Supplement and generally accepted credit underwriting guidelines."

- MLPA § (kk): "No error, omission, misrepresentation, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of either Mortgage Loan Seller or the related Originator."

242.    Section 23 of the MLPA makes Assured an express third-party beneficiary of the

MLPA. *See also* SSA § 7.16 (making Assured an express third-party beneficiary of the SSA

with the authority to enforce any "right, remedy or claim conferred" therein).  Further, under

Section 2.08 of the SSA, the Trust assigned "all of its right, title and interest in and to the HELOCs and its right to exercise the remedies . . . for breaches of the representations, warranties, agreements and covenants of [EMC] contained in the [MLPA], to the Indenture Trustee, for the benefit of the Noteholders and [Assured]." EMC also agreed that "such representations, warranties, agreements and covenants will run to and be for the benefit of the Indenture Trustee and [Assured], and the Indenture Trustee may enforce, without joinder of [BSABS] or the [Trust], the repurchase obligations of [EMC] set forth herein and the [MLPA] . . . ." *See* SSA § 2.08.

## 2. *Transaction-Level Representations and Warranties*

243.   EMC induced Assured to issue the Policy by, among other things, extending to Assured the representations and warranties EMC had made in the Operative Documents, providing even broader representations and warranties in the I&I Agreement, and affording Assured even greater remedies for breaches of EMC's representations and warranties than those that EMC had extended to the Trustee and purchasers of the Notes in the Transaction Documents. These additional representations and remedies were consistent with Assured's central role in the Transaction as the ultimate backstop for payments due to the purchasers of the Notes.

244.   EMC's broad representations and warranties, and its commitment to bear the risk of their inaccuracy, are clearly and unambiguously stated in the I&I Agreement. First, the I&I Agreement explicitly extends to Assured the numerous representations and warranties that EMC made in the Operative Documents:

> I&I Agreement § 2.01(m): "*Operative Documents.* Each of the representations and warranties of the Seller, the Issuer and the Depositor contained in the applicable Operative Documents to which it is a party is true and correct as of the date reflected therein and each of the Seller, the Issuer and the Depositor hereby makes

each such representation and warranty to, and for the benefit of, the Insurer as if the same were set forth in full herein."

245.    Second, the I&I Agreement provides that Assured is a third-party beneficiary of the underlying Operative Documents, with all rights afforded thereunder, and incorporates and restates for the benefit of Assured all of the representations, warranties, and covenants that EMC made in the Operative Documents:

> I&I Agreement § 2.02(k):  *"Third-Party Beneficiary.*  Each of [EMC], the Issuer and the Depositor agrees that the Insurer shall have all rights provided to the Insurer in the Operative Documents and that the Insurer shall constitute a third-party beneficiary with respect to such rights in respect of the Operative Documents and hereby incorporates and restates its representations, warranties and covenants as set forth therein for the benefit of the Insurer . . . ."

*See also* MLPA § 27; SSA § 7.16; Indenture § 11.17.

246.    Third, the I&I Agreement adds for Assured's benefit additional and broader Transaction-Level Representations not found in the MLPA, SSA, or AAR, including EMC's promise as to the truthfulness of the information that it and its affiliates provided to Assured and investors about itself, the Transaction, and GreenPoint's origination and underwriting practices, as well as the truthfulness of the information that EMC provided to the rating agencies to secure the requisite credit ratings:

> I&I Agreement § 2.01(j):  *"Accuracy of Information.*  Neither the Operative Documents to which it is a party nor other information relating to the HELOCs, the operations of the Seller, the Issuer or the Depositor or the financial condition of the Seller, the Issuer or the Depositor (collectively, the "Documents"), as amended, supplemented or superseded, furnished to the Insurer in writing or in electronic form by the Seller, the Issuer or the Depositor contains any statement of a material fact which was untrue or misleading in any material respect when made or fails to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. Since the furnishing of the Documents, there has been no change nor any development or event involving a prospective change known to the Seller, the Issuer or the Depositor that would render

126

any of the Documents untrue or misleading in any material respect."

I&I Agreement § 2.01(l):  *Compliance With Securities Laws; Accuracy of Information.*  The offer of the Securities complies or shall comply in all material respects with all requirements of law, including all registration requirements of applicable securities laws.  Without limiting the foregoing, the Offering Document[285] . . . does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading as of the date of the Offering Document, as of the Closing Date and as of any amendment or supplement to the Offering Document . . . .   The offer of the Insured Notes has not been and will not be in violation of the Securities Act or any other federal or state securities laws. . . .[286]

247.   As demonstrated by its plain language, the Accuracy of Information representation and warranty in Section 2.01(j) of the I&I Agreement gave Assured a strong guaranty as to the veracity of information conveyed to Assured before the closing of the Transaction.  This information included, among other things, the mortgage-loan tapes sent to Assured on July 15, 2005,[287] July 27, 2005,[288] August 8, 2005,[289] and August 30, 2005.[290]  The

---

[285] The I&I Agreement defines the "Offering Document" to include "the Prospectus, dated June 24, 2005, as supplemented by the Prospectus Supplement, dated Aug. 31, 2005, in respect of the Insured Notes and any amendment or supplement thereto, and any other offering document in respect of the Securities prepared by or on behalf of the Depositor that makes reference to the Policy."

[286] The significance of this representation and warranty is further bolstered by Section 3.01(j) of the I&I Agreement which provides that Assured "shall be entitled to rely on each of the documents[] required to be delivered to the Underwriters pursuant to the Underwriting Agreement[,]" (*i.e.*, the Offering Documents).

[287] *See* Email from G. Scott Tabor (Mortgage Finance, Bear, Stearns & Co.) to Ken Rosenberg (Director, Assured) and Jack Gray (Director, Structure Finance, Assured), dated July 15, 2005, attaching preliminary loan tape, EMC-ASSURED 000537729-730.

[288] Email from G. Scott Tabor (Mortgage Finance, Bear, Stearns & Co.) to Ken Rosenberg (Director, Assured), dated July 27, 2005, attaching preliminary loan tape, EMC-ASSURED 000538592-593.

[289] Email from Sally N. Kawana (Vice President, Home Equity Group, Bear, Stearns & Co.) to Rafi Warburg (Analyst, Structured Finance, Assured), dated Aug. 8, 2005, attaching preliminary loan tape, EMC-ASSURED 000569685-686.

mortgage-loan tapes were extensive spreadsheets that, as represented and warranted by EMC, purported to contain true, accurate, and complete data concerning the proposed loan pool, including key metrics for assessing the borrowers' ability to repay their loans and the sufficiency of the mortgaged properties as collateral. As discussed above and in detail below, the data disclosed on these tapes were false and misleading.

248. The Compliance with Securities Laws representation and warranty in Section 2.01(l) of the I&I Agreement afforded Assured an equally strong guaranty concerning the veracity of the statements made in the Offering Documents, which included the ProSupp prepared to market the securities to investors. The ProSupp contains material statements pertaining to the loan attributes, the underwriting performed during the origination of the HELOCs, and the risks associated with the Transaction. But, like the data on the mortgage-loan tapes, the attributes and quality of the HELOCs described in the ProSupp were false and the policies, procedures, and guidelines by which they were originated were not as represented and warranted.

## B. EMC'S CONTRACTUAL COVENANTS REINFORCING THE PARTIES' BARGAINED-FOR RISK ALLOCATION

### 1. EMC's Promise to Give "Prompt" Notice of Breaches

249. To reinforce the parties' bargained-for risk allocation and further assure the Transaction participants that the securitized HELOCs complied with EMC's myriad loan-level representations and warranties, the MLPA provides ongoing obligations on all securitization participants to promptly disclose any HELOC found to have been included in the Transaction in violation of any of those representations and warranties.

---

[290] Email from G. Scott Tabor (Mortgage Finance, Bear, Stearns & Co.) to Rafi Warburg (Analyst, Structured Finance, Assured), dated Aug. 30, 2005, attaching final loan tape, EMC-ASSURED 000527099-100.

250.    Specifically, Section 7 of the MLPA provides, in pertinent part, as follows:

> Upon discovery or receipt of notice by [EMC], [BSABS], the
> [Trust], [Assured] or the Indenture Trustee of a breach of any
> representation or warranty of [EMC] set forth in this Section 7
> which materially and adversely affects the value of the interests of
> [BSABS], the [Trust], [Assured], the Noteholders or the Indenture
> Trustee in any of the [HELOCs] delivered to [BSABS] pursuant to
> this Agreement, the party discovering or receiving notice of such
> breach shall give prompt written notice to the others.

251.    The notification provision is absolute; it is in no way conditioned on EMC's

ability to pursue claims against the originator of those HELOCs (*i.e.*, GreenPoint) or ultimately

cure the defects affecting the breaching HELOCs.  Instead, it is designed to give prompt notice to

the Transaction participants of any breaching HELOC, to ensure that EMC – and not Assured,

the Transaction, or its investors – bear the risk of loss associated with defective HELOCs that

EMC should not have securitized.

252.    EMC's promise to promptly notify other Transaction participants of breaching

HELOCs subsequently found to have been included in the Transaction induced Assured and

investors to participate in the Transaction.

### 2.    EMC's Promise to Repurchase or
### Cure Breaching HELOCs Within 90 Days

253.    The disclosure of the existence of breaching HELOCs included in the Transaction

is necessary and essential to enforcing EMC's express contractual obligation to repurchase those

HELOCs or cure the breach in a timely manner (*i.e.*, within 90 days).  This disclosure and

prompt repurchase-or-cure mechanism also seeks to minimize the risk of loss to Assured and the

Transaction's investors in the event Bear Stearns securitized defective HELOCs by allocating

those risks squarely to Bear Stearns.

254.    To carry out this bargained-for risk allocation, and to convey absolute confidence

that EMC was standing behind the quality of the securitized HELOCs, EMC agreed in the

MLPA that, should any of its loan-level representations and warranties prove untrue, it would cure the breach(es) or remove the breaching HELOC(s) from the pool.  To this end, immediately following the notification obligations described above, Section 7 of the MLPA provides, in pertinent part, as follows:

> In the case of any such breach of a representation or warranty set forth in this Section 7, within 90 days from the date of discovery by [EMC], or the date [EMC] is notified by the party discovering or receiving notice of such breach (whichever occurs earlier), [EMC] will (i) cure such breach in all material respects, (ii) purchase the affected HELOC at the applicable Purchase Price,[291] or (iii) if within two years of the Closing Date, substitute a qualifying Substitute Mortgage Loan in exchange for such HELOC . . . .[292]

255.   While EMC's cure, repurchase, or substitution obligation (the "Repurchase Protocol") was a critical Transaction feature and a material inducement for Assured to insure the Transaction, the parties intended this remedy to address the inadvertent inclusion in the Transaction by EMC of the aberrant non-complying HELOC.  These provisions do not adequately address or compensate Assured for the enormous harm inflicted by Bear Stearns' fraud or the wholesale failures to comply with the express representations and warranties that EMC made in the Transaction Documents.  The Repurchase Protocol is not and was not intended to be an exclusive remedy in such circumstances.  EMC thwarted the intent of the parties

---

[291] The MLPA defines "Purchase Price" as "an amount equal to the sum of (i) 100% of the principal remaining unpaid on such Mortgage Loan as of the date of purchase (including if a foreclosure has already occurred, the principal balance of the related Mortgage Loan at the time the Mortgaged Property was acquired), (ii) accrued and unpaid interest thereon at the Mortgage Interest Rate through and including the last day of the month of purchase and (iii) any costs and damages (if any) incurred by the Trust in connection with any violation of the terms of such Mortgage Loan of any anti-predatory lending laws."

[292] EMC committed to repurchase *or* substitute incurable breaching loans, but the substitution remedy only was available for two years after the September 9, 2005 closing date, and therefore, was no longer available to EMC as of August 17, 2009 (the date that Assured first gave notice to EMC of breaches of its representations and warranties) or thereafter.  Assured therefore omits reference to the substitution remedy in this Complaint.

130

embodied in their contractual agreements by selling to the Trust predominantly non-compliant HELOCs, misrepresenting material facts and omitting material information, and pervasively breaching its representations and warranties. Further compounding the harm, EMC, under the direction of Bear Stearns and subsequently JP Morgan executives, has subverted the Repurchase Protocol by refusing to repurchase all but a negligible number of defective HELOCs submitted to it by Assured.

### C. THE BROAD LEGAL AND EQUITABLE REMEDIES RESERVED AND AFFORDED TO ASSURED UNDER THE TRANSACTION DOCUMENTS

#### 1. Assured's Express Right to Pursue Any and All Remedies "at Law or in Equity"

256. The parties understood that the Repurchase Protocol would not fully address the quantum of risk and harm borne by Assured in the event of wholesale misrepresentation of facts material to its risk assessment. Accordingly, while other parties to the Transaction may be limited to the remedies set forth in the MLPA and SSA, as applicable, Assured is not. Section 5.02 of the I&I Agreement provides that any and all remedies at law and in equity – including those available in the Operative Documents – are available to Assured on a non-exclusive and cumulative basis.

257. Pursuant to Section 5.02(a) of the I&I Agreement, EMC agreed that upon the occurrence of an "Event of Default,"[293] which event includes EMC's breaches of the loan-level representations and warranties in the MLPA, Assured may

> take whatever action at law or in equity as may appear necessary or desirable in its judgment to collect the amounts, if any, then due under this Insurance Agreement or any other Operative Document

---

[293] An "Event of Default" is defined under Section 5.01(a) of the I&I Agreements as occurring when, among other things, "[a]ny representation or warranty made by EMC . . . hereunder or under the Operative Documents, or in any certificate furnished hereunder or under the Operative Documents, shall prove to be untrue or incomplete in any material respect, unless remedied under the Operative Documents."

> or to enforce performance and observance of any obligation, agreement or covenant of [EMC] . . . under this Insurance Agreement or any other Operative Documents.

258.    Section 5.02(b) of the I&I Agreement further provides that any and all remedies existing at law and in equity – including those available in the Operative Documents – are available to Assured on a non-exclusive and cumulative basis.

259.    Pursuant to Section 5.03(a) of the I&I Agreement, EMC expressly agreed that "[t]he exercise by [Assured] of any right hereunder shall not preclude the exercise of any other right, and the remedies provided herein to [Assured] are declared in every case to be cumulative and not exclusive of any remedies provided by law or equity."

260.    Finally, Section 4.03(a) of the I&I Agreement states that each of EMC's obligations under the I&I Agreement are "absolute and unconditional" and must be performed in accordance with the I&I Agreement "under all circumstances, irrespective of . . . (viii) any other circumstances . . . that might otherwise constitute a defense available to, or discharge of, . . . [EMC] . . . in respect of any Operative Document."

### 2.    *Assured's Express Contractual Rights to Indemnification, Payments, and Reimbursement*

261.    Pursuant to Section 3.04(a) of the I&I Agreement, EMC also agreed to pay and indemnify Assured for any claims, losses, or demands arising out of or relating to, among other things, any breach of a representation, warranty, or covenant made by EMC.  In particular, Section 3.04(a) states that EMC agrees

> to pay, and to protect, indemnify and save harmless, [Assured] . . . from and against any and all claims, losses, liabilities (including penalties), actions, suits, judgments, demands, damages, costs and expenses (including reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) of any nature arising out of or relating to the breach by [EMC] . . . of any of the representations or warranties contained in Section 2.01 or Section 2.05 or arising out of or relating to the transactions

132

contemplated by the Operative Documents by reason of: . . . (iv) the breach by [EMC] . . . of any representation, warranty or covenant under any of the Operative Documents to which it is a party or the occurrence, in respect of [EMC] . . . , under any of the Operative Documents of any 'event of default' or any event which, with the giving of notice or the lapse of time or both, would constitute any 'event of default'. . . ."

262.   EMC separately agreed to reimburse Assured for any payments resulting from, among other things, EMC's failure to comply with the remedial provisions of the SSA and the MLPA. Specifically, in Section 3.03(b) of the I&I Agreement, "EMC agree[d] to pay [Assured], and [Assured] shall be entitled to reimbursement from [EMC] and shall have full recourse against [EMC] for, (i) any payment made under the Policy arising as a result of [EMC's] failure to . . . deposit an amount in respect of any defective Mortgage Loan as required pursuant to Section [7] of the Mortgage Loan Purchase Agreement, together with interest on any and all such amounts remaining unreimbursed . . . ."

263.   EMC also agreed that it would pay Assured any expenses incurred in enforcing EMC's obligations under the Operative Documents. To that end, Section 3.03(c) of the I&I Agreement states that "[EMC] agrees to pay [Assured] any and all charges, fees, costs and expenses that [Assured] may reasonably pay or incur, including reasonable attorneys' and accountants' fees and expenses, in connection with (i) the enforcement, defense or preservation of any rights in respect of any of the Operative Documents." Moreover, Section 3.03(d) of the I&I Agreement entitles Assured to collect interest on any and all amounts recovered as reimbursement or any and all amounts expended in enforcing or preserving its rights under the I&I Agreement.

## IX.    EMC'S PERVASIVE BREACHES OF ITS REPRESENTATIONS AND WARRANTIES

### A.    ASSURED'S LOAN-LEVEL REVIEW UNCOVERED PERVASIVE BREACHES

264.    The HELOCs that Bear Stearns sold to the Trust in connection with the

Transaction have failed miserably.  Only 688 of the 6,028 HELOCs initially sold to the Trust are

current as of September 26, 2011.  A loan-level review and analysis undertaken by Assured's

independent consultants (at enormous effort and expense) has revealed that a significant number

of HELOCs in the Transaction breach one or more of EMC's extensive loan-level

representations and warranties due to rampant misrepresentations and fraud occurring during

origination, GreenPoint's abject failure to adhere to its own underwriting guidelines, and other

materially false statements regarding the key loan characteristics.

265.    To date, Assured, through its independent consultant, has reviewed a total of 906

HELOCs in the Transaction.  The results of Assured's loan-level analyses revealed that at least

820 HELOCs breached one or more of EMC's representations and warranties, evidencing a

staggering 88.5 percent breach rate.  These HELOCs contain one or, in most cases, multiple

defects that constitute a breach of one or more of the numerous representations and warranties

made by EMC in the MLPA and that materially altered the HELOCs' risk profile.  These defects

include:

- Rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property as the borrower's residence (rather than as an investment), and subsequent failure to so occupy the property;

- Failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;

- Inflated and fraudulent appraisals; and

- Pervasive violations of GreenPoint's own underwriting guidelines without adequate, or any, compensating factors, and in disregard of prudent mortgage-

134

lending practices, including, for example, HELOCs made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social-security numbers, (iii) with credit scores below the required minimum, (iv) with DTI, LTV, and CLTV ratios above the allowed maximums, or (v) with relationships to GreenPoint or other non-arm's-length relationships.

266.    Each of these breaches materially and adversely affected the value of Assured's interests in the identified HELOC.  Loans subject to fraud, that were originated without regard for GreenPoint's own underwriting guidelines and prudent and proper lending practices, or the key attributes of which are otherwise misrepresented, are riskier and less valuable than loans not suffering from such shortcomings.

267.    The pervasive breaches of EMC's representations and warranties, revealed by the loan-file reviews and supported by the dismal loan performance of the Transaction, pierce the very heart of the bargain struck by the parties.  EMC did not sell to the Trust the contemplated portfolio of loans with the represented attributes.  Rather, EMC transferred a pool in which the overwhelming majority of HELOCs did not comply with expectations and, in fact, bore little resemblance at all to the loans that EMC had expressly represented would comprise the pool.

**B.    EMC REFUSED TO REPURCHASE ALL OF THE BREACHING HELOCS IDENTIFIED BY ASSURED**

268.    Pursuant to Section 7 of the MLPA, through a series of e-mails and letters dated August 17, 2009, April 8, 2010, and July 8, 2010, Assured promptly gave formal notice to EMC and the other Transaction participants identifying 820 HELOCs with an aggregate principal balance of $52,870,800 found to have been included in the Transaction in breach of EMC's contractual warranties, and described the breaches affecting each HELOC with specificity. Assured demanded that EMC comply with its contractual obligation to repurchase the non-compliant HELOCs and further reserved any and all rights to assert additional claims or demands including with respect to indemnification, reimbursement, breaches, or other claims.  Upon

135

receipt of such notices, EMC became obligated under the MLPA and SSA to repurchase or cure the affected HELOCs within 90 days.

269.     In response to Assured's breach notices, EMC, at the behest of Bear Stearns and its new management under JP Morgan, refused to repurchase or acknowledge the breaches with respect to **all 820 breaching HELOCs** that Assured identified.  EMC's wholesale rejection of Assured's repurchase demands amounts to a deliberate and bad faith frustration of the Repurchase Protocol.

## X.  JP MORGAN TORTIOUSLY INTERFERED WITH EMC'S CONTRACTUAL OBLIGATION TO ASSURED

### A.  JPMorgan Chase & Co. Acquired Bear Stearns' Securitization Machine at a Fire Sale

270.     Bear Stearns' house of cards built on its fraudulent mortgage securitization machine collapsed in the spring of 2008.  Following its unprecedented collapse, The Bear Stearns Companies and its subsidiaries – including Bear, Stearns & Co. and EMC – were acquired by JPMorgan Chase & Co. in a fire sale for only $10 a share, which was funded, in part, through a $29 billion non-recourse loan from the American taxpayers.

271.     Immediately upon assuming control of what was left of Bear Stearns for nominal consideration, its subsidiary, JP Morgan, began deliberately frustrating insurers' rights in the Bear Stearns securitizations to avoid having to account for Bear Stearns' massive exposure related to its securitizations on its consolidated financial statements.  Most significantly, JP Morgan implemented a bad-faith strategy to reject without justification insurers' legal remedies, demands, and other claims relating to the toxic loans backing Bear Stearns securitizations.  As a result, JP Morgan interfered with EMC's contractual obligations including those owed to Assured and other insurers and investors.

**B.**     **AFTER THE MERGER, JP MORGAN IMPLEMENTED
POLICIES TO REJECT WHOLESALE CLAIMS FOR BREACHING
LOANS TO MANIPULATE ITS ACCOUNTING RESERVES**

*1.     JP Morgan Ordered EMC, "Do Not Repurchase Any Loans"*

272.     Following its acquisition of Bear Stearns in March 2008, JP Morgan took over

EMC's operations, policies, and procedures, including those concerning EMC's responses to

claims against EMC for breaches of contractual warranties. As soon as it assumed the helm, JP

Morgan implemented an across-the-board moratorium on the repurchase of breaching loans from

securitizations to avoid properly recognizing on its consolidated financial statements the massive

exposure related to securitizations that it inherited from Bear Stearns and EMC.

273.     Specifically, on May 16, 2008, Alison Malkin, the Executive Director of JP

Morgan's Securitized Products division, sent an email alerting EMC employees "***IMPORTANT:***

***Please do not repurchase any loans***" because "JPM is evaluating processes and has put a

temporary hold until they have finished."[294]   On July 14, 2008, Malkin reinforced JP Morgan's

directive, stating that "*[t]he only way a loan can be repurchased from a deal is if I send an*

*email*."[295]   With the moratorium in place, JP Morgan immediately began (i) cancelling the

repurchase of large volumes of loans that EMC previously determined had to be repurchased,

and (ii) rejecting wholesale subsequent demands by insurers, including Assured, to repurchase

breaching loans from Bear Stearns' securitizations.

---

[294] Email from Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products) to
Ashley Poole (EMC Mortgage Corporation Analyst, Representations and Warranties Department) and
Whitney Long (EMC Residential Mortgage Vice President, Risk Management and Claims), dated May
16, 2008, EMC-AMB 007165488-490 at 489 (emphasis added).

[295] Email from Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products) to
Gary Lyles (Bear, Stearns & Co. Internal Audit Department), dated July 14, 2008, EMC-AMB
010858522-524 (emphasis added). *See also* 9/29/2011 Jewell Deposition Tr. at 249-52 (confirming "that
when JPMorgan came in after the merger, that it put a hold on buying out loans from securitizations that
EMC or Bear Stearns had determined to have material PSA breaches" and identifying Alison Malkin as
"the person at JPMorgan that was responsible and that directed Bear Stearns and EMC" with respect to
the review and repurchase of loans from securitizations).

274.     An EMC employee (who performed claims analysis for EMC until the JP Morgan

takeover, and for JP Morgan thereafter) confirmed that JP Morgan's new policy proscribed the

repurchase of loans by EMC unless it had recourse against the seller of the loan.[296]  That was not,

and is not, a legitimate basis to deny repurchase demands.

275.     Nonetheless, following JP Morgan's direction, EMC improperly rejected *all* of

Assured's requests that EMC repurchase breaching HELOCs from the Trust.  In doing so, JP

Morgan tortiously interfered with the parties' contractual repurchase remedies.

**2.      *JP Morgan Directed EMC to Deny Financial Guarantors' Repurchase
Demands While Simultaneously Asserting the Same Breach Claims
Against Originators***

276.     Further underscoring its improper interference, as JP Morgan was directing EMC

to reject financial guarantors' demands to repurchase breaching loans, JP Morgan simultaneously

advanced the breach claims asserted by the financial guarantors against originators of loans,

including GreenPoint, in an attempt to recover funds for itself.

277.     JP Morgan first carried out this scheme in connection with securitization

transactions insured by Syncora Guarantee Inc. ("Syncora") and Ambac Assurance Corporation

("Ambac").  Those transactions involve mortgage loans of similar type and vintage as those

included in the Transaction.  With respect to loans in the Syncora- and Ambac-insured

transactions, JP Morgan directed EMC to deny the financial guarantors' demands for repurchase

while simultaneously demanding that the originators of those loans repurchase the same loans for

the same defects identified by Syncora and Ambac.

---

[296] 9/25/2010 Lu Deposition Tr. at 131-38 ("Q.  So to sum it up a little more clearly, Alison Malkin
instructed Ashley Poole to add analysis of recourse to seller to the claims against analysis?  (over
objection)  A.  Based on this e-mail, yes.  Q.  Okay.  And in turn Ms. Poole instructed you to fulfill that
request, correct?  A.  Yes.").

278.    For example, on March 4, 2008, Syncora gave formal notice to EMC of 380

securitized loans that breached one or more of EMC's representations and warranties.[297]  Within

days after receiving Syncora's notice, on March 11, Bear, Stearns & Co.'s Managing Director of

claims issued a repurchase demand on EMC's behalf to GreenPoint, the entity that sold those

loans to EMC prior to securitization, asserting that the same breaches identified by Syncora

constituted breaches of GreenPoint's representations and warranties under its agreement with

EMC.[298]  EMC's letter to GreenPoint stated unqualifiedly: "The breaches under the

Securitization MLPA [*i.e.*, contract between EMC and Syncora] also constitute breaches under

the Agreement [*i.e.*, contract between EMC and GreenPoint]."[299]  In response, GreenPoint

refused to repurchase the loans because, among other things, EMC had not repurchased any of

those loans from the securitization and, thus, suffered no loss.[300]  Thereafter, on June 26, 2008,

JP Morgan's Executive Director, Alison Malkin, continued to pursue EMC's claims against

GreenPoint, adamantly asserting "*that it is EMC's position that these breaches materially and

adversely affect the value of the [loans]*."[301]  But at the same time as JP Morgan was attempting

---

[297] Letter from XL Capital Assurance, Inc. to EMC Mortgage Corp., dated March 4, 2008, EMC-SYN 000002855-58

[298] Letter from Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage, President) to GreenPoint Mortgage Funding, Inc., dated March 11, 2008, EMC-SYN 00283796-99

[299] Letter from Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage, President) to GreenPoint Mortgage Funding, Inc., dated March 11, 2008, EMC-SYN 00283796-99.

[300] Letter from Rose Medina (GreenPoint Vice President, Rep & Warranty) to Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage, President), undated, EMC-SYN 00283794-95 (responding to Stephen Golden's March 11, 2008 letter)

[301] Letter from Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products) to Rose Medina (GreenPoint Vice President, Rep & Warranty), dated June 26, 2008, EMC-SYN 000003048; 1/22/2010 Megha 30(b)(6) Deposition Tr. 257-58 ("Q: So there's no ambiguity whatsoever that as of June 26, 2008, EMC was taking the position that the breaches that Syncora identified materially and adversely affected the value of the revolving credit lines, correct? . . . A. (Perusing) This letter reads

to recover from GreenPoint based on Syncora's breach positions, Malkin took diametrically opposing positions in repeatedly refusing to comply with all but 4 percent of Syncora's repurchase demands.[302]

279.   JP Morgan has acted similarly with respect to financial guarantor Ambac. That is, while simultaneously refusing to repurchase breaching loans identified by Ambac, JP Morgan advanced those same positions in an attempt to recover funds for itself from originators that supplied the loans to EMC.[303] JP Morgan also rebuffed Ambac's breach claims and barred EMC's repurchase of loans even where Bear Stearns had previously asserted repurchase claims against originators pertaining to the same defects that Ambac subsequently identified in the same loans (including claims that Bear Stearns agreed to settle in exchange for monetary payments from the seller that it pocketed in lieu of repurchasing the toxic loans from the securitizations).[304]

280.   JP Morgan's duplicity was not limited to Syncora and Ambac, but was part and parcel of a bad-faith corporate policy, which directly interfered with Assured's contractual right to have EMC repurchase breaching loans. But because Assured made its repurchase demands to EMC after Ambac and Syncora had already commenced litigation against EMC, JP Morgan attempted to finesse the wording of its claims against GreenPoint, while denying Assured's claims against EMC for the same loans, warranties, and breaches.

---

that, yes. Q. Thank you. And you see no ambiguity whatsoever in that statement, do you? A. No, I don't.").

[302] Letter from Jackie Oliver (EMC Mortgage Corporation Senior Vice President, Chief Servicing Counsel) to XL Capital Assurance, Inc., dated June 4, 2008, EMC-SYN 000002859-2914; Letter from Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products) to XL Capital Assurance, Inc., dated Aug. 4, 2008, EMC-SYN 00620317-343.

[303] Ambac Amended Complaint ¶¶ 207-08.

[304] Ambac Amended Complaint ¶ 209.

281. Specifically, after receiving Assured's breach notices on April 8, 2010 and July 8, 2010 identifying 820 breaching HELOCs from the Transaction, EMC in turn forwarded these repurchase demands to GreenPoint on May 5, 2010 and November 10, 2010, respectively. When GreenPoint rebuffed EMC's demands, EMC included qualifying language in its reply letters: "Although EMC may not necessarily agree with all of the factual contentions or concede the validity of the claims being asserted [by Assured], EMC will insist that [GreenPoint] honor [its] contractual obligations to repurchase any defective Loans and/or fully indemnify EMC against any losses."[305]

282. But when, by letter dated January 6, 2011, GreenPoint complained to EMC that "[n]either [EMC's] letter nor Assured's letter alleges the breach of any representation or warranty made by GreenPoint to EMC" and that the alleged breaches were "unfounded,"[306] EMC abandoned the pretense of its earlier qualification. By letter dated January 16, 2011, EMC stated -- without qualification – that it had previously notified GreenPoint of "breaches of certain representations and warranties contained in that certain Mortgage Loan Purchase Agreement (the 'Purchase Agreement') between GreenPoint and EMC Mortgage Corporation" and reserved its rights.[307]

283. Despite having asserted Assured's repurchase demands against GreenPoint (and clarified that it had in fact provided notice of breaches of representations and warranties), JP Morgan nonetheless refused to comply with Assured's repurchase demands for the very same breaching HELOCs. On July 7 and October 5, 2010, Thomas E. Tarantino of JP Morgan,

---

[305] *See* Letters from EMC to Capital One (as successor to GreenPoint), dated May 5, 2010 and Nov. 10, 2010, EMC-ASSURED 000000037-42 and EMC-ASSURED 000000001-03, respectively.

[306] *See* Letter from Rose Medina (Vice President, GreenPoint) to Janice Tenison (EMC), dated Jan. 6, 2011, EMC-ASSURED 000476876-77.

[307] *See* Letter from EMC to GreenPoint, dated Jan. 19, 2011, EMC-ASSURED 000476875.

authorized to act on EMC's behalf, formally responded to Assured's April 8 and July 8, 2010 breach notices and rejected Assured's repurchase requests for all of the 820 breaching HELOCs.[308]

### 3.  JP Morgan Ignored EMC's Prior Breach Positions and Adopted Conflicting Positions to Reject Assured's Breach Claims in Bad Faith

284.   JP Morgan caused EMC to take newfound positions as to circumstances in which loans must be repurchased from a securitization that were inconsistent with, and contravened, EMC's own interpretation of its obligations prior to JP Morgan's takeover.

285.   In May 2008, with "less than a month on the job," Malkin told EMC that "its own breach determinations with respect to its own loans in its own securitizations are incorrect," and, as an EMC witness conceded, due to Malkin's direct orders "the [repurchase] recommendations were changed."[309]   Accordingly, at JP Morgan's directive, EMC canceled the repurchase of loans that "we have previously added to the Repurchase Log, but we need to re-address using our *updated* standards."[310]

---

[308] *See* Letters from Thomas E. Tarantino (as authorized signatory for EMC) to Assured, dated July 7, 2010 and Oct. 5, 2010, EMC-ASSURED 000784264 and AGC_SACO00467081-7082, respectively. After Malkin's departure from JP Morgan in or about December 2008, Thomas Tarantino took over her responsibilities, having "ultimate authority with respect to whether or not a securitization breach is approved or not approved."  1/22/2010 Megha 30(b)(6) Deposition Tr. at 141-42; *see also* 1/29/2010 Haggerty Rule 30(b)(6) Deposition Tr. at 13.

[309] 1/22/2010 Megha Rule 30(b)(6) Deposition Tr. at 190-92.  In her initial review alone, conducted on or about May 5, 2008, Malkin "disagreed with 56% of EMC/Bear Stearns findings."  *See* Email from Whitney Long (EMC Residential Mortgage Vice President of Risk Management and Claims) to Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products), dated May 5, 2008, EMC-AMB 007173918-919;  9/29/2011 Jewell Deposition Tr. at 250-54 (as of May 2008 "loans that Bear Stearns had previously determined should have been bought out of the securitizations were re-reviewed by Alison Malkin" who had "ultimate authority" to change Bear Stearns' prior breach determinations), 325-30 (with respect to loans previously determined by Bear Stearns as having a securitization breach, "Alison Malkin was responsible for reviewing these loans and making a final determination as to whether or not EMC would accept or reject the PSA breach claim" because "she was in charge of the group, so ultimately it's her final call.").

[310] *See, e.g.,* Email from Michael Peacock (EMC Mortgage Corporation Securitization Breach Team), dated May 14, 2008, EMC-AMB 009119930-931 at EMC-AMB 009119931 (emphasis added).

286.    The employees formerly responsible for EMC's security-breach determinations diplomatically concluded that, with respect to JP Morgan's reversals, "[i]t seems that most of the differences are related to Bear's conservatism related to JP's relevant liberal interpretation of the PSAs."[311]

287.    JP Morgan's interpretations of EMC's repurchase obligations were contrived.  For instance, JP Morgan took the position that the following were not breaches warranting the repurchase of loans from the securitization:  (i) the absence of key documentation from the loan file (without which the loan could be rescinded) and (ii) a finding that the borrower's stated income was not reasonable.  The head of EMC's securitization breach team was properly baffled by those positions:  "The idea that missing certain significant docs is not a security breach issue is a fairly foreign concept that I have just not gotten my mind around yet.  The stated income issue is very similar, in that *the reasonableness test was a requirement in virtually all the guidelines* from the various lenders that we obtained loans from."[312]  Nonetheless, there was nothing the former EMC executive could do, as post-Merger "ultimately the authority to resolve any debate sat with JPMorgan."[313]

288.    By 2010, when Assured began submitting formal notices to EMC of HELOCs in the Transaction that breached one or more of EMC's warranties, JP Morgan's contrived bases for rejecting repurchase demands had become standard operating policy and directly contradicted Bear Stearns' interpretation of EMC's representations and warranties in finding material

---

[311] Email from Tamara Jewell (EMC Mortgage Corp., Vice President and Manager of Quality Control) to Whitney Long (EMC Residential Mortgage Vice President of Risk Management and Claims) and Stephen Golden (Bear, Stearns & Co. Managing Director, Warehouse and EMC Residential Mortgage, President), dated May 7, 2008, EMC-AMB 011739718-719.

[312] Email from Michael Peacock (EMC Mortgage Corporation Securitization Breach Team) to Tamara Jewell (EMC Mortgage Corp., Vice President and Manager of Quality Control), dated May 8, 2008, EMC-AMB 007173931-932 (emphasis added).

[313] 6/10/2010 Peacock Deposition Tr. at 254-56.

breaches in HELOCs prior to JP Morgan's acquisition. Specifically, as early as November 2006, Bear Stearns repurchased at least 34 HELOCs in the Transaction after acknowledging material breaches of EMC's representations and warranties due to, among other things, rampant misrepresentations or fraud concerning borrowers' ability to repay their debts, and abject underwriting failures.[314] When Assured identified other breaching HELOCs suffering from virtually identical defects, JP Morgan deliberately caused EMC to reject Assured's repurchase demands by adopting positions to refute the existence and materiality of breaches that are directly contrary to the breach determinations reflected in Bear Stearns' prior loan reviews, including, by way of example, the following:

- Loan No. ▮▮▮▮: On April 8, 2010, Assured asked EMC to repurchase this HELOC on the basis that it breached EMC's representations and warranties requiring compliance with GreenPoint's underwriting guidelines because, among other reasons, the borrower's stated monthly income of $9,860 was unreasonable for the stated employment as a middle school history teacher, and was not supported by the borrower's credit profile. Assured re-verified the borrower's income and determined that it was actually $3,153.86 per month. In its July 7, 2010 formal response to Assured, EMC rejected Assured's demand, claiming merely that the HELOC was "approved on a Stated Income program, which requires verification of employment, but does not provide for reverification of income during or following origination." EMC ignored the fact that GreenPoint's guidelines explicitly require an assessment of reasonableness of stated income and that its own representation and warranty to Assured provided that "[n]o fraud, error, omission, misrepresentation, gross negligence or similar occurrence with respect to a [HELOC] has taken place on the part of any Person, including without any limitation, the Mortgagor . . . ." Indeed, EMC's files contradict its position and reflect Bear Stearns' own determination that another HELOC (Loan No. ▮▮▮▮) materially breached EMC's representation and warranties, because a borrower's income was misrepresented at the time of application where the borrower stated he was employed by a public school district as a psychologist earning $12,300 a month, but its quality control department used online sources to determine that that salary was not reasonable. EMC determined that, using a

---

[314] Email from Cheryl Glory (Bear, Stearns & Co. Managing Director of US RMBS Investor Relations) to Jeff Verschleiser (Bear, Stearns & Co. Senior Managing Director, Head of ABS & Wholeloan Desk) and Keith Lind (Bear, Stearns & Co. Managing Director, Trading), dated May 9, 2007, EMC-ASSURED 0004777864 ("we requested EMC review these loans for MLPA and PSA breaches. Based on their findings the loans we purchased out around November and claims were filed against GreenPoint.").

reasonable salary, the borrower's DTI was 13.65 percent above the maximum allowed under the program.

- Loan No. ▮▮▮▮ : On April 8, 2010, Assured asked EMC to repurchase this HELOC on the basis that it breached EMC's representations and warranties requiring compliance with GreenPoint's underwriting guidelines because, among other reasons, the loan exceeded the DTI maximum and there was no evidence that the borrower had sold his prior residence at the time of closing. In its July 7, 2010 formal response to Assured, EMC rejected Assured's demand, claiming that the lender considered all "documentation in the file reflecting debts that existed at the time of origination." EMC's files contradict its position and reflect Bear Stearns' determination that another HELOC (Loan No. ▮▮▮▮ ) materially breached EMC's representations and warranties where a credit report obtained by its quality control department demonstrated undisclosed mortgage debts prior to closing, causing the borrower's DTI to exceed the guideline maximum.

- Loan No. ▮▮▮▮ : Assured asked EMC to repurchase this HELOC on April 8, 2010 because the borrower failed to disclose additional liabilities resulting from the borrower's acquisition of additional properties, including the purchase of a property one day prior to the closing. Assured utilized third-party resources to identify the borrower's undisclosed liabilities. In its July 7, 2010 formal response to Assured, EMC rejected Assured's demand, claiming that the lender considered all "documentation in the file reflecting debts that existed at the time of origination." EMC's files contradict its position and reflect Bear Stearns' own determination that another HELOC (Loan No. ▮▮▮▮ ) materially breached EMC's representations and warranties, where its quality control department identified "several mortgages were acquired in the close proximity to the June 9, 2005 closing date."

- Loan No. ▮▮▮▮ : On April 8, 2010, Assured asked EMC to repurchase this HELOC on the basis that it breached EMC's representations and warranties requiring compliance with GreenPoint's underwriting guidelines because, among other reasons, the loan exceeded the CLTV maximum by 60 percent. In its July 7, 2010 formal response to Assured, EMC rejected Assured's demand, stating that "[t]he claimed discrepancies, even if assumed to have existed at origination, were satisfied through alternate means or were not material to underwriting determination, and do not constitute breaches of representations and warranties." EMC's files contradict its position and reflect Bear Stearns' own determination that another HELOC (Loan No. ▮▮▮▮ ) materially breached EMC's representations and warranties, where the loan exceeded the CLTV program parameters by merely 4 percent.

- Loan No. ▮▮▮▮ : On April 8, 2010, Assured asked EMC to repurchase this HELOC on the basis that it breached EMC's representations and warranties requiring compliance with GreenPoint's underwriting guidelines because, among other reasons, the loan failed to meet the minimum required FICO score of 700. In its July 7, 2010 formal response to Assured, EMC rejected Assured's demand,

stating that "[t]he claimed discrepancies, even if assumed to have existed at origination, were satisfied through alternate means or were not material to underwriting determination, and do not constitute breaches of representations and warranties." EMC's files contradict its position and reflect Bear Stearns' own determination that another HELOC (Loan No. ▇▇▇▇▇▇▇) materially breached EMC's representations and warranties, where the credit report obtained by its quality control department showed that the borrower had an average FICO score of 675, below the guideline minimum of 680.

289.    The conflicting and incompatible positions that JP Morgan asserted on EMC's

behalf exemplifies JP Morgan's bad-faith strategy to reject legitimate repurchase demands by

Assured (and other financial guarantors) in order to mask any exposure to those claims on its

financial statements.  JP Morgan employed these fraudulent and deceptive practices in order to

tortiously interfere with and frustrate Assured's contractual rights and remedies by preventing

EMC from honoring its repurchase obligations without justification.

### C.    JP MORGAN INTERFERED WITH EMC'S CONTRACTS TO MANIPULATE AND UNDERSTATE ACCOUNTING RESERVES

290.    JP Morgan's motivation for preventing EMC from repurchasing breaching loans

is to artificially lower repurchase-related accounting reserves on JPMorgan Chase & Co.'s

consolidated balance sheet in an improper attempt to hide the massive liabilities inherited from

Bear Stearns.  The evidence of this improper motivation is clear.  As explained above, JP

Morgan cut EMC's securitization breach findings by over half within days of assuming control

of the repurchase process.  The motivation for JP Morgan's reversals was not lost on the EMC

executive responsible for cancelling the repurchases, who observed that "[f]rom *a reserves

standpoint* . . . the number has dropped from $31M/-$13.9M to $17M/-$7.6M."[315]  In other

words, of the loans with $31 million in unpaid balance previously found by EMC to warrant

repurchase from securitizations, JP Morgan's reversals left only $17 million to be repurchased.

---

[315] Email from Whitney Long (EMC Residential Mortgage, Vice President of Risk Management and Claims) to Alison Malkin (J.P. Morgan Securities Inc. Executive Director, Securitized Products), dated May 5, 2008, EMC-AMB 007173918-919.

And JP Morgan's reversals reduced "exposure" to these loans from $13.9 million to $7.6 million.  Thus, within days of assuming control of the repurchase process, JP Morgan slashed EMC's breach findings in order to reduce by a corresponding amount JPMorgan Chase & Co.'s accounting reserves.

291.    As the extreme positions JP Morgan is taking to avoid its repurchase allegations are being discovered, its reserving practices for repurchase obligations are now attracting the scrutiny of financial regulators.[316]  In January 2010, the SEC issued a comment letter following an 8-K filing by JPMorgan Chase & Co. seeking substantial additional disclosures concerning its repurchase reserves.  The SEC requested a detailed explanation as to how JP Morgan "establish[es] repurchase reserves for various representations and warranties . . . made to . . . GSE's, monoline insurers and any private loan purchasers," including "the specific methodology employed to estimate the allowance related to various representations and warranties, including any differences that may result depending on the type of counterparty to the contract."[317]  A full inquiry of JP Morgan's repurchase practices and policies necessarily will demonstrate its improper rejection of its repurchase obligations to manipulate JPMorgan Chase & Co.'s accounting reserves.

292.    The purported justification JPMorgan Chase & Co. has given the public for its low repurchase reserves fails to explain its reserves and repurchase positions in connection with the Transaction.  In November 2010, JPMorgan Chase & Co. disseminated announcements in the public sphere indicating that it continues to reserve minimal amounts to cover EMC's

---

[316] Menal Mehta, *The SEC Just Demanded More Information on JPMorgan Repurchase Liabilities*, Bus. Insider, June 24, 2010, *available at* http://www.businessinsider.com/sec-jpmorgan-reserves-liabilities-2010-6.

[317] Letter from Amit Pande (SEC Accounting Branch Chief) to Michael J. Cavanaugh (JPMorgan Chase & Co. Chief Financial Officer) dated Jan. 29, 2010 at 1-2, *available at* http://www.scribd.com/doc/33507476/SEC-Letter-to-JPM-Re-More-Disclosure-on-Buybacks-Jun-17-2010.

repurchase exposure, in part because "[t]ypically [deal documents] do not warrant that loans are free from borrower fraud."[318] This reasoning does not hold true for the Transaction, as several representations and warranties precisely to that effect were made by EMC to Assured in connection with the Transaction.[319] And even if the reasoning were true, which it is not, it fails to account for the myriad other representations and warranties, apart from no borrower fraud, that EMC breached.

293.    EMC has a continuing obligation to repurchase the breaching loans in the Transaction, and in turn, JPMorgan Chase & Co. has a significant accounting liability it inherited when it acquired Bear Stearns that it must recognize. But JP Morgan has interfered, and continues to interfere, with EMC's contractual obligations to Assured through fraudulent, illegal, and improper means in order to hide its accounting liabilities.

## XI.    EMC WAS A MERE ALTER EGO AND INSTRUMENTALITY OF BEAR, STEARNS & CO.

294.    Throughout the time prior to JP Morgan's acquisition of Bear, Stearns & Co., Bear, Stearns & Co. exercised exclusive, complete domination and control of EMC both generally and specifically with respect to the Transaction, and used such domination to commit fraud, breaches of contract, and other wrongs against Assured, resulting in grave injury to Assured. EMC was in effect a sham entity designed by Bear, Stearns & Co. to defraud investors in and insurers of Bear Stearns securitizations, including Assured.

295.    Moreover, Bear, Stearns & Co. held out EMC as an adequately capitalized corporation capable of backing the representations and warranties it made to Bear Stearns

---

[318] JPMorgan Chase & Co., *BancAnalysts Association of Boston Conference*, Charlie Scharf, CEO, Retail Financial Services, at 33 (Nov. 4, 2010) (online at files.shareholder.com/downloads/ONE/967802442x0x415409/c88f9007-6b75-4d7c-abf6-846b90dbc9e3/BAAB_Presentation_Draft_11-03-10_FINAL_PRINT.pdf).

[319] *See* Section VIII.A, above.

securitization participants, including Assured.  But EMC was not adequately capitalized for its corporate undertaking, as it did not set sufficient reserves for its repurchase liability to securitization trusts, including with respect to the Transaction.[320]  Meanwhile, Bear, Stearns & Co. siphoned EMC's corporate funds to offset losses on Bear, Stearns & Co.'s trading books, as if the funds belonged to Bear, Stearns & Co.[321]

296.    Accordingly, equity requires that JP Morgan, as successor to Bear, Stearns & Co., be held accountable and liable for the actions and wrongs of EMC.

## XII.   HARM SUFFERED BY ASSURED

297.    The Transaction that Bear Stearns marketed and effectuated based on its materially false and misleading representations and disclosures has failed miserably.  An overwhelming percentage of the loans that Bear Stearns securitized in the Transaction either have been written off as total losses or are severely delinquent causing massive shortfalls in the cash flows of principal and interest needed to pay down the securities.  As a result, the purchasers of the Insured Notes have incurred severe losses that have been passed on to Assured as the financial guarantor.

---

[320] *See* EMC Mortgage Corporation and Subsidiaries, Independent Auditors' Report, Consolidated Financial Statements As of and for the Years Ended November 30, 2006 and 2005, EMC-AMB 012128918-947.  With respect to claims by EMC against sellers, "[t]he Company evaluates seller obligations to the Company and reserves for any seller obligation that the Company deems uncollectible." *Id.* at 943.  But, with respect to EMC's own liability for its representation and warranty breaches to securitization counterparties, "[t]he contingencies triggering the obligation to indemnify are not generally expected to occur," and "it is unlikely that the Company will have significant losses under these arrangements." *Id.  See also* 10/3/2011 Marano Deposition Tr. at 123 ("I do not recall [EMC] establishing reserves for breaches of rep and warranty on securitization trusts.").

[321] *See* EMC Mortgage Corp. Claims Settlements Report for the month ending 11/30/2006, EMC-AMB 003673312 (allocating $6.7 million in cash obtained by EMC in claims settlements with sellers to offset markdown losses on Bear, Stearns & Co.'s FIXED and ARMS trading desks, led by Jeff Verschleiser and Michael Nierenberg, respectively); 10/6/2011 Verschleiser Deposition Tr. at 83-84 ("EMC was a subsidiary of Bear Stearns so if there was a fee earned, it was just an intercompany transfer. . . . *[I]t's just one pocket to the other*.").

298.   As of October 25, 2011, the Transaction has experienced cumulative losses of more than $75 million, and approximately $77 million of the original principal balance of the HELOCs has been charged off.

299.   The severe losses realized by the Transaction have resulted in Assured having to make substantial claim payments to purchasers of the Insured Notes. Since making the first claims payment in June 2008, as of October 25, 2011, Assured has paid unreimbursed claims of more than $43 million.

300.   Due to the high rate of expected defaults, future claims payments by Assured are inevitable. Therefore, in addition to the substantial claims payments already made by Assured under the Policy, Assured has been forced to set aside tens of millions of dollars in reserves based on the expectation of future shortfalls affecting the Transaction.

301.   As discussed above, the pervasive breaches of EMC representations and warranties, revealed by the loan-file reviews and Bear Stearns' internal documents, and supported by the dismal loan performance in the Transaction, decimate the bargain struck by the parties. As has only recently become clear, Bear Stearns did not sell to the Trust the contemplated portfolio of loans with the represented attributes. Rather, Bear Stearns transferred a pool of HELOCs, the majority of which did not bear any resemblance to the representations and warranties made by EMC. In doing so, Bear Stearns induced Assured into insuring the Transaction based upon materially false and misleading information.

302.   Contrary to EMC's representations and warranties in the I&I Agreement, the Offering Documents that Bear Stearns prepared to market the Notes that Assured insured (and the same documents that it filed with the SEC) contained material misrepresentations and omissions because they did not adequately or accurately disclose the true attributes of the

HELOCs (*e.g.*, the weighted average CLTV and DTI ratios or occupancy status), the level of fraud and underwriting failings permeating the EMC loan pools, the grossly deficient origination practices of the originator of the HELOCs, EMC's dismal due diligence practices, the duplicitous role of its quality control department, or its scheme to clear out its inventory of defective loans by securitizing them in the Transaction. Assured would never have issued its Policy or agreed to participate in the Transaction had it known the true facts.

303.  Having pervasively and systematically breached its representations and warranties and eviscerated the Repurchase Protocol, EMC has materially breached the I&I Agreement as a whole, which breaches entitle Assured to be (i) returned to the position it would have been in had it not entered into the I&I Agreement and issued its Policy and (ii) compensated for the incremental harm incurred as a result of its participation in the Transaction.

304.  At the very least, this relief requires the payment to Assured by Defendants of all claim payments made to date and all future claim payments required to be made under the Policy, as well as all costs and attorneys' fees incurred in prosecuting its claims against Defendants.

## XIII.  JPMORGAN CHASE & CO. HAS STRIPPED EMC OF ITS ASSETS, SEEKING TO RENDER EMC A JUDGMENT-PROOF SHELL, AND SUBJECTING JPMC BANK TO SUCCESSOR LIABILITY

305.  Subsequent to the filing of the original Complaint in this action detailing EMC's liability for the extensive losses suffered by Assured, JPMorgan Chase & Co. has taken steps to strip EMC of its assets and render it unable to satisfy any judgment against it. In violation of EMC's numerous contractual obligations to Assured, on or about April 1, 2011, JPMorgan Chase & Co. effectuated the Asset Transfer, an intercompany asset sale whereby EMC transferred to its affiliate JPMC Bank all of EMC's servicing-related assets. (The mortgage-servicing business entails, among other things, processing payments from borrowers for securitized mortgages and

distributing the proceeds to the trusts, as well as pursuing delinquent borrowers and bringing foreclosure actions.)  The servicing operations EMC sold to JPMC Bank constituted substantially all of EMC's assets and its last remaining operating assets.

306.    At the time of the Transaction, servicing was one of EMC's several business operations, and one that Bear Stearns featured prominently in its discussions with Assured.  As explained above, EMC also specialized in the acquisition, securitization, and disposition of mortgage loans.  But by the time of the Asset Transfer in early 2011, JPMorgan Chase & Co. had shut down EMC's mortgage-loan acquisition and securitization operations.  Servicing was EMC's last remaining business operation, and its servicing business constituted EMC's last remaining substantial asset.

307.    EMC has been shorn of its assets and has become, in essence, a shell.  By taking these improper actions, JPMorgan Chase & Co. has subjected its subsidiary, JPMC Bank, to liability as EMC's successor.

308.    Assured has been greatly harmed by EMC's breaches of contract in effectuating the Asset Transfer without Assured's required consent.  Among other harms, as a consequence of the Asset Transfer, EMC has been stripped of its business operations and left as a shell without the wherewithal to satisfy its ongoing contractual obligations to Assured in the Transaction.

### A.    EMC BREACHED ITS COVENANTS NOT TO TRANSFER ITS ASSETS OR ITS SERVICING RIGHTS WITHOUT ASSURED'S CONSENT

309.    Pursuant to the terms of express negative covenants in the I&I Agreement governing the Transaction, EMC agreed not to, without Assured's express written consent, "merge with or into any Person or transfer all or substantially all of its assets to any Person," I&I Agreement § 2.03(c), and not to "interfere in any material respect with the enforcement of any

rights of [Assured] under or with respect to any of the Operative Documents or the Policy," *id.* § 2.03(a), among other things.

310.    The restrictions on EMC's ability to merge or transfer all or substantially all of its assets, and to interfere with Assured's enforcement rights, were critical contractual protections for Assured. Assured required assurances that its counterparty in the Transaction had the continuing financial wherewithal to stand behind the obligations, explained above, to cure or repurchase defective loans in the Transaction, reimburse Assured, and provide the indemnities required by its agreement with Assured.

311.    EMC, together with JPMorgan Chase & Co., however, ignored these contractual obligations, and, without obtaining Assured's express written consent, completed the Asset Transfer that stripped EMC of its sole remaining operating asset.

### B.    ASSURED'S CONTRACTUAL RIGHTS TO SUE ANY SUCCESSOR OF EMC

312.    In addition to breaching EMC's contractual obligations, the Asset Transfer has resulted in JPMC Bank becoming liable to Assured for all obligations of EMC, including the repurchase of all breaching loans, as EMC's successor under the "Successor and Assigns" provisions of the MLPA governing the Transaction. Pursuant to the MLPA, "[a]ny person into which [EMC] may be merged or consolidated (or any person resulting from any merger or consolidation involving [EMC]), any person resulting from a change in form of [EMC] or any person succeeding to the business of [EMC], shall be considered a 'successor' of [EMC] hereunder and shall be considered a party hereto." MLPA § 23.

313.    Similarly, the I&I Agreement provides that the I&I Agreement shall be binding on EMC's successor: "This Insurance Agreement shall be a continuing obligation of the parties

153

hereto and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns." I&I Agreement § 4.04(a).

314. Because the servicing business was EMC's sole remaining ongoing operating business, when JPMC Bank succeeded to that business through the Asset Transfer, it succeeded to EMC's obligations with respect to the Transaction pursuant to the plain terms of the Transaction Documents.

### C. JPMORGAN CHASE & CO. EFFECTUATED A DE FACTO MERGER OF EMC AND JPMC BANK

315. In addition to making JPMC Bank EMC's successor by operation of these contractual provisions, the Asset Transfer orchestrated by the two entities' mutual parent company, JPMorgan Chase & Co, resulted in JPMC Bank becoming liable for all of the obligations and liabilities of EMC by operation of law. Ultimate ownership of the servicing operations that EMC transferred remain unchanged: Both before and after the Asset Transfer, EMC and JPMC Bank were affiliates of the same banking family and ultimately owned and controlled by the same parent holding company, JPMorgan Chase & Co.

316. In addition, EMC has ceased independent business operations. EMC's website now describes EMC as "a brand of JPMorgan Chase Bank, N.A.,"[322] and states that "JPMorgan Chase Bank, N.A. services loans under the EMC Mortgage name."[323] EMC no longer services mortgages, and no longer engages in any other business operations.

317. JPMC Bank has assumed the obligations necessary for the uninterrupted continuation of the operations performed by EMC prior to the Asset Transfer. Specifically,

---

[322] EMC Mortgage® A Brand of JPMorgan Chase Bank, N.A., https://www.emcmortgagecorp.com/ EMCMORTGAGE/ (last visited October 16, 2011).

[323] EMC Mortgage® A Brand of JPMorgan Chase Bank, N.A., About Us, https://www.emcmortgagecorp. com/EMCMORTGAGE/MainContent/about_us.jsp (last visited October 16, 2011).

JPMC Bank has assumed EMC's obligations to service mortgage loans under the contracts governing various securitization transactions, including the Transaction at issue in this litigation.

318.    JPMC Bank has retained EMC's management and personnel, as well as EMC's physical locations and, as noted, EMC's assets and general business operations.  After the Asset Transfer, EMC's former management and personnel continue to handle the transferred servicing operations from the same business locations.  EMC's former servicing operations located in Dallas, Texas – now belonging to JPMC Bank – are continuing to handle payment processing, borrower inquires, and related functions.[324]

## FIRST CAUSE OF ACTION

**(Against Defendants JP Morgan, as successor to EMC alter ego Bear Stearns, and EMC for Fraudulent Inducement)**

319.    Assured re-alleges and incorporates by reference paragraphs 1 through 318 of this Complaint.

320.    As set forth above, Defendants JP Morgan (formerly Bear, Stearns & Co.) and EMC made materially false public statements, and omitted material facts, with the intent to defraud the public and Assured.

321.    Defendants made materially false statements and omitted material facts with the intent to defraud Assured in pre-contractual communications between Assured and Defendants' officers.

322.    Defendants, knowingly and with the intent to defraud, delivered to Assured materially false and misleading documentation, including investor presentations, loan tapes, due

---

[324] EMC Mortgage® A Brand of JPMorgan Chase Bank, N.A., Contact Us, https://www.emcmortgage corp.com/EMCMORTGAGE/MainContent/contact_us.jsp (last visited October 16, 2011).

diligence results, and Offering Documents, and fraudulently induced ratings by the rating agencies.

323.   Assured reasonably relied on Defendants' statements and omissions when it entered into the I&I Agreement and issued its Policy.

324.   As a result of Defendants' statements and omissions, Assured insured securities backed by a pool of loans that had a risk profile far higher than Defendants led Assured to understand.

325.   As a result of Defendants' false and misleading statements and omissions, Assured has suffered, and will continue to suffer, damages in an amount to be determined at trial.

326.   Because Defendants committed these acts and omissions maliciously, wantonly, oppressively, and with knowledge that they would affect the general public – which they have – Assured is entitled to punitive damages.

## SECOND CAUSE OF ACTION

### (Against Defendants EMC and JP Morgan, as successor to EMC alter ego Bear Stearns, for Breaches of Representations and Warranties)

327.   Assured re-alleges and incorporates by reference paragraphs 1 through 326 of this Complaint.

328.   The I&I Agreement is a valid and binding agreement between Assured and EMC.

329.   Assured has performed all of its obligations under the I&I Agreement.

330.   EMC has materially breached its representations and warranties under Section 7 of the MLPA and Section 2.01 of the I&I Agreement.

331.   Assured has been damaged and will continue to be damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

**(Against Defendants EMC and JP Morgan, as successor to EMC alter ego Bear Stearns, for Breaches of the Repurchase Obligation)**

332.    Assured re-alleges and incorporates by reference paragraphs 1 through 331 of this Complaint.

333.    EMC has materially breached its obligations under Section 7 of the MLPA, Section 2.03 of the SSA, and Section 2.02 of the I&I Agreement by refusing to cure or repurchase the HELOCs that breached EMC's representations and warranties and with respect to which notice of breach has been provided by Assured to EMC.

334.    Assured has been damaged and will continue to be damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

**(Against Defendants EMC and JP Morgan, as successor to EMC alter ego Bear Stearns, for Material Breaches of the I&I Agreement)**

335.    Assured re-alleges and incorporates by reference paragraphs 1 through 334 of this Complaint.

336.    EMC induced Assured to enter into the I&I Agreement and to issue its Policy by making extensive representations and warranties concerning the HELOCs that EMC caused to be sold to the Trust and EMC's and GreenPoint's practices, by agreeing to broad remedies for breaches of those representations and warranties, and by procuring favorable shadow ratings and securities ratings from S&P and Moody's.

337.    EMC's representations and warranties and related remedial commitments were material to Assured's decision to insure the Insured Notes, and Assured was induced thereby to enter into the I&I Agreement and perform its obligations thereunder.

338.    EMC has materially breached the I&I Agreement, and the loan-by-loan cure-or-repurchase remedy not only is inadequate to address the magnitude and pervasiveness of the breaches identified, but is being frustrated by EMC's wholesale failure to comply with it.

339.    Assured has been damaged and will continue to be damaged in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION

**(Against Defendants EMC and JP Morgan, as successor
to EMC alter ego Bear Stearns, for Indemnification)**

340.    Assured re-alleges and incorporates by reference paragraphs 1 through 339 of this Complaint.

341.    Pursuant to Section 3.04(a) of the I&I Agreement, Assured is entitled to be indemnified by EMC, the Trust, and BSABS, jointly and severally, for all claims, losses, liabilities, demands, damages, costs, or expenses of any nature arising out of or relating to the breach by EMC of any of the representations or warranties contained in Section 2.01 of the I&I Agreement or arising out of or relating to the transactions contemplated by the Operative Documents by reason of, among other things, a breach by EMC, the Trust, or BSABS of any representation, warranty, or covenant contained in the Operative Documents or the occurrence, in respect of EMC, the Trust, or BSABS, under any of the Operative Documents of any "event of default."

342.    EMC has breached numerous representations, warranties, and covenants set forth in the Operative Documents and those breaches have caused Assured to pay claims and incur losses, costs, and expenses, and will continue to cause Assured to pay claims and incur losses, costs, and expenses in an amount to be determined at trial.

158

## SIXTH CAUSE OF ACTION

### (Against Defendants EMC and JP Morgan, as successor to EMC alter ego Bear Stearns, for Claim Payments, Costs, and Fees)

343.    Assured re-alleges and incorporates by reference paragraphs 1 through 342 of this Complaint.

344.    Section 3.03(c) of the I&I Agreement requires EMC "to pay to [Assured] any and all charges, fees, costs and expenses that [Assured] may reasonably pay or incur, including reasonable attorneys' and accountants' fees and expenses, in connection with . . . the enforcement, defense or preservation of any rights in respect of any of the Operative Documents, including . . . participating in any litigation . . . relating to any of the Operative Documents . . . ."

345.    Section 3.03(b) of the I&I Agreement provides that EMC "agrees to pay [Assured], and [Assured] shall be entitled to reimbursement from [EMC] and shall have full recourse against [EMC] for, (i) any payment made under the Policy arising as a result of [EMC's] failure to . . . deposit an amount in respect of any defective Mortgage Loan as required pursuant to Section [7] of the Mortgage Loan Purchase Agreement . . . ."

346.    In addition, Sections 3.03(b) and (d) of the I&I Agreement require EMC to pay Assured interest on any and all amounts recovered as reimbursement under either Sections 3.03(b) and 3.03(c) of the I&I Agreement.

347.    Assured has incurred numerous expenses, including attorneys' fees and consultant and expert fees, in order to enforce, defend, and preserve its rights under the Operative Documents.  Assured also has made payments under the Policy as a result of EMC's failure to deposit amounts into the Trust in respect of defective loans securitized in the Transaction.

348.    EMC is liable for all such expenses, fees, costs, and payments and interest thereon.

## SEVENTH CAUSE OF ACTION

### (Against Defendant JP Morgan for Tortious Interference
### with Contractual Relationship)

349.     Assured re-alleges and incorporates by reference paragraphs 1 through 348 of this

Complaint.

350.     Under Section 7 of the MLPA and Section 2.03 of the SSA, as applicable, EMC is

required to cure, repurchase, or provide substitutes for loans that breached EMC's

representations and warranties.  Assured is an express third-party beneficiary of both the MLPA

and the SSA.

351.     Bear, Stearns & Co. at all relevant times had notice and knowledge of this

contractual relationship between Assured and EMC and of EMC's contractual obligations to

Assured.  After EMC and Bear, Stearns & Co. were acquired by JPMorgan Chase & Co., JP

Morgan also had notice and knowledge of such contractual obligations.

352.     As a direct and proximate result of JP Morgan's tortious interference, which is

continuing, EMC breached such contractual obligations, and is continuing to do so.

353.     JP Morgan's tortious interference was, and is, improper and without justification

or privilege.  JP Morgan's interference was not intended to, and did not, further the economic

interest of EMC; and, as a mere affiliate of EMC, JP Morgan did not have its own economic

interest in EMC that would be protected by EMC's breach of its contractual obligations to

Assured.  Moreover, JP Morgan's interference was not intended to protect any purported

economic interest it had in EMC; rather, it did so in order to assist its parent corporation, JP

Morgan Chase, in effectuating a massive accounting fraud based on an unjustified and material

understatement of reserves on its financial statements relating to the liability inherited from EMC

for repurchase obligations associated with defective loans.

354.    Moreover, JP Morgan effectuated its interference with EMC's contractual obligations to Assured by fraudulently and deceptively representing to Assured that the rejections of Assured's repurchase demands were based on the reasons set forth in the written responses to those demands.

355.    JP Morgan engaged in these actions through improper, fraudulent, and deceptive means and with the conscious, willful, wrongful, tortious, illegal, and wanton intent to manipulate JPMorgan Chase & Co.'s required accounting disclosures and injure Assured in its trade or business.

356.    As a direct and proximate result of the conduct described herein, Assured has been damaged, and continues to be damaged, in its trade or business.  Assured has suffered, and will continue to suffer, monetary loss that it would not have suffered but for JP Morgan's tortious conduct, and is threatened with continuous and irreparable damage and/or loss.

## EIGHTH CAUSE OF ACTION

### (Against Defendant EMC for Breach of Contract – the Asset Transfer)

357.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 356 of this Complaint.

358.    EMC has consolidated with, merged into, or transferred all or substantially all of its assets to JPMC Bank without Assured's express written consent, in violation of the I&I Agreement.

359.    As a result of EMC's breaches, Assured has been and will continue to be damaged in an amount to be determined at trial.

## NINTH CAUSE OF ACTION

### (Against Defendant JPMC Bank for Successor Liability)

360.  Plaintiff re-alleges and incorporates by reference paragraphs 1 through 359 of this Complaint.

361.  JPMC Bank is liable for any and all damages, reimbursement, and indemnification amounts resulting from the wrongful actions of EMC, as alleged herein, because both contractually under the Transaction Documents and as a matter of law JPMC Bank is the successor to EMC as a result of EMC's Asset Transfer to JPMC Bank on or about April 1, 2011, wherein JPMC Bank acquired all or substantially all of EMC's assets.

362.  JPMC Bank is a person that has succeeded to the business of EMC. As a result, JPMC Bank is the successor to EMC under the MLPA governing the Transaction and automatically became a party to the MLPA in accordance with their terms. In addition, because JPMC Bank is a person that succeeded to the business of EMC, JPMC Bank is the successor to EMC and the I&I Agreement governing the Transaction is binding on JPMC Bank.

363.  Additionally, JPMC Bank is the successor to all of the obligations and liabilities of EMC by operation of law as a consequence of the *de facto* merger of JPMC Bank and EMC resulting from the Asset Transfer.

364.  After the Asset Transfer, there remains continuity of ownership of EMC and JPMC Bank. Both before and after the Asset Transfer, EMC and JPMC Bank were ultimately owned and controlled by the same parent holding company, JPMorgan Chase & Co.

365.  EMC has ceased its ordinary business operations. After the Asset Transfer, JPMC Bank services loans under the EMC Mortgage Name.

366.  JPMC Bank has assumed the liabilities necessary for the uninterrupted continuation of the operations performed by EMC prior to the Asset Transfer. Specifically,

162

JPMC Bank has assumed EMC's obligations to service mortgage loans under the contracts governing various RMBS deals.

367.    JPMC Bank has retained EMC's management and personnel, as well as EMC's physical locations, assets, and general business operations.  After the Asset Transfer JPMC Bank has continued the servicing operations once belonging to EMC using EMC's employees, management, and facilities.

## PRAYER FOR RELIEF

**WHEREFORE**, Assured respectfully prays for the following relief:

- For an award of all legal and/or equitable damages and punitive damages to be proven at trial against Defendants for their fraudulent inducement of Assured's participation in the Transaction and issuance of the Policy;

- For an award of compensatory, consequential, and/or equitable damages, including all of Assured's claim payments made and to be made in the future, and any other present and future damages to be proven at trial, against Defendants for their pervasive and material breaches of representations and warranties and related contractual remedial obligations, constituting a material breach of the I&I Agreement and other Operative Documents, and frustration of the parties' bargain;

- For an order compelling Defendants to comply with the obligations under MLPA § 7 and SSA § 2.03 to cure or repurchase the HELOCs that breach the contractual representations and warranties;

- For an order of indemnification of Assured against Defendants for the claim payments and other losses and expenses that Assured has paid or will pay in the future that were caused by Defendants' breaches of their representations, warranties, or covenants; their negligence, misfeasance, or malfeasance; and untrue statements and material omissions in the Offering Documents, pursuant to I&I Agreement § 3.04(a);

- For an order awarding to Assured reimbursement of the claim payments and other amounts, including interest, that Assured has paid or will pay in the future under the Policy that arise from Defendants' breaches of representation, warranties, or covenants under the Operative Documents and from Defendants' negligence, willful misconduct, bad faith, or reckless disregard in the performance of their duties and obligations under the Operative Documents, and of Assured's attorneys' fees and other costs and expenses, including interest, paid and incurred in enforcing, defending, and preserving its rights and enforcing Defendants' obligations under the Operative Documents, pursuant to I&I Agreement §§ 3.03(b), (c), and (d);

- For an order of prejudgment interest; and

- For an order awarding Assured such other and further relief as the Court deems just and proper.

164

Dated:      New York, New York
            November 18, 2011

                    Patterson Belknap Webb & Tyler LLP

                    _____

                    Erik Haas
                    Robert W. Lehrburger
                    Benjamin S. Litman
                    Muhammad U. Faridi
                    1133 Avenue of the Americas
                    New York, NY  10036-6710
                    Telephone:  (212) 336-2000
                    Fax:  (212) 336-2222
                    ehaas@pbwt.com
                    rwlehrburger@pbwt.com
                    blitman@pbwt.com
                    mfaridi@pbwt.com

                    *Attorneys for Plaintiff Assured Guaranty Corp.*